1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF TEXAS

3                       DALLAS DIVISION

4
   UNITED STATES OF AMERICA,      )        3:14-CR-340-K
5               Government,        )
                                   )
6                                  )
   VS.                            )        DALLAS, TEXAS
7                                  )
                                   )
8  TREVEON DOMINIQUE ANDERSON      )
   and JIMMY HATCHETT,            )
9               Defendants.        )        October 22, 2018

10

11            TRANSCRIPT OF JURY TRIAL VOLUME 1

12          BEFORE THE HONORABLE ED KINKEADE

13            UNITED STATES DISTRICT JUDGE

14

15  A P P E A R A N C E S:

16

17  FOR THE GOVERNMENT:        MR. JOHN J. DE LA GARZA
                               UNITED STATES DEPARTMENT OF JUSTICE
18                             NORTHERN DISTRICT OF TEXAS
                               U.S. Courthouse, Third Floor
19                             1100 Commerce Street
                               Dallas, Texas  75242
20                             john.delagarza@usdoj.gov
                               (214) 659-8682
21
                               MR. WALT M. JUNKER
22                             UNITED STATES DEPARTMENT OF JUSTICE
                               NORTHERN DISTRICT OF TEXAS
23                             U.S. Courthouse, Third Floor
                               1100 Commerce Street
24                             Dallas, Texas  75242
                               walt.junker@usdoj.gov
25                             (214) 659-8630

```
 1   FOR THE DEFENDANT,           MR. E.X. MARTIN
     TREVEON DOMINIQUE ANDERSON:  Law Offices of E.X. Martin
 2                                8828 Greenville Avenue
                                  Dallas, Texas  75243
 3                                exmartin@airmail.net
                                  (214) 343-7400
 4

 5                                MS. CAROLYN A. HILL
                                  Attorney at Law
 6                                4144 N. Central Expressway
                                  Suite 1200
 7                                Dallas, Texas  74204
                                  carolynhillatty@gmail
 8                                (214) 418-3867

 9
     FOR THE DEFENDANT,           MR. NATHAN ROGERS
10   JIMMY HATCHETT:              Burleson Pate & Gibson
                                  Founders Square
11                                900 Jackson Street
                                  Suite 330
12                                Dallas, Texas  75202
                                  nrogers@bp-g.com
13                                (214) 871-4900

14
                                  MR. PAUL TALIAFERRO LUND
15                                Burleson Pate & Gibson
                                  Founders Square
16                                900 Jackson Street
                                  Suite 330
17                                Dallas, Texas  75202
                                  plund@bp-g.com
18                                (214) 871-4900

19
     COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
20                                United States Court Reporter
                                  1100 Commerce St., Rm. 1625
21                                Dallas, Texas  75242
                                  (214) 753-2170
22

23

24        Proceedings reported by mechanical stenography and

25   transcript produced by computer.
```

```
 1                    JURY TRIAL VOLUME 1 - OCTOBER 22, 2018
 2                         P R O C E E D I N G S
 3             THE COURT:  Okay.  Are we ready to bring them in?
 4             MR. JUNKER:  Judge, I think that we've reached
 5   agreements on preadmission of certain exhibits.  Do you want to
 6   do that right quick?
 7             THE COURT:  Tell me about that.
 8             MR. JUNKER:  Yes.  So, Judge, we have both exhibits
 9   and we also have business records affidavits that we're asking
10   only be admitted as court exhibits.  And if the Court please, I
11   will go through just the exhibits first and then do a second
12   list of just the business records affidavits.
13             THE COURT:  I can barely hear you.  Come to this
14   microphone.
15             MR. JUNKER:  My apologies.
16             THE COURT:  No, it's not you.  It's not you.
17             MR. JUNKER:  So we have two types of exhibits.  One
18   would be for trial for use with the jury, and the other list
19   would be business records affidavits that we would ask to be
20   admitted just merely as court exhibits not to go to the jury.
21             And if the Court please, I would prefer to read
22   through just the exhibit list and then go back and read you the
23   numbers for the business records affidavits.
24             THE COURT:  You bet.
25             MR. JUNKER:  All right.  So for admission for all
```

1    purposes would be Exhibits 1 -- do you want the description or

2    just the numbers?

3              THE COURT:  Just the numbers.

4              MR. JUNKER:  Okay.  1, 2, 7, 8, 11, 20, 21, 23, 25,

5    27, 29, 31, 33, 41, 45, 47, 48, and 49.

6              And for business records affidavits, Your Honor --

7              THE COURT:  Go ahead.

8              MR. JUNKER:  Business records affidavits, Your Honor,

9    would be Exhibits 12, 22, 24, 26, 28, 30, 32, 42, and 50.

10             THE COURT:  All right.  Mr. Martin, on behalf of your

11   client, is that your agreement, too?  The first set were for

12   all purposes.  The second set, just admitted in front of me

13   since they're exhibits just for -- oh, they were for documents

14   and it's just to get those documents in.

15             MR. MARTIN:  We have spent a lot of time on it.  And,

16   yes, I agree with it.

17             THE COURT:  Okay.

18             MR. MARTIN:  We all worked on that.

19             MR. ROGERS:  Yes, Your Honor.

20             THE COURT:  Okay.  All right.  And so both sides

21   agree with that.

22                  (Government's Exhibit Nos. 1, 2, 7, 8, 11, 20, 21,

23                  23, 25, 27, 29, 31, 33, 41, 45, 47, 48, and 49

24                  received)

25                  (Government's Exhibit Nos. 12, 22, 24, 26, 28, 30,

```
 1                     32, 42, and 50 received for record purposes only)
 2              THE COURT:  Okay.  All right.  I'm ready to give them
 3    the oath and the instructions, so here we go.
 4              MR. JUNKER:  Your Honor, one other matter.
 5              THE COURT:  Wait.
 6              MR. JUNKER:  Sorry.  It's also my understanding that
 7    there's an agreement between the parties that the Government
 8    need not display every single page of the telephone records,
 9    that all parties stipulate if the jury really wants to see
10    those back in the jury room that they could.
11              THE COURT:  Is that right?
12              MR. MARTIN:  Yes, Your Honor.
13              MR. LUND:  That's fine, Your Honor, provided that if
14    we want to show them some pages we can do so.
15              THE COURT:  Oh, obviously you can.  Yes, of course.
16              MR. LUND:  Thank you, Judge.
17              THE COURT:  Anything else?
18              MR. ROGERS:  Briefly, Your Honor, just a housekeeping
19    matter.  I don't know if the Court has a preference, because
20    there are two co-defendants, if you want us to go in a certain
21    order --
22              THE COURT:  I don't care.
23              MR. ROGERS:  -- opening and closing.
24              THE COURT:  It's whatever y'all want to do.
25              MR. ROGERS:  Yes, Your Honor.  Thank you.
```

```
 1              THE COURT:  Y'all just work it out among yourselves.
 2              Okay.  All right.  I just want it to be the same over
 3    and over.
 4              (Pause)
 5              SECURITY OFFICER:  All rise for the jury.
 6              (Jury in)
 7              THE COURT:  Y'all remain standing for just a second
 8    and take your final oath as oath as jurors.
 9              Here we go.  Raise your right hand.
10              THE COURTROOM DEPUTY COURT:  Do you and each of you
11    solemnly swear that in the case before the Court you will true
12    verdict render according to the law that should be given to you
13    and as charged by the Court and the evidence submitted to you
14    under the rules of the Court, so help you God?
15              (Jury affirm)
16              THE COURT:  Y'all be seated.  Thank you very much.
17              All right.  Ladies and gentlemen, you've now been
18    sworn as the jury in this case, and I want to take a few
19    minutes to tell you something about your duties as jurors and
20    give you some instructions.
21              First of all, I keep the courtroom really cold, so
22    dress warmly.  I don't think you'll need a toboggan, but you're
23    welcome to wear a jacket.  It makes people be really alert when
24    we keep it pretty chilly.
25              At the end of the trial I will give you more detailed
```

1    instructions.  You must follow my instructions in doing your

2    job as jurors.

3              The criminal case has been brought by the United

4    States Government against Treveon Dominique Anderson and Jimmy

5    Hatchett.

6              At times, as I told you earlier, I may refer to the

7    Government as the prosecution and Mr. Anderson and Mr. Hatchett

8    as the Defendants.

9              The Defendants have been charged by the Government

10   with criminal violations of federal law.  Both Mr. Anderson and

11   Mr. Hatchett have been charged with:

12             Conspiracy to interfere with commerce by robbery;

13             2.  Interference with commerce by robbery in a

14   separate charge.

15             3.  Using, carrying, and brandishing a firearm in

16   relation to a crime of violence; and

17             4.  Two counts of kidnapping.

18             The indictment is simply the description of the

19   charges made by the Government against the Defendants.  It is

20   not evidence that the Defendants committed a crime.  Both the

21   Defendants have pleaded not guilty to the charges, and a

22   defendant is presumed innocent and may not be found guilty by

23   you unless all 12 of you unanimously find the Government has

24   proved the Defendants' guilt beyond a reasonable doubt.

25             Mr. Anderson and Mr. Hatchett are being tried

1   together, but you will have to give separate consideration to

2   the case.  Just a second.  Sorry.

3           (Pause)

4           THE COURT:  You will have to give separate

5   consideration of the case again each Defendant because they are

6   each entitled to your separate consideration.  Do not think of

7   them as a group.

8           Your first step in the trial will be the opening

9   statements.  The Government in its opening statement will tell

10  you about the evidence which it intends to put before you so

11  you'll have an idea of what this case is going to be.

12          The opening statement is not evidence.  Its purpose

13  is only to help you understand what the evidence will be and

14  what the Government will try to prove.

15          After the Government's opening statement, the

16  Defendants' attorneys may or may not make opening statements.

17  At this point in the trial, no evidence will have been offered

18  by either side.

19          Next, the Government will offer evidence that it

20  claims will support the charges against the Defendants.  The

21  Government's evidence may consist of the testimony of witnesses

22  as well as documents and exhibits.  Some of you have probably

23  heard the term "circumstantial evidence" and "direct evidence."

24  Do not be concerned with these terms.

25          You are to consider all the evidence given in this

 1  trial.

 2          After the Government's evidence, the defense lawyers

 3  may make opening statements if they've not already done so and

 4  present evidence on the Defendants' behalf, but they're not

 5  required to do so.

 6          I remind you that the Defendants are presumed

 7  innocent and the Government must prove the guilt of each

 8  Defendant beyond a reasonable doubt and each element involving

 9  each charge.  The Defendants do not have to prove their

10  innocence.  If the Defendants decide to present evidence, the

11  Government may then introduce rebuttal evidence -- may or may

12  not.

13          After you've heard all the evidence on both sides,

14  the Government and the Defendants will each be given time for

15  their final arguments.

16          I told you that the opening statements are not

17  evidence, and that's also true of the closing arguments.  They

18  are not evidence either, but you should pay close attention to

19  them.

20          The final part of the trial occurs when I instruct

21  you about the rules of law which you are to use in reaching

22  your verdict.

23          After hearing my instructions, you will leave the

24  courtroom together to make your decision.  Your deliberations

25  will be secret.  You will never have to explain your verdict to

1     anyone.

2          Now that I've described the trial itself, let me

3     explain the jobs that you and I are to perform during the

4     trial.

5          I will decide which rules of law apply to the case in

6     response to questions or objections raised by the attorneys as

7     we go along and also in the final instructions given to you

8     after the evidence and arguments are completed.

9          You must follow the law as I explain it to you

10    whether you agree with it or not.

11         You and you alone are the judges of the facts;

12    therefore, you should give careful attention to the testimony

13    and exhibits because based upon this evidence you will decide

14    whether the Government has proved beyond a reasonable doubt

15    that the Defendants committed the crimes with which they have

16    been charged in the indictment.

17         You must base your decision regarding each

18    Defendant's guilt only on the evidence in the case and my

19    instructions about the law.

20         You will have the exhibits with you when you

21    deliberate.  Now, what's helped in this case, both sides have

22    agreed to the admission of a certain number of exhibits.  And

23    unless otherwise, you may assume that we've already addressed

24    that and that I've admitted those evidence as they bring them

25    in front of you.  If for any reason there's additional exhibits

1    that are not agreed upon, you will see us go through that.  One

2    side will offer, and the other side may object, and I will rule

3    at that time.  But most -- most of the exhibits have been

4    agreed upon in this case.

5          The evidence from which you will find the facts will

6    consist of the testimony of witnesses, documents, and other

7    items received into the record as exhibits and any facts that

8    the lawyers agree to -- or what we call stipulations are

9    made -- and they stipulate to or that the Court may instruct

10   you to find.

11         The Court -- when I refer to the Court, that's me.

12         Certain things are not evidence and must not be

13   considered by you, and I will list them for you now.

14   Statements, arguments, and questions by lawyers are not

15   evidence.  Objections to questions are not evidence.

16         Lawyers have an obligation to their clients to make

17   objections when they believe evidence being offered is improper

18   under the rules of evidence.  You should not be influenced by

19   the objection or by the Court's ruling on it.

20         If the objection is sustained, ignore the question.

21   If it's overruled, treat the answer like any other.  If you're

22   instructed that some item of evidence is received for a limited

23   purpose only, you must follow that instruction.

24         3.  Testimony that the Court has excluded or told you

25   to disregard is not evidence and must not be considered.

1    Anything you may have heard -- may have seen, heard, or read

2    outside the courtroom is not evidence and must be disregarded.

3    You are to decide the case solely on the evidence presented

4    here in the courtroom.

5            It will be up to you to decide which witnesses to

6    believe, which witnesses not to believe, and how much of any

7    witness's testimony to accept or reject.  I will give you some

8    guidelines for determining the credibility of the witnesses at

9    the end of the case.

10           If you would like to take notes during the trial, you

11   may do so.  On the other hand, you're not required to take

12   notes if you prefer not to do so.  Each of you should make your

13   own decision about this.

14           If you do decide to take notes, be careful not to get

15   so involved in the note taking that you become distracted from

16   the ongoing proceedings.

17           Your notes should be used only as memory aids.  You

18   should not give your notes precedence over your independent

19   recollection of the evidence.  If you do not take notes, you

20   should rely upon your own independent recollection of the

21   proceedings, and you should not be unduly influenced by the

22   notes of other jurors.

23           Notes are not entitled to any greater weight than the

24   memory or impression of each juror as to what the testimony may

25   have been.  whether you take notes or not, each of you must

1    form and express your own opinion as to the facts of the case.

2                You will note that we do have an official court

3    reporter making a record of the trial; however, we will not

4    have typewritten transcripts of this record available for use

5    in reaching a decision in this case.

6                Both Defendants are charged with the following:

7                Conspiracy to interfere with commerce by robbery,

8    Count One;

9                Count Two.  Interference with commerce by robbery;

10               Count Three.  Using, carrying, and brandishing a

11   firearm during and in relation to a crime of violence; and

12               Counts Four and Five.  Kidnapping.

13               I will give you detailed instructions on the law at

14   the end of the case, and those instructions will control your

15   deliberation and decision.

16               During the course of the trial, do not talk to any

17   witness, with the parties, or with any of the lawyers in the

18   case.  Please do not talk with them about any subject at all.

19               You may be unaware of the identity of everyone

20   connected with the case; therefore, in order to avoid even the

21   appearance of impropriety, do not engage in any conversation

22   with anyone in or about the courtroom or courthouse.  It is

23   best that you remain in the jury room during breaks in the

24   trial and do not linger in the halls.

25               In addition, during the course of the trial, do not

1   talk about the trial with anyone else, not your family, not

2   your friends, not the people at your work.

3            Do not discuss this case among yourselves until I

4   have instructed you on the law and you have gone to the jury

5   room to make your decision at the end of the trial.  Otherwise,

6   without realizing it, you may start forming opinions before the

7   trial is over.

8            It is important that you wait until all the evidence

9   is received and you've heard my instructions on the rules of

10  law before you deliberate among yourselves.

11           Let me add that during the course of the trial you

12  will receive all the evidence you properly may consider to

13  decide the case.  Because of this, do not attempt to gather any

14  information on your own which you think might be helpful.  Do

15  not engage in any outside reading on this case.  Do not attempt

16  to visit any places mentioned in the case, and do not in any

17  other way try to learn about the case outside the courtroom.

18           Now that the trial has begun, you as jurors must

19  decide this case based solely on the evidence presented here

20  within the four walls of this courtroom.

21           This means that during the trial you must not conduct

22  any independent research about this case or the individuals

23  involved in the case.  You must not read about it in the

24  newspapers or watch or listen to television or radio reports of

25  what's happening here.  You should not consult dictionaries or

 1  reference materials, search the Internet, websites, blogs, or
 2  use any other electronic tools to obtain information about this
 3  case or to help you decide the case.
 4        Please do not try to find out information from any
 5  source outside the confines of this courtroom.
 6        I hope that for all of you this case is interesting
 7  and noteworthy, but, again, you may not discuss this case with
 8  anyone, even your fellow jurors, until you retire to
 9  deliberate.
10        Although you may begin discussing the case with your
11  fellow jurors after you retire to deliberate, you still may not
12  discuss the case with anyone else until you have returned a
13  verdict and the case is at an end.
14        I know that probably all of you use cell phones, the
15  Internet, and other tools of technology.  You also must not
16  talk to anyone about this case or use these tools to
17  communicate electronically with anyone about the case.  This
18  includes your family and friends.
19        You may not communicate with anyone about the case
20  through any means, including your cell phone, email,
21  BlackBerry, iPhone, text messaging, on Snapchat, Twitter,
22  through any blog or website, including Facebook, Google, Google
23  Plus, MySpace, LinkedIn, or YouTube, or any other -- other
24  sites at all.  You may not use any similar technology of social
25  media even if I have not specifically mentioned it here.

1          I expect you will inform me as soon as you become

2     aware of another juror's violation of these instructions.

3          A juror who violates these instructions jeopardizes

4     the fairness of these proceedings and a mistrial could result,

5     which would require the entire trial process to have to start

6     over.

7          At times during the trial a lawyer may make an

8     objection to a question by the other side or to an answer by a

9     witness.  This simply means that the person objecting is

10    requesting -- that would be a lawyer -- that I make a decision

11    on a particular rule of law.  Do not draw any conclusion from

12    those objections or from my rulings on those objections.  These

13    relate only to the legal questions that I must determine and

14    should not influence your thinking.

15         If I sustain an objection to a question, the witness

16    may not answer it.  Do not attempt to guess what answer might

17    have been given had I allowed the question to be answered.

18         Similarly, if I tell you not to consider a particular

19    statement, you should put that statement out of your mind, and

20    you may not refer to that statement in your later

21    deliberations.

22         If an objection is overruled, treat the answer like

23    any other.

24         During the course of the trial, I may ask a question

25    of a witness.  If I do, that does not indicate I have an

1   opinion about the case, about the facts in the case.  Nothing I

2   say or do should lead you to believe that I have any opinion

3   about the facts nor be taken as indicating what your verdict

4   should be.

5          During the trial I may have to interrupt the

6   proceedings to confer with the lawyers about the rules of law

7   which should apply here, and sometimes we talk here at the

8   bench, and some of these conferences may take some time, so as

9   a convenience to you I will excuse you from the courtroom.

10          I will try to avoid those interruptions as much as

11   possible and try to keep them short, but please be patient even

12   if the trial seems to be moving slowly.  Conferences outside

13   your presence are sometimes unavoidable.

14          Finally, there are three basic rules about a criminal

15   case which you -- each of you should keep in mind.

16          First, the Defendants are presumed innocent until

17   proven guilty.

18          The fifth superseding indictment against the

19   Defendants brought by the Government is only an accusation,

20   nothing more.  It is not proof of guilt or anything else.  The

21   Defendants, therefore, start out with a clean slate.

22          Second, the burden of proof is on the Government

23   until the very end of the case.  The Defendants have no burden

24   to prove their innocence or to present any evidence or to

25   testify.  Since the Defendants have the right to remain silent,

```
 1    the law prohibits you in arriving at your verdict from
 2    considering that the Defendants may not have testified.
 3              Third, the Government must prove the Defendant's
 4    guilt beyond a reasonable doubt.  I will give you further
 5    instructions on this point -- on this point later, but bear in
 6    mind that in this respect a criminal case is different from a
 7    civil case.
 8              Thank you for your attention, and now I need to get
 9    the pleas of each of the Defendants in each of the counts.
10              Mr. -- who's going to start?  Mr. Martin?
11              MR. MARTIN:  Yes, Your Honor.
12              THE COURT:  Are you?  Okay.
13              MR. MARTIN:  For Mr. Anderson, not guilty, Your
14    Honor.
15              THE COURT:  On each -- everything?
16              MR. MARTIN:  Everything.
17              THE COURT:  Each one?
18              MR. MARTIN:  Yes, sir.
19              THE COURT:  All right.
20              MR. ROGERS:  Your Honor, Mr. Hatchett pleads not
21    guilty on all counts.
22              THE COURT:  All right.  Thank you.
23              All right.  So I think we're ready for opening
24    statements.
25              Are you ready, Mr. de la Garza?
```

 1              MR. DE LA GARZA:  Yes, Your Honor.

 2              Do we need to read the indictment to the jury?

 3              THE COURT:  You can.

 4              Do y'all want the indictments read, or do you waive

 5    that?  Or tell me.  Do you think it needs to be read?

 6              MR. MARTIN:  I'd waive it for Anderson.

 7              MR. ROGERS:  Waive it as well, Your Honor.

 8              THE COURT:  All right.

 9              MR. DE LA GARZA:  Thank you, Your Honor.

10              Do you mind if I take my water with me, Your Honor?

11              THE COURT:  I don't mind unless it's ten gallons

12    worth or something.

13              MR. DE LA GARZA:  It's close.

14              (Pause)

15              MR. DE LA GARZA:  May I proceed, Your Honor?

16              THE COURT:  Yes, sir.

17                        OPENING STATEMENT

18    BY MR. DE LA GARZA:

19              Around 3:00 in the morning on November 17th of 2013,

20    more than a dozen men are driving north on I-45 from Houston to

21    the Dallas area.  They aren't registered for a business

22    convention.  They aren't coming for a high school reunion.

23    They aren't coming to go to a Cowboy's game.  They're bearing

24    down on Dallas to rob a jewelry store in Irving, Texas, using

25    cell phones, stolen vehicles, and guns.

1       The evidence during this trial will show that the
2   robbery they committed was not spontaneous or a spur of the
3   moment event.  It was planned.  It was prepared for.  It was
4   plotted.

5       The jewelry store in Irving, Texas, had been targeted
6   and researched.  Recruiting had been done for this robbery.
7   The men in the crew had met in Houston at a place they called
8   the Gambling Shack to discuss the details, who would go inside,
9   who would stay outside to watch for police, would guns be used,
10  how many.  Dark clothing and gloves would have to be brought
11  and worn, and faces would have to be covered.

12      Some of the men who were plotting this robbery had
13  known each other for years.  Some had grown up with each other
14  in the same neighborhoods.  Some knew each other's families
15  very well.  Ranging in age from their early 20s to mid-50s, the
16  men eventually put their scheme into motion.

17      They gathered together early, early on a Sunday
18  morning in Houston, divided up among three cars, and started
19  making their way up to Dallas, up Interstate 45.

20      On the drive up, some of the men used their cell
21  phones to communicate with each other and to just pass the
22  time.  That will be important in this case.

23      The evidence will show the robbery crew arrived in
24  Dallas before sunrise, making its way to Interstate 35 from
25  I-45.

1          The group stopped at a restaurant to eat some

2     breakfast.  Some of them went to buy hammers to smash the

3     jewelry store's glass cases.  Some went to buy bags to hold the

4     loot that they would haul out of the jewelry store.

5          A Ford cargo van was stolen to be used in the

6     robbery.  A Dodge minivan was also stolen for the group to

7     switch out to from the Ford.

8          One of the crew was then posted with that van in a

9     Walmart parking lot about a mile from the jewelry store.

10    Another was posted in a parking garage at a hotel further from

11    the store to be a second switch-out driver after the inside men

12    ditched the Dodge minivan.

13         The rest of the crew then drove on to the jewelry

14    store in the Valley Ranch neighborhood of Irving.  All this

15    time the men had continued to use their cell phones.  Again,

16    this will be important.

17         Once at the jewelry store, four of the men, mostly

18    the older men, took up lookout positions in vehicles parked

19    close to the store, one pair near a restaurant and the other

20    pair across the street in an apartment complex.  The inside

21    men, mostly the younger men, and one older man, moved close to

22    the store in the Ford van and waited.

23         They watched the store, saw customers come and go,

24    and talked with the lookouts over their cell phones.

25         It was broad daylight, 11:30 a.m. on a Sunday in

 1   Irving, Texas.

 2            You will actually see this crime as it was committed

 3   that day.  The store's security system, Tilak Jeweler's

 4   security system, filmed it from start to finish.

 5            You will see the Ford van back up to the store.  You

 6   will see seven men dressed in black, faces covered, and hands

 7   in gloves pile out of the van.

 8            You will see them storm into the store, smashing one

 9   of the doors to get in.  Some of them have hammers in their

10   hand, and three of them have pistols.

11            One of the gunmen draws down on Ajay Soni, one of the

12   owners of the jewelry store.  Another one draws down on Vinnie

13   Patel.

14            That gunman forces -- the first gunman forces the two

15   men down on the ground and binds their hands with plastic zip

16   ties, the pistol inches from them as he does this.

17            To make the robbery even more personal, that first

18   gunman steals Mr. Patel's watch off his wrist, again while the

19   pistol's muzzle is inches from his back.  The evidence will

20   show that gunman was Treveon Anderson.

21            Another one of the gunmen, the last into the store,

22   draws down on Mr. Soni and Mr. Patel as they are being bound by

23   Mr. Anderson.  He then starts ripping jewelry from one of the

24   smashed display cases.  The evidence will show that gunman was

25   Jimmy Hatchett.

1          You will see the other five men rampage through the
2    store, smashing cases, looting jewelry, and dumping them into
3    their bags.  Incredibly, one of them uses the pistol he carries
4    like a hammer to shatter the glass cases.
5          The seven men were in the store for less than two
6    minutes.  In that short amount of time, they stole over
7    $500,000.00 in 22-carat gold jewelry from Mr. Soni, Mr. Patel,
8    and the employees, about seven of them, gathered that day at
9    the jewelry store.
10          Accompanied by the lookouts, the inside men then fled
11   from the store, making their way to the stolen minivan.
12          As they planned, they switched from the Ford van to
13   the Dodge minivan, drove to the second switch-out location,
14   abandoned the Dodge, and took off in one of the vehicles driven
15   up from Houston.
16          They were soon back on their way south.
17          To further distance themselves from the crime they
18   had committed, they stopped along I-35 to meet a woman who had
19   specifically been called and had driven up from Houston to
20   transfer the jewelry to her car.  They didn't want to carry it
21   back with them.
22          The group then gathered and made its way south.
23          Once in Houston, they stopped at a strip club called
24   the Ice Cream Castle, stripped the jewelry of all the tags, and
25   piled it into empty bags -- in bags to be sold to fences.  The

1    older men then took the -- took the jewelry and sold it for

2    cash.

3            Is this the end of the story?  No.  It will continue

4    in the courtroom today in front of you.  You will hear

5    testimony and evidence that proves Mr. Anderson and

6    Mr. Hatchett, along with the other men, plotted and then

7    committed this robbery.

8            You'll hear from Mr. Soni, the owner of Tilak

9    Jewelers, a long-standing local business that sells gold

10   jewelry acquired from around the world.  He will tell you what

11   he thought was just going to be another average day, a Sunday

12   in November, turned into a horrific event that he still

13   remembers today.

14           He will describe the violence and the fear that

15   Mr. Anderson and Mr. Hatchett brought to his business,

16   including the half million dollars of jewelry taken and the

17   thousands of dollars of damage done to the store during that

18   crime.

19           You will hear about the investigation done by the

20   Irving Police Department and the Federal Bureau of

21   Investigation.

22           You will see the zip ties used to kidnap and restrain

23   Mr. Soni and Mr. Patel, as well as pictures of the stolen vans

24   used in the robbery.

25           You will hear about blood that was found in the

 1   broken glass display cases, blood from the men who robbed the
 2   place.
 3           And the FBI's investigative work will further be laid
 4   out for you during the trial.
 5           Most importantly, you will hear from men who
 6   committed the robbery with Mr. Anderson and Mr. Hatchett.
 7   Obviously, these men, you will discover, aren't choirboys.
 8   They are violent thieves.  But these are the men that threw
 9   in -- or Mr. Hatchett and Mr. Anderson threw in with.  These
10   are the men that traveled with them that four hours from
11   Houston and Dallas, the couple of hours in Dallas, and all the
12   way back.  These are the men that grouped together that was
13   this band of robbers.  You will hear from some of them.
14           They will tell you that Mr. Anderson and Mr. Hatchett
15   joined the scheme in Houston and helped carry it out in Irving.
16   They will be able to identify themselves as well as point out
17   Mr. Anderson and Mr. Hatchett on that video.
18           The words of these men will be supported by cell
19   phone records.  Remember I told you how important it was the
20   fact that these men had used their phones all the way up from
21   Houston to Dallas and all the way back to Houston?
22           Mr. Anderson's records, cell phone records, from
23   November 17th of 2013 will show his phone traveling up I-45
24   from Houston to the Dallas area early that morning.  They will
25   then later in the day show that phone traveling back from the

1    Dallas area to Houston.

2           And his cell phone records will also -- and other

3    cell phone records of the other men involved in the robbery

4    will also show that his phone was not alone.  His phone was

5    accompanied by their phones.  Their phones traveled up and came

6    back just like his phone did.

7           Records will show also that his phone called and was

8    called by the men who committed the robbery.

9           The Government will also present Mr. Hatchett's cell

10   phone records.  While the FBI was not able to obtain the cell

11   phone information needed to locate Mr. Hatchett's cell phone

12   that day, the records will demonstrate that his phone, like

13   Mr. Anderson, was calling and being called by the men involved

14   in that robbery that day.

15          Additionally, Mr. Hatchett's own Facebook postings

16   will add to the proof that he made the trip to Irving.

17          In a posting made at roughly 7:30 p.m. on the night

18   before, Saturday night, 7:30, Mr. Hatchett states to his

19   girlfriend, "I'm leaving tonight, going out of town.  I will be

20   back tomorrow if all goes well.  If not, I will be out of my

21   misery."

22          I want to thank you in advance for your attention

23   that I'm certain you will pay to all aspects of this trial.  I

24   know you will understand the seriousness of the crimes

25   Mr. Anderson and Mr. Hatchett are charged with and how

1    important a fair and just verdict is to everyone gathered here.

2              Mr. Junker and I will anticipate, after we have done

3    our job representing the United States of America in this

4    trial, you will feel very confident returning guilty verdicts

5    against Mr. Anderson and Mr. Hatchett.

6              Thank you.

7              THE COURT:  Thank you.

8              MR. MARTIN:  Judge, we'll waive opening at this time.

9              THE COURT:  All right.

10             MR. ROGERS:  Your Honor, may it please the Court.

11             THE COURT:  Yes, sir, Mr. Rogers.

12             MR. ROGERS:  Counsel.

13                         OPENING STATEMENT

14   BY MR. ROGERS:

15             Ladies and gentlemen of the jury, early on the

16   morning of November 17, 2013, a group of men did travel up from

17   Houston to Dallas to rob a jewelry store in Irving, and it is

18   likely that you will hear from the owners of that jewelry

19   store.  What happened to them is tragic and it's traumatic, but

20   we don't dispute that there was a robbery at that store that

21   day.  What we do dispute is that Mr. Hatchett was involved in

22   that robbery whatsoever.

23             The Judge told you in jury selection and just

24   reminded you a few minutes ago two of the most important

25   concepts in our criminal justice system:  the presumption of

1     innocence and the burden of proof.

2          Mr. Hatchett is not guilty of this crime right now,

3     and it's the Government's burden to prove to you beyond a

4     reasonable doubt by the end of this trial that he was involved

5     in this robbery.

6          It's the Government's burden, because the Government

7     can muster its resources at any point against anyone to accuse

8     and prosecute them of a crime.  And the Government is going to

9     have to change your mind from this point, because Mr. Hatchett

10    is not guilty.

11         Now, the Government is going to do that by bringing

12    evidence over the next couple of days.  And there are two

13    groups I like to think about the evidence in.

14         Reliable evidence.  And there I'm talking about data

15    or forensic evidence.  By data I mean Facebook records, cell

16    phone records, things that are just memorialized by computers,

17    reports generated by computers.  Call them reliable because

18    it's just a computer is making a memorial or making a record of

19    what happened.  Cell phone records, who was called, what number

20    was called, what number that was called from, what time the

21    call was made and how long it lasted.  Facebook records about

22    what was posted, when a picture was posted.

23         But even though that evidence may be reliable because

24    it's just a memorialization of what happened, five years later

25    that evidence can be taken out of context.

1              The other type of evidence is a little more suspect.

2    The Government is going to bring testimony, and some of that

3    testimony that you're going to hear is from people who placed

4    Mr. Hatchett at the store on that morning.  These aren't

5    innocent bystanders.  These aren't independent eyewitnesses.

6    These are men who are part of that conspiracy to commit this

7    robbery.  And what you're going to hear is that these men have

8    great incentive to place Mr. Hatchett at the scene of the

9    jewelry store that day.

10             You're going to hear that sometimes they will say

11   whatever it takes in order to benefit themselves.  And you're

12   going to hear that these men had had a hard time maintaining a

13   consistent story throughout the course of this investigation.

14             In a couple of days we'll get up -- I'll be able to

15   get up and talk to you again about the evidence and the

16   testimony that you've heard.  I look forward to that.  I look

17   forward to you being able to find Mr. Hatchett not guilty of

18   this crime.

19             THE COURT:  All right.  Ready to call your first

20   witness?

21             The rule has been invoked, so everybody knows that.

22             You told your witnesses.  That's correct?

23             MR. JUNKER:  Yes, Your Honor.  That's correct.

24             THE COURT:  All right.  Okay.

25             MR. JUNKER:  May I adjust the podium, Your Honor?

```
 1    But if the Court please, at this time the Government would call
 2    Mr. Soni to the stand.
 3              THE COURT:  All right.  Ronnie will turn that around
 4    for you.
 5              MR. JUNKER:  Thank you, Mr. Jacobson.
 6              THE COURT:  And he will give that water back to
 7    Mr. de la Garza.
 8              Okay.  When the rule is invoked, that means neither
 9    side's witnesses -- unless there's certain exceptions, have to
10    stay outside the courtroom until they're called to testify.
11              (Pause)
12              MR. JUNKER:  While I'm waiting, I'm just going to
13    talk to Ms. Lee.
14              THE COURT:  Okay.  Sure.
15              (Pause)
16              THE COURT:  Good morning, sir.  If you will come
17    right up here next to me.
18              Actually, it's afternoon.  Sorry.
19              Sir, let me get you sworn in.  Ronnie is going to do
20    that for me.
21              (The witness was sworn)
22              THE COURT:  If you will take a seat right there next
23    to me in that.
24              THE WITNESS:  Here?
25              THE COURT:  Yes, sir.
```

```
 1              Let me talk to you just a minute.  That chair wobbles
 2   all around, but it doesn't scoot closer to the microphone.  So
 3   you will have to make sure that you're talking --
 4              THE WITNESS:  Yes, sir.
 5              THE COURT:  -- loud enough that you can hear your
 6   voice like you can hear mine right now.
 7              THE WITNESS:  Yes, sir.
 8              THE COURT:  Okay?
 9              THE WITNESS:  Yes, sir.
10              THE COURT:  Okay.  Thank you.
11              Is there water down there for you?
12              THE WITNESS:  No.
13              MR. JUNKER:  May I approach, Your Honor?
14              THE COURT:  He's going to give you some water.
15              THE WITNESS:  Yes, sir.
16              THE COURT:  Here we go.  Yes.
17              (Pause)
18              THE WITNESS:  Thank you.
19              MR. JUNKER:  You're welcome.
20              THE COURT:  Okay.  Go ahead, Mr. Junker.
21              MR. JUNKER:  Thank you, Your Honor.
22            AJAY SONI, GOVERNMENT'S WITNESS, SWORN
23                     DIRECT EXAMINATION
24   BY MR. JUNKER:
25   Q.   Would you please state your name again for the record?
```

```
 1    A.    Ajay Soni.

 2    Q.    Okay.  And how do you spell your first name?

 3    A.    A-J-A-Y.

 4    Q.    Okay.  Because of the acoustics in this courtroom, you

 5    just need to kind of keep your voice up.  And if you need to

 6    adjust that mic, you know, feel free to piddle with it just a

 7    little.

 8          Mr. Soni, would you please tell the jury what you do

 9    for a living?

10    A.    I'm a jeweler.  I have a jewelry store.

11    Q.    Okay.  And what's the name of that jewelry store?

12    A.    Tilak Jewelers.

13    Q.    And how's it spelled?

14    A.    Spelled?

15    Q.    Yes.

16    A.    T-I-L-A-K.

17    Q.    Okay.  And back in 2013, did you have a partner in that

18    jewelry store?

19    A.    Yes.

20    Q.    And who was that?

21    A.    Vino Patel.

22    Q.    Okay.  And his first name, is that spelled

23    V-I-N-O-D-K-U-M-A-R?

24    A.    Yes.  That's like -- Kumar.  Vinodkumar Patel, yes.

25    Q.    Okay.  And does he -- he goes by a nickname, I take it?
```

```
 1   A.   Vinnie.
 2   Q.   Vinnie?
 3   A.   Yeah.
 4   Q.   All right.  And his last name is Patel?
 5   A.   Patel.
 6   Q.   How long had you known Vinnie Patel when you went into
 7   business with him?
 8   A.   We were born in the same city.  Since '59.  So since kids.
 9   The families know each other, so we go back one generation.
10   Q.   For quite a while, then?
11   A.   Yes, yes.
12   Q.   And where were y'all born?  Where did you grow up?
13   A.   Zambia.
14   Q.   Okay.
15   A.   A country in central Africa.
16   Q.   Central Africa?
17   A.   Yes.
18   Q.   And what is your family's -- you understand, by the way,
19   that you are the person referred to in the indictment by the
20   initials A.S. --
21   A.   Yes, sir.
22   Q.   -- for the initials in your name?
23   A.   Yes, sir.
24   Q.   And that Vinnie Patel is the person referred to as V.P. in
25   the indictment?
```

```
 1   A.   (Indicating in the affirmative)
 2   Q.   Do you understand that?
 3   A.   Yes, sir.
 4   Q.   Okay.  So before we get into that, though, what I want to
 5   do is give the jury just a little bit more of your background.
 6             So how long have you been involved in the jewelry
 7   business?
 8   A.   Since '78, when my parents opened the first store.
 9   Q.   Okay.  And where did they open the first store at?
10   A.   In London, England.
11   Q.   Okay.  Do you still -- does your family still have that
12   store?
13   A.   Yes, we still have the store.
14   Q.   Is it still run by a family member?
15   A.   Yeah, my brother runs that one.
16   Q.   All right.  When did you come to the United States?
17   A.   We started this in '94, with Vinnie and me.
18   Q.   All right.  And that's Tilak Jewelry?
19   A.   Yes, sir.
20   Q.   Where was Tilak Jewelry first located?
21   A.   O'Connor and 183.
22   Q.   Okay.  And at some point did you decide to move the store?
23   A.   Yes.  We moved to a better location, 635 and MacArthur.
24   Q.   I'm sorry?
25   A.   635 and MacArthur.
```

```
 1   Q.   6 --
 2   A.   We moved to the better location, a bigger location.
 3   Q.   635 and MacArthur?
 4   A.   And MacArthur.
 5   Q.   All right.  You're talking about cross streets then,
 6   right?
 7   A.   Yes, sir.
 8   Q.   Okay.  Would the address for that store be 8300 North
 9   MacArthur Boulevard?
10   A.   Yes, sir.
11   Q.   All right.  Is that in Irving?
12   A.   Yes, sir.
13   Q.   Here in the state of Texas?
14   A.   Yes, sir.
15   Q.   Why is it you decided to move to that location?
16   A.   We needed more space, and this was a brand-new building
17   that was being built.
18   Q.   Okay.
19   A.   So we took the front section.  We have better exposure.
20   Q.   So in 2013, Tilak Jewelry was at that location?
21   A.   Yes, sir.
22   Q.   And you said you needed more space.  How much -- roughly,
23   how big is that store?
24   A.   5,000 square feet.
25   Q.   Okay.  You need to slow down just a little bit.
```

```
 1    A.    Okay.
 2    Q.    I know it's natural to speed up in this kind of
 3    circumstance, but we need to make certain that -- there's
 4    somebody taking all this down, and he's got to --
 5    A.    Okay.
 6    Q.    -- be able --
 7    A.    Yes, sir.
 8    Q.    -- to get it all.
 9    A.    Okay.
10    Q.    All right.  In 2013, did that Tilak Jewelry store have a
11    security system?
12    A.    Yes.
13    Q.    And did it have a silent alarm system?
14    A.    Yes.
15    Q.    Did it also have a video-recording capability?
16    A.    Yes, sir.
17    Q.    Okay.  And about how many cameras did you-all have at that
18    location in 2013?
19    A.    I think 28, if I remember right.
20    Q.    About 28?
21    A.    Yes.
22    Q.    All right.  Now, I'd like to direct your attention to
23    Sunday, November 17, 2013, at about 11:30 a.m.
24          Were you working on that day?
25    A.    Yes.
```

1   Q.   Did it start off pretty much as a normal day?

2   A.   Normal, yes.

3   Q.   Well, I mean, did you open up and all that?

4   A.   Yes.

5   Q.   Like you regularly would?

6   A.   Yes.

7   Q.   Okay.  Who was at the store at that time?

8   A.   Vinnie and I opened the store, and the staff were there,

9   employees.

10  Q.   And about how many people did you have as far as staff

11  working that day?

12  A.   I think total we were eight.

13  Q.   Eight?

14  A.   Yes.

15  Q.   Did you have any family members working that day?

16  A.   The wives hadn't come in yet.  My son was there.

17  Q.   Your son was there?

18  A.   Yes, yes.

19  Q.   And how old was your son?

20  A.   Born '87, so 26.

21  Q.   I'm not trying to get you in trouble.

22  A.   26, 27.

23  Q.   Okay.

24  A.   Okay.

25  Q.   But he was working that day as well?

```
 1   A.   Yes, yes.
 2   Q.   All right.  And would you please tell the jury what
 3   happened very briefly, just an overview of what happened around
 4   11:30 a.m.?
 5   A.   So we had opened.  The girls had finished cleaning all the
 6   glass cabinets, because there's quite a few of them, and the
 7   door and all that.
 8            And we saw a van, a closed van, a panel van, I think
 9   they call them, come into the development.  And Vinnie was
10   actually going home for something -- something that he needed
11   to go home.  He said, "I'll go home and come back in a little
12   while."
13            And this van came in the parking lot.  It reversed
14   into a spot.
15   Q.   So it backed in?
16   A.   Backed, yeah.  It was --
17   Q.   Okay.
18   A.   We couldn't understand why a van came, so we both said it.
19   "What's a van doing at 11:30 in our parking lot?"
20            And then suddenly the doors opened, and people piled
21   out.  Seven people came out all dressed from head to toe, so
22   you couldn't see anybody's face or fingers or hands or
23   anything.  And they came through the front door.  And the
24   second door was closed because it has a lock on it, and we have
25   the thing to make the entry.  They broke the locks.
```

1  Q.   So you-all -- you-all can lock that inside door?

2  A.   Yes, it is locked.  It's kept --

3  Q.   It's a set of double-glass doors?

4  A.   Yes, yes.

5  Q.   And the inner doors, you have some mechanism --

6  A.   Control, yes.

7  Q.   -- you can lock them?

8  A.   Control for entry.

9  Q.   Okay.  Go ahead.

10 A.   They broke the glass.  They're pointing something -- like

11 they're pointing a gun at me and Vinnie.  I think it was a gun.

12 And they broke the glass.  They came underneath the bar, the

13 handlebar.  And then everyone came in.

14      And me and Vinnie were -- and one girl was in the

15 front, but she was by the till.  Me and Vinnie were right near

16 the door.  We ran.  As soon as we saw them piling out of the

17 van, we ran to hit the panic buttons.  We hit the panic

18 buttons.  I was screaming.

19      As soon as they came in, we were zip tied in the

20 back, both of us.  The girl had actually jumped the cabinet and

21 gone and hid in the restroom.  My son was in the vault.  He

22 shut the door, and he locked the vault door from the inside,

23 and he pressed the panic buttons.  We were zip tied.

24 Q.   Let me stop you there just for a moment.

25      You said that you hit the panic buttons.  What does

1    that mean?  What is the panic --

2    A.    It's -- it's the button that calls the police.  It's a

3    silent alarm.

4    Q.    Silent alarm?

5    A.    Yes.

6    Q.    You also mentioned a girl.  Was that one of the employees?

7    A.    Employees, yes.

8    Q.    When these individuals backed up in that van and got out,

9    what happened -- besides you and Mr. Patel, what happened to

10   the rest of the people who were working?

11   A.    So since they had just cleaned the glass -- so the girls

12   normally -- they have these water -- water canisters which they

13   fill up.  So they were washing their hands, going to the

14   restroom, because it's still early, no customers yet.  And they

15   were doing stuff in the back, just doing their stuff.

16   Q.    In the back of the store?

17   A.    Back of the store.  We have a work -- a place for the

18   employees to have lunch and all that.

19   Q.    Sure.  So is this -- and is this a separate area of the

20   store that the public cannot see when they come into --

21   A.    Yes, they cannot go there.

22   Q.    Okay.  So the other employees, before these men got into

23   the store, were already --

24   A.    In the rear section.

25   Q.    They're in the rear section?

```
 1   A.   Yes.
 2   Q.   Did they stay there?
 3   A.   Yeah, because I was shouting, "No, no."  And they heard
 4   the shout.  I think they popped their head out and saw, and
 5   they all ran back in there.
 6   Q.   And you mentioned one other girl separately?
 7   A.   Yes.
 8   Q.   What happened to her?
 9   A.   She was near the till, and she hit the panic button by the
10   till, and she jumped over the cabinet and ran into the restroom
11   on the side.
12   Q.   Okay.  Now, back in 2013, when this happened, was your
13   security system active and working?
14   A.   Yes.
15   Q.   So was this caught on videotape?
16   A.   Yes.
17   Q.   And did you provide that to the police when they came to
18   investigate later?
19   A.   Yes, we did.
20           MR. JUNKER:  And, Your Honor, at this time, with the
21   Court's permission, we would like -- we've already pre-admitted
22   Government's Exhibit 2.  We would ask permission to publish it
23   to the jury.
24           THE COURT:  You may.  It's been pre-admitted.
25           MR. JUNKER:  I'm going to move out of the way so the
```

```
 1    jury can see it.
 2             THE COURT:  That will be great.
 3             Ronnie, lights.
 4             (Video played)
 5             MR. JUNKER:  Your Honor, may I approach the witness?
 6             THE COURT:  Yeah, you just did.
 7             What are you doing?
 8             MR. JUNKER:  I wanted to approach the witness.
 9             THE COURT:  Oh, okay.  Great.
10             (Pause)
11    BY MR. JUNKER:
12    Q.   Mr. Soni, is this the white van you described earlier?
13    A.   Yes, sir.
14             (Pause)
15    Q.   And, Mr. Soni, just so the jury understands, the looping
16    that we're seeing in this, is this several of the different
17    camera angles in your store?
18    A.   Yes.
19             (Pause)
20    Q.   Mr. Soni, who is that man out front of the store right
21    there?
22    A.   In the blue shirt is Vinnie Patel, Vino Patel.
23    Q.   And who's the man off to the far left?
24    A.   That's me on the left.
25    Q.   Thank you.
```

```
 1                     (Pause)
 2    Q.   Mr. Soni, what's happening to your hands at this point in
 3    the video?
 4    A.   We are being tied up.  Me and Vinnie both were tied up.
 5    Q.   With zip ties?
 6    A.   Yes, sir.
 7                     (Pause)
 8    Q.   And what's happening at this point?
 9    A.   They took Vino's watch.
10    Q.   His Rolex watch?
11    A.   Yes, sir.
12                     (Pause)
13    Q.   Mr. Soni, in the video you could see several round white
14    objects rolling around in the floor.  Do you know what those
15    are?
16    A.   Those are bangle stands.
17    Q.   Bangle --
18    A.   They're displays for the bracelets that are put on there.
19    And they -- the maximum they took was the bracelets from that
20    top angle there.
21    Q.   Okay.
22    A.   They broke all the glass there.
23              MR. JUNKER:  Thank you.
24              (Video stopped)
25    BY MR. JUNKER:
```

1   Q.   Mr. Soni, how long had you been at this new location for

2   Tilak Jewelry when this happened?

3   A.   We opened May 2012, so just over a year.

4   Q.   Just over a year?

5   A.   (Indicating in the affirmative)

6   Q.   All brand-new glass cases?

7   A.   Yeah.  Everything was brand new.  We built the whole

8   business, inside.  We only had bare walls or anything there.

9   Q.   At several points during the -- well, first of all, let me

10  cover this.

11        So as long as this video was, this does not cover

12  every camera angle in your store, correct?

13  A.   No, it doesn't.

14  Q.   Okay.  Prior to coming to court today, were you asked to

15  review the original of all the angles and this condensed

16  version?

17  A.   Yes.

18  Q.   And is this a fair and accurate depiction of what happened

19  with some of the best camera angles?

20  A.   Yes, it is.

21  Q.   Okay.  At one point during the video you're reaching

22  underneath a cabinet kind of like this one.  What were you

23  doing at that point?

24  A.   Pressing the panic buttons.

25  Q.   Okay.  Did either you or Mr. Patel have a handgun or own a

1   firearm?

2   A.   No, we don't carry.

3   Q.   So were there any firearms in the store that day other

4   than the ones brought in by the people who robbed the place?

5   A.   No handguns, nothing in the store.

6   Q.   Okay.  And you mentioned that they got you on the ground

7   and zip tied you.  Was that at gunpoint?

8   A.   Yes.

9   Q.   Okay.  Did they tell you to get on the ground?

10  A.   Yes.

11  Q.   All right.  So during the robbery, were you -- were you

12  essentially detained in that area of the store?

13  A.   Yeah, face down.

14  Q.   Okay.  Were you free to move about?

15  A.   No.

16  Q.   I'm sorry?

17  A.   No.

18  Q.   Okay.  And you mentioned they took Mr. Patel's watch?

19  A.   Yes.

20  Q.   Was he also restrained?

21  A.   Yes, sir, he was tied up as well.

22          MR. JUNKER:  May I approach the witness, Your Honor?

23          THE COURT:  Yes, sir.  You don't need to ask again.

24  Just once for me.

25          MR. JUNKER:  Thank you, Your Honor.

```
 1                THE COURT:  You bet.
 2                MR. JUNKER:  Just trying to be careful.
 3                THE COURT:  No, that's fine.
 4   BY MR. JUNKER:
 5   Q.   I'm handing you what has been marked as Exhibits 3 and 4
 6   for identification only.
 7                I'll show you Number 3 first.
 8   A.   Yeah.
 9   Q.   What does that appear to be?
10   A.   Zip ties.
11   Q.   Is that similar --
12   A.   Similar to what we had, yes.
13   Q.   Okay.  What was used to restrain you?
14   A.   Yes, sir.
15   Q.   I'm going to hand you Exhibit 4.  And, again, does that
16   appear to be similar, if not identical, to the ones used?
17   A.   Very similar.
18   Q.   All right.  Mr. Soni, would it be fair to say that you
19   were afraid when this happened?
20   A.   Petrified.  Very scared.  You cannot fathom how you feel
21   at that period.  You have somebody tying you up, pointing a gun
22   at you.  It is scary to the maximum degree.
23   Q.   And your friend and partner, Mr. Patel, did he appear to
24   be afraid?
25   A.   Yeah.
```

1    Q.   Fair to say that you were afraid of physical harm?

2    A.   Anything can happen, because you are tied and you have a

3    gun pointed.  You could be shot as well.  So it was very, very

4    scary.

5    Q.   And your son was in the store someplace at the time?

6    A.   Yes, my son was in the vault, because in the morning we do

7    the refills, and he was doing that.  So when I was shouting, he

8    closed the door to the vault and then shut the vault itself and

9    pressed the panic buttons in there.

10   Q.   Were you at all afraid that they might venture further

11   back into the store?

12   A.   Yes, for the stock as well.

13   Q.   Okay.  Because of the way the Defendants were dressed and

14   how they came into the store, can you identify anybody that

15   took place or participated in this robbery?

16         MR. LUND:  Objection, Your Honor, to the

17   characterization of the Defendants being the ones that came

18   into the store.

19         MR. JUNKER:  I apologize.  I'll rephrase, Your Honor.

20   Withdraw the question.

21         MR. LUND:  Move to strike, Your Honor.

22         THE COURT:  Strike.

23   BY MR. JUNKER:

24   Q.   Mr. Soni, because of the way that the robbers were dressed

25   and concealed their faces, et cetera, are you able to identify

```
 1   anybody that participated in that robbery?
 2   A.   No.
 3            MR. JUNKER:  Do we have Exhibit 15 also?
 4            May I approach the witness again?
 5            THE COURT:  Yes.
 6   BY MR. JUNKER:
 7   Q.   Mr. Soni, I'm going to hand you, if I can get this opened,
 8   what's been marked as Exhibit 15 for identification.
 9            Could you tell us what this is?
10   A.   This is a bracelet roll.  We put the bracelets in the
11   display on this.
12   Q.   And does that appear to be one that's --
13   A.   Yes, it's the one we used in the store.
14   Q.   Okay.  So does that appear to be a jewelry display stand
15   from your store?
16   A.   Yes, sir.
17   Q.   After this occurred, at some point the police came,
18   correct?
19   A.   Yeah.  Yes, sir.
20   Q.   And you talked to them about what happened?
21   A.   The police were there in about maybe a minute, minute and
22   a half, after everything happened.
23   Q.   Well, let me ask you this.  The entire thing that we
24   watched, the video, approximately how long did it take for the
25   robbers to do this?
```

```
 1    A.    I think one minute and 25 or 30 seconds.
 2    Q.    So it was very organized?
 3    A.    Very organized.
 4    Q.    Very quick?
 5    A.    Very quick.
 6    Q.    Afterwards you had to make, I assume, repairs to the
 7    store?
 8    A.    Yes, sir.
 9    Q.    Was the store closed or opened during those repairs?
10    A.    We had to close for three days.
11    Q.    Okay.  So that would have interfered with your ability to
12    do business?
13    A.    Yes, sir.
14    Q.    And the business that you conduct, sir, the jewelry
15    business that you're involved in, is that all local jewelry, or
16    where do you get your jewelry from?
17    A.    So we import the jewelry.  We buy from other wholesalers
18    outside Texas, like New York and California.
19    Q.    Okay.
20    A.    And primarily we bought from India.
21    Q.    India?
22    A.    Yes, sir.
23    Q.    All right.  So you -- your business deals in both
24    interstate and foreign commerce?
25    A.    Yes, sir.
```

1  Q.   At some point after this happened did somebody from the

2  FBI come to talk to you about where you got your jewelry from,

3  that kind of thing?

4  A.   Yes, sir.

5  Q.   And were you asked to create a spreadsheet of the jewelry

6  that was missing?

7  A.   Yes, sir.

8  Q.   And its country of origin or state of origin, that kind of

9  thing?

10  A.   Yes, we were.

11  Q.   All right.  I think up there in front of you there's a

12  book of exhibits.  And if you could go to the item marked

13  Number 6.

14  A.   Yeah.

15  Q.   And just for the record, what is Item 6?

16  A.   Item 6 is a -- sorry.  Item 6 is a spreadsheet showing the

17  items on one side, description, and then weight and the

18  vendor's name and the date of purchase.

19  Q.   Is that the spreadsheet you created -- excuse me -- that

20  you created regarding the jewelry that was missing or stolen?

21  A.   Yes, this is it.

22  Q.   Who created that?

23  A.   I did.

24  Q.   All right.

25           MR. JUNKER:  Your Honor, at this time the Government

```
 1   would offer Government's Exhibit 6 as evidence in the
 2   case-in-chief.
 3              THE COURT:  No objections?
 4              MR. MARTIN:  No objection, Your Honor.
 5              MR. LUND:  No objection, Your Honor.
 6              THE COURT:  All right.  Government's Exhibit 6 is
 7   admitted into evidence.
 8                  (Government's Exhibit No. 6 received)
 9              MR. JUNKER:  Permission to publish, Your Honor?
10              THE COURT:  Yes.
11              MR. JUNKER:  Ms. Lee, can we have Exhibit 6 on the
12   screen?
13              (Pause)
14   BY MR. JUNKER:
15   Q.   Okay.  While we're waiting for that to come up on the
16   screen, can you give the jury an idea of the total retail value
17   of the jewelry that was stolen?
18   A.   The total value of what we got from the insurance was over
19   $400,000.00.
20   Q.   Okay.  And did you also have to make repairs to the
21   store --
22   A.   Yes.
23   Q.   -- as we mentioned earlier?
24   A.   Yes, sir.
25   Q.   And that's above and beyond as far as the cost of repairs
```

1    to the store?

2    A.    Yeah.  Plus, we were -- we have a deductible of

3    $25,000.00, which we are still out of pocket.

4    Q.    Okay.  Would it be fair to say, Mr. Soni -- I think it's

5    obvious, but I still have to ask -- was all this jewelry taken

6    against your will?

7    A.    Yes, sir.

8    Q.    It was not done voluntarily?

9    A.    No.

10   Q.    And just a moment.

11         (Pause)

12   Q.    Well, let's do this.  So the short-term effects on your --

13   on your store would have been the repairs?

14   A.    The repairs, the trauma.  To be honest, the repairs and

15   the trauma --

16   Q.    Okay.

17   A.    -- that we suffered, all of us, including the staff.

18   Q.    Okay.  Well, let's talk about that.

19   A.    It's quite hard.

20   Q.    Okay.  The trauma would be -- is that something you're

21   still dealing with today?

22   A.    Yes.  We still -- if I see a van or a truck or anything

23   coming near the store, I'm still reliving this all the time.

24   Q.    All right.  I don't want to go into detail, but have you

25   increased the security at your store --

```
 1   A.   Yes.
 2   Q.   -- since this happened?
 3   A.   Quite a bit more.
 4   Q.   Okay.  Additional cameras?
 5   A.   More cameras, and we've put metal grilles on the doors and
 6   the windows, and we have a security guard to watch it all the
 7   time.
 8   Q.   All right.
 9            MR. JUNKER:  Ready?
10            All right.  We can publish Exhibit 6, then.
11            (Pause)
12   BY MR. JUNKER:
13   Q.   So, Mr. Soni, this may be easier to see in the paper copy
14   that you've got there, but this is a list of the jewelry that
15   was taken?
16   A.   Yes, sir.
17   Q.   And on the -- over here I see the names of different
18   items, correct?
19   A.   Yes, sir.
20   Q.   So we have things like rings, bracelets, waist belt?
21   A.   Yes, sir.
22   Q.   Right?
23   A.   Yes, sir.
24   Q.   And tell us about -- it looks like most of this jewelry is
25   gold.
```

1            What's next to the column next to the gold?
2   A.   The column next to the gold is the weight.
3            If you see the last one --
4   Q.   If --
5   A.   Do you want me to point at it?  There you go.
6   Q.   So right here.  What's -- what's this column here?
7   A.   Oh, okay.  That's weight of the product.
8   Q.   The weight of the product?
9   A.   Yes.
10           And then next to it is the quality, 22 carat, which
11  we only do.
12  Q.   Okay.  So this is the weight, and this is the carat?
13  A.   Yes.
14  Q.   There are actually two columns, then?
15  A.   Yes, sir.
16  Q.   And the carat is the quality or --
17  A.   So 22 carat is the fineness of the gold.
18  Q.   Okay.
19  A.   Yeah.
20  Q.   So most all of this looks -- it's the highest quality of
21  gold?
22  A.   Yeah.  We do only that.
23  Q.   Okay.  And what is this column right here?
24  A.   That's the value of it.
25  Q.   Right there?

```
 1   A.   Yes.

 2   Q.   The value?

 3   A.   Yeah.

 4   Q.   Okay.  What's this column?

 5   A.   I think it's the back order number.  Oh, supply number.

 6   Q.   Okay.

 7   A.   11 -- 10028 relates to the supplier number.  And his name

 8   is Vallabji Malsi.

 9   Q.   And what's this column right here?

10   A.   That's the name of the supplier.

11   Q.   All right.  And this one right here?

12   A.   The date we put it on the system.

13   Q.   The date you put it on the system?

14   A.   So the date we imported it.

15   Q.   When it was imported?

16   A.   Yeah.  So 5-1 -- 5-3-2013, whatever date we brought it in.

17   Q.   Okay.

18   A.   Well, purchase date.  Let's put it that way.  It's

19   easier.

20   Q.   All right.  And we've got some things written in here.

21   What are these?

22   A.   Yeah.  So the "I" relates to India as to where it comes

23   from.

24   Q.   Okay.

25   A.   "N" is New York.
```

```
 1   Q.   All right.
 2   A.   California is "C."
 3   Q.   "C" is California.
 4            What's "H"?
 5   A.   "H" is -- we have a supply in Houston --
 6   Q.   Okay.
 7   A.   -- of some items.
 8   Q.   All right.  And what was "G"?
 9   A.   That's -- that's from Germany.
10   Q.   Germany?
11   A.   Yes.
12   Q.   Okay.
13   A.   There's a supplier we used who comes from Germany that we
14   purchase from.
15   Q.   And so all this material existed in this store on November
16   the 17th, 2013, when this robbery occurred?
17   A.   Yes.
18   Q.   All right.  And your business was actively involved on
19   that date in interstate commerce --
20   A.   Yes, sir.
21   Q.   -- and foreign commerce?
22   A.   Yes, sir.
23   Q.   And by the way, your customer base, do your customers come
24   only from Texas or from all over?
25   A.   No, we have all the six states around us, and even from
```

 1   California we have customers.  We have them from everywhere.

 2   We have a good name.  They come to you anywhere.  A good

 3   reputation.

 4   Q.   Okay.

 5           MR. JUNKER:  Thank you, Mr. Soni.

 6           No further questions at this time, Your Honor.  Pass

 7   the witness.

 8           THE COURT:  All right.  Mr. Martin?

 9           MR. MARTIN:  No questions, Your Honor.

10           MR. LUND:  No questions, Your Honor.

11           THE COURT:  All right.  You can step down, sir.

12           Call your next witness, Mr. Junker.

13           MR. DE LA GARZA:  Your Honor, the Government calls

14   Irving Police Officer Vance Barnes.

15           (Pause)

16           MR. JUNKER:  Your Honor, may this witness be excused?

17           THE COURT:  Is that okay with y'all?

18           MR. LUND:  No objection, Your Honor.

19           MR. MARTIN:  No objection.

20           THE COURT:  He is excused.

21           Thank you, sir.

22           (Pause)

23           THE COURT:  Right up here, please, sir.

24           Good afternoon.

25           If you will let me get you sworn in, please, sir.

```
 1                    (The witness was sworn)
 2              THE COURT:  If you will take a seat right next to me,
 3    officer.
 4              And if you will make sure you talk into the
 5    microphone at all times so that you can hear your voice like
 6    this, okay?
 7              THE WITNESS:  Okay.
 8              THE COURT:  That means if you lean back in the chair,
 9    we won't be able to hear you, all right?
10              THE WITNESS:  Yes, sir.
11              THE COURT:  All right.  And they're going to get you
12    some water, which they haven't done yet, but they will.
13              MR. DE LA GARZA:  Yes, Your Honor.
14              May I approach the witness, Your Honor?
15              THE COURT:  Yes, you may.
16              MR. DE LA GARZA:  Thank you.
17              THE COURT:  And replace it with this other water if
18    it's already up there.
19              Is there one already up there, or did he take it with
20    him?
21              MR. DE LA GARZA:  I think he took it with him.
22              THE COURT:  Okay.  Well, there you go.  He gets
23    something from the Government.
24              All right.  Here you go.
25              MR. DE LA GARZA:  May I proceed?
```

```
 1                    THE COURT:  Yes.
 2                    MR. DE LA GARZA:  Okay.
 3                    VANCE BARNES, GOVERNMENT'S WITNESS, SWORN
 4                         DIRECT EXAMINATION
 5     BY MR. DE LA GARZA:
 6     Q.   What's your name, sir?
 7     A.   Vance Barnes.
 8     Q.   How do you spell your last name?
 9     A.   B-A-R-N-E-S.
10     Q.   And what do you do for a living?
11     A.   I'm a crime scene investigator for the City of Irving
12     Police Department.
13     Q.   How long have you been an Irving police officer?
14     A.   20 years.
15     Q.   Did you do anything in law enforcement before you became
16     an Irving police officer?
17     A.   Yes, sir.  I was a deputy sheriff at Tarrant County
18     Sheriff's Department for ten and a half years.
19     Q.   Did you receive training for Irving Police Department
20     through their academy or their original academy?
21     A.   Yes, sir, through the Irving police academy.
22     Q.   And when did you attend the academy?
23     A.   In -- actually, twice.  Whenever I became a deputy for
24     Tarrant County Sheriff's Department, I went through the
25     academy.  And then in 1999, I went through the academy at
```

1    Irving.

2    Q.   What kind of assignments have you had with Irving Police

3    Department?

4    A.   Been in patrol and also in crime scene, which is my

5    current capacity.

6    Q.   How long have you been in crime scene?

7    A.   Ten years.

8    Q.   And what type of activities do you do in the crime scene

9    section or crime scene division of Irving Police Department?

10   A.   We document crime scenes, process crime scenes, locate and

11   process physical evidence.

12   Q.   Are you a certified peace officer in the state of Texas?

13   A.   Yes, sir.

14   Q.   Is that through TCLEOSE?

15   A.   TCOLE.

16   Q.   TCOLE?

17   A.   Yes.

18   Q.   What's the letters for TCOLE, the acronym?

19   A.   Texas Commission of Law Enforcement.

20   Q.   T-C-O-L-E?

21   A.   Yes.

22   Q.   Okay.  Thank you.

23            I'm going to draw your attention back to

24   November 17th of 2013.

25            Were you working with the Irving Police Department on

1   that date?

2   A.   Yes.

3   Q.   Were you called out to a crime scene to process and work a

4   crime scene that day?

5   A.   Yes, I was.

6   Q.   And what scene was that?

7   A.   It was a jewelry store robbery.

8   Q.   What was the location that you went to, do you recall?

9   A.   It was in the 8000 block -- 8000 block-ish of MacArthur.

10  Q.   Was there a certain business that you were called to?

11  A.   Yes.  It was Tilak.

12  Q.   Can you spell that for the jury?

13  A.   I cannot remember exactly how to spell that, no.

14  Q.   Okay.  And what time of the day were you called out to the

15  Tilak or Tilak Jewelry store?

16  A.   It was approximately 11:45 a.m.

17  Q.   And when you got there, did you hear that a certain kind

18  of crime had occurred?

19  A.   Yes.  It was an aggravated robbery.

20  Q.   And do you remember how many individuals they said were

21  involved in the robbery?

22  A.   They said six to seven.

23  Q.   Were there other officers there who had come to the

24  jewelry store as well?

25  A.   Yes.

1    Q.   You weren't the first officer there, were you?

2    A.   No.

3    Q.   Okay.  As part of your job as a crime scene investigator,

4    did you photograph the inside of the jewelry store?

5    A.   Yes, I did.

6              MR. DE LA GARZA:  May I approach, Your Honor?

7              THE COURT:  Yes.

8              (Pause)

9    BY MR. DE LA GARZA:

10   Q.   If you could refer to Government's Exhibit Number 9,

11   please.

12             Is that a multipage exhibit?

13   A.   Yes, sir.

14   Q.   How many pages comprise that exhibit, exactly?

15   A.   The sequencing number is 1 or 001 through 062.  So 62.

16   Q.   Would you take a second and flip through those pictures

17   and see if you can identify what they are?

18   A.   Yes, sir.  They are the photographs of the jewelry store.

19   Q.   Did you take those photographs on November 17th of 2013?

20   A.   Yes.

21   Q.   Do they accurately depict the store as you saw it on that

22   day?

23   A.   Yes.

24             MR. DE LA GARZA:  Your Honor, at this time we would

25   offer into evidence Government's Exhibit Number 9.

```
 1                  THE COURT:  And there's no objections, correct?
 2                  MR. MARTIN:  No objections.
 3                  MR. LUND:  No objection, Your Honor.
 4                  THE COURT:  Then that is admitted into evidence.
 5                      (Government's Exhibit No. 9 received)
 6                  MR. DE LA GARZA:  Thank you.
 7                  Ms. Lee, could we have photograph Number 1 of
 8      Government's Exhibit Number 9, please?
 9                      (Pause)
10      BY MR. DE LA GARZA:
11      Q.   Officer Barnes, what does photograph Number 1 depict?
12      A.   That is the front entry area of the outside of the
13      building.
14      Q.   Is the entry to the left or the center of the photograph?
15      A.   To the left.
16      Q.   And what's the --
17                  MR. DE LA GARZA:  May we have -- I'm sorry.  May we
18      have Number 2, please, Ms. Lee?
19      BY MR. DE LA GARZA:
20      Q.   Is that the main door there at the jewelry store?
21      A.   Yes, sir.
22      Q.   It's in the center of the photograph?
23      A.   Yes, sir.
24      Q.   Those double-glass doors?
25      A.   Correct.
```

```
 1   Q.   Do you recall what suite number the jewelry store is?
 2   A.   100.
 3          MR. DE LA GARZA:  May I have Number 3 please,
 4   Ms. Lee?
 5          May I have Number 4, Ms. Lee?
 6          (Pause)
 7          MR. DE LA GARZA:  Your Honor, if I didn't before, I
 8   do have permission to publish these to the jury?
 9          THE COURT:  You do.
10          MR. DE LA GARZA:  Thank you.
11   BY MR. DE LA GARZA:
12   Q.   Now, looking at Number 4 in Government's Exhibit Number 9,
13   what is that a picture of?
14   A.   That is a picture standing at the exterior doors, looking
15   into the foyer, into the secondary doors.
16   Q.   So there's a first set of doors that are in the front of
17   the picture, correct?
18   A.   Correct.
19   Q.   And the second set of doors are towards the center of the
20   picture?
21   A.   Correct.
22   Q.   Is the glass smashed in that second set of doors?
23   A.   Yes, sir, the door on the right-hand side.
24          MR. DE LA GARZA:  Picture Number 5, Ms. Lee, please.
25   BY MR. DE LA GARZA:
```

1    Q.   Is that a better picture of the second set of doors at the

2    Tilak Jewelry store on November 17th of 2013?

3    A.   Yes.

4            MR. DE LA GARZA:  Picture Number 6.

5            Thank you, Ms. Lee.

6    BY MR. DE LA GARZA:

7    Q.   What is that a picture of?

8    A.   That is a picture with that door open, looking into the

9    jewelry store showroom.

10   Q.   What is Number 7 a picture of?

11   A.   That's immediately inside and to the right as you enter

12   the door -- the second set of doors.

13   Q.   And we're now seeing picture Number 8.  Is that a picture

14   of the first island there in the store?

15   A.   Correct.

16           THE COURT:  Why are the pictures so out of contrast

17   and the lights?  Is there something wrong with them?

18           MR. JUNKER:  Your Honor, I --

19           THE COURT:  Earlier we saw a video, and you can see

20   the tile.  This looks like it was taken with a flash or

21   something.  Do we know?

22           MR. JUNKER:  Your Honor, if I may.  I checked our

23   computer system.  It's appearing crisp on our system.  I think

24   it's the -- the projection system is washing it out for some

25   reason.

```
 1              THE COURT:  Is it?  Okay.  All right.
 2     BY MR. DE LA GARZA:
 3     Q.   Picture Number 9, officer, what is that?
 4     A.   That's just walking around to the left of the entry doors.
 5     Q.   In the right top corner of Government -- of Government's
 6     Exhibit Number 9, picture Number 9, do you see some -- a door?
 7     A.   Yes, sir.
 8     Q.   Is that the door to the vault area of the store?
 9     A.   Yes, it is.
10              MR. DE LA GARZA:  Thank you, Mr. Jacobson.
11              Can we have Number 10, please?
12     BY MR. DE LA GARZA:
13     Q.   What is this a picture of, officer?
14     A.   One of the smashed display cases in the center island.
15     Q.   Were the majority of the cases inside the store damaged?
16     A.   Yes.
17     Q.   Was there glass inside the cases as well as outside the
18     cases?
19     A.   Yes, there was.
20              MR. DE LA GARZA:  And, Ms. Lee, if we can scroll
21     through -- 11 through 33.
22              (Pause)
23              MR. DE LA GARZA:  Stop, Ms. Lee, at 34, please.
24     BY MR. DE LA GARZA:
25     Q.   And, Officer Barnes, now looking at picture 34 of
```

1    Government's Exhibit Number 9, is that the vault area that you

2    described previously?

3    A.   Yes.

4            MR. DE LA GARZA:  Ms. Lee, could we have Government's

5    picture Number 4 out of Government's Exhibit Number 9, please?

6    40.  I'm sorry, I said it incorrectly.  40.  I apologize.

7    BY MR. DE LA GARZA:

8    Q.   Officer Barnes, looking at Government's Exhibit Number 9,

9    picture Number 40, what does that picture depict?

10   A.   That is the center office area of the front circular

11   island.

12           MR. DE LA GARZA:  Can we have 41 and Number 42,

13   Ms. Lee, please?

14           (Pause)

15           MR. DE LA GARZA:  Your Honor, may we approach?

16           THE COURT:  Sure.

17           (Bench Conference held off the record)

18           THE COURT:  All right.  We're going to take a break,

19   try to get these pictures working right.  Sorry.  I never have

20   tried a case where there wasn't some kind of glitch in the IT.

21   So if some of y'all are in IT, fix it.  I'm kidding.

22           Y'all go back there and don't talk about the case.

23   We'll bring you back out in a minute.

24           SECURITY OFFICER:  All rise.

25           (Recess from 3:44 to 4:03)

1          THE COURT:  All right.  Back on the record.

2          Okay.  Are we ready to bring the jury in?

3          MR. DE LA GARZA:  Yes, Your Honor.

4          THE COURT:  You've got an hour's worth of more stuff

5   today, both of y'all?

6          MR. JUNKER:  Yes, Your Honor.

7          THE COURT:  Okay.  There we go.

8          It's just the nature of the beast, these machines.

9   We should have never gotten away from slate on a chalkboard.

10          SECURITY OFFICER:  All rise for the jury.

11          (Jury in)

12          THE COURT:  Y'all be seated.

13          We're not going to have the problem fixed till

14   tomorrow, so we're going to go on to some other things.  We'll

15   figure it out overnight while y'all are at home watching

16   Dancing with the Stars, whatever y'all watch.

17          All right.  Go ahead.

18          MR. DE LA GARZA:  Thank you, Your Honor.

19   BY MR. DE LA GARZA:

20   Q.   Officer Barnes, I'm showing you what's been marked as

21   Government's Exhibit Number 3.  Do you recognize that?

22   A.   Yes.

23   Q.   And what is that?

24   A.   It's a set of flex cuffs taken from the center desk area

25   inside the store.

1    Q.   So when you arrived at the jewelry store, as part of your

2    investigation did you locate those flex cuffs inside the store?

3    A.   Yes, sir.

4    Q.   Showing you what's been marked as Government's Exhibit

5    Number 4, what is that?

6    A.   It's a second set of flex cuffs that were located in the

7    northwest corner desk area of the store.

8              MR. DE LA GARZA:  Your Honor, at this time we would

9    offer into evidence Government's Exhibit 3 and 4.

10             MR. LUND:  No objection, Your Honor.

11             THE COURT:  All right.  That's admitted.

12             MS. HILL:  No objection.

13             THE COURT:  It's admitted.

14             (Government's Exhibit Nos. 3 and 4 received)

15   BY MR. DE LA GARZA:

16   Q.   As part of processing a crime scene, do you look for

17   objects that might help you solve the crime later on inside the

18   location?

19   A.   Yes.

20   Q.   Let me show you what's been marked as Government's Exhibit

21   Number 14.  Can you identify what that is?

22   A.   It's labeled as a slide spring from behind the desk area

23   inside the store.

24   Q.   If you need to, Officer Barnes, could you open it to

25   further identify the exhibit?

1   A.   Yes, sir, it is the slide spring that I located inside the

2   store.

3              MR. DE LA GARZA:   Your Honor, at this time we'd offer

4   Government's Exhibit 14.

5              THE COURT:   Are these all pre-admitted?

6              MR. DE LA GARZA:   These were not, Your Honor.

7              THE COURT:   Oh, they're not?

8              MR. ROGERS:   No.

9              THE COURT:   Okay.

10             MR. LUND:   No objection, Your Honor.

11             MR. MARTIN:   No objection.

12             THE COURT:   All right.   Those are admitted into --

13   that is admitted into evidence, 14.

14                  (Government's Exhibit No. 14 received)

15   BY MR. DE LA GARZA:

16   Q.   And when you -- can you pull the Item 14 out of the

17   envelope that it's enclosed in?

18             And is that made of metal?   Composite?   Wood?

19   A.   The spring itself is metal.   The rod containing the spring

20   is a plastic polymer.

21   Q.   Are you familiar with springs like that?

22   A.   Yes, sir, I am.

23   Q.   How are you familiar with springs like that?

24   A.   Just through my training and experience in shooting of my

25   own firearms.

1    Q.   This may be an obvious question, but do police officers

2    have to deal with firearms on a daily basis?

3    A.   Yes, sir.

4    Q.   Okay.  Your own firearm as well as firearms of other

5    people?

6    A.   Yes.

7    Q.   In your crime scene investigation experience, have you

8    collected parts of firearms at other crime scenes?

9    A.   Yes, sir.

10   Q.   Okay.  In your training and experience, what is

11   Government's Exhibit 14, is that consistent with a firearm

12   slide spring?

13   A.   Yes, it is.

14           MR. DE LA GARZA:  Your Honor, at this time with the

15   approval of the Court, we'd like to defer Officer Barnes'

16   testimony to tomorrow to continue on with the photographs.

17           THE COURT:  Oh, that will be fine.  We'll finish that

18   when we get the photograph deal all worked out.  That will be

19   fine.

20           MR. DE LA GARZA:  Thank you.

21           THE COURT:  Sorry, officer.  You're going to need to

22   come back, okay?

23           THE WITNESS:  Yes, sir.

24           THE COURT:  All right.  Thank you.

25           (Pause)

 1                MR. JUNKER:  Judge, if I may, one moment.

 2                THE COURT:  Oh, wait.  One more.

 3                (Pause)

 4                MR. DE LA GARZA:  Your Honor, I've just been advised

 5      by my co-counsel we have a few more questions.

 6                THE COURT:  Oh, okay.

 7                MR. DE LA GARZA:  Sorry.

 8                THE COURT:  He can read your mind?

 9                MR. DE LA GARZA:  He double-checks me, Your Honor,

10      pretty well.

11                THE COURT:  Okay.  All right.

12                     DIRECT EXAMINATION CONTINUED

13      BY MR. DE LA GARZA:

14      Q.   As part of your processing of the crime scene at the Tilak

15      Jewelry store in Irving on November 17, 2013, did you collect

16      any blood evidence?

17      A.   Yes, I did.

18      Q.   And where was that blood evidence collected from?

19      A.   From inside the smashed jewelry displays.

20      Q.   And how did you collect that evidence?  How did you go

21      about, you know, picking it up and seizing it as evidence?

22      A.   Each individual piece of glass that I seized -- there were

23      multiple pieces of glass that had blood on it.  I wore latex

24      gloves, collected each individual piece, changing my gloves in

25      between each seizure of blood evidence.

1              After I seized the glass with the blood on it, I also

2    obtained blood swabs, sample swabs of blood drops that were

3    inside that case, again swapping gloves in between each sample.

4    Q.    How many cases did you collect blood evidence from --

5    A.    Two.

6    Q.    -- do you recall?

7    A.    Two.

8    Q.    And you said the blood was both on the glass as well as

9    dropped into the case?

10   A.    Correct.  It was actually on the broken glass inside the

11   case as well as on the displays themselves inside the case.

12   Q.    Further on down in your investigation in this case, did

13   you process or did you photograph and process a van that you

14   had found?

15   A.    Yes, I did.

16   Q.    And when I say you had found, it actually had been found

17   by someone else, some other officers, correct?

18   A.    Correct.

19   Q.    And where was that van located?

20   A.    In the 8100 block of Walton Boulevard.

21   Q.    Did that van match the description of the van that had

22   been used in the robbery?

23   A.    Yes, it did.

24   Q.    Is the license plate of the van visible in the video of

25   the robbery?

1    A.   I do not remember, recall if it was or not.

2    Q.   And where was the van that -- what type of van was that

3    that you processed?

4    A.   It was a Ford van, cargo van.

5    Q.   When we say "cargo van," does it have windows on the

6    sides?

7    A.   No.

8    Q.   So it's just metal from top to bottom?

9    A.   Correct.

10   Q.   And where did you process that vehicle?  What location?

11   A.   It was parked in a parking lot in the 8100 block of

12   Walton.

13   Q.   Is that location within a mile or two from the Tilak

14   Jewelry store that you just processed earlier in the day?

15   A.   Yes.

16   Q.   And how many hours was it between when you processed the

17   Tilak store and then got to the van and processed it?

18   A.   Approximately three.  Three hours.

19   Q.   Had you already gone back to the office?

20   A.   Yes.

21   Q.   And you were called out again?

22   A.   Yes.

23   Q.   Okay.  When you processed the van, can you describe to the

24   jury how you did that, procedures you used?

25   A.   Again, each time I -- I located blood evidence inside the

1    van also, took samples of that blood evidence.

2              THE COURT:  Talk into the microphone.

3              THE WITNESS:  Took samples of that blood evidence

4    along with some glass with blood evidence inside that van.  I

5    collected that, and, again, in between each sample changing

6    gloves and -- prior to taking samples.

7    BY MR. DE LA GARZA:

8    Q.   Did you locate any other items inside the van?

9    A.   Yes, sir.

10   Q.   I'm showing you what's been marked as Government's

11   Exhibit 15.  Do you recognize that item?

12   A.   Yes, sir.

13   Q.   And what is that?

14   A.   It is a white pillow-type display, jewelry display.

15   Q.   And where did you find that?

16   A.   Inside the back of the van.

17   Q.   Okay.

18             MR. DE LA GARZA:  Your Honor, at this time the

19   Government offers Government's Exhibit 15.

20             MR. LUND:  No objection, Your Honor.

21             MR. MARTIN:  No objection, Your Honor.

22             THE COURT:  Government's 15 is admitted into

23   evidence.

24             (Government's Exhibit No. 15 received)

25   BY MR. DE LA GARZA:

1    Q.   Will you please remove it from the envelope, officer?

2    A.   (Complying)

3    Q.   On November 17th of 2013, at how many locations did you

4    see objects like Government's Exhibit Number 15?

5    A.   Two different locations.

6    Q.   Which locations were those?

7    A.   Inside the jewelry store and this one inside the white

8    van.

9    Q.   Besides the Government's Exhibit 15 and the blood, was

10   there anything else that you found inside the van?

11   A.   Yes.  There were white zip tie -- zip ties matching the

12   ones inside the store, along with some trash bags, black trash

13   bags.

14   Q.   Officer, I'm now showing you what's been marked

15   Government's Exhibit 5.  I believe it's 5A and 5B.

16          Would you identify what those exhibits are?

17   A.   They're the white flex cuffs located inside the van,

18   inside the white van.

19   Q.   How many flex cuffs did you find inside the van, the white

20   Ford van?

21   A.   There's a total of, I believe, seven total.  Seven or

22   eight total.  Several of them put together.  One, two, three,

23   four, five, six -- so eight total.

24   Q.   When you say "put together," can you describe what you

25   mean to the jury by that?

1  A.   They were preassembled in a way that you could use them to

2  cuff someone, looped them through, making big loops to where

3  all you had to do was slip them over someone's wrist, cinch

4  them down, and then you have essentially handcuffs made out of

5  the zip ties.

6  Q.   Officer, Government's Exhibit 5A and 5B, could you remove

7  the ones you just described, the ones that are looped together?

8  A.   (Complying)

9  Q.   To your knowledge, are flex cuffs sold in that -- in that

10 format?

11 A.   No.

12 Q.   Are they sold in long strips where they're not actually

13 folded over into each other?

14 A.   Yes.

15 Q.   And you found Government's Exhibit 5A and 5B inside the

16 white Ford van?

17 A.   Yes.

18 Q.   Do you need to take a second to reassemble everything?

19 A.   Yeah.  Let me get them back together.

20 Q.   Yes, sir.

21       (Pause)

22 A.   Okay.

23 Q.   Officer, I'm showing you what's been marked as

24 Government's Exhibit 16.  What is Government's Exhibit 16?

25 A.   It's a black plastic trash bag located inside the back of

1    the white van.

2    Q.   And that was found inside the van on November 17th of

3    2013?

4    A.   Yes, sir.

5    Q.   Where exactly in the van was it found?

6    A.   In the back cargo area of that van.

7    Q.   Were the flex ties next to it or sitting on top of it?

8    A.   They were sitting next to it.

9    Q.   Okay.

10          MR. DE LA GARZA:  Your Honor, at this time we would

11   offer into evidence Government's Exhibit Number 16.

12          MR. LUND:  No objection, Your Honor.

13          MR. MARTIN:  No objection.

14          THE COURT:  Government's 16 is admitted into

15   evidence.

16          (Government's Exhibit No. 16 received)

17          MR. DE LA GARZA:  Your Honor, at this time we would

18   also offer into evidence Government's Exhibit 5, which is 5A

19   and 5B.

20          THE COURT:  Well, that's two -- two exhibits.  It's

21   really why I caution you not to use A and B's.  Let's use

22   numbers.

23          But do you have any objection to 5A or 5B?

24          MR. LUND:  No objection, Your Honor.

25          MR. MARTIN:  No objection.

```
 1              THE COURT:  Then they are both admitted into
 2     evidence.
 3                  (Government's Exhibit Nos. 5A and 5B received)
 4              MR. DE LA GARZA:  Thank you, Your Honor.
 5              THE COURT:  You bet.
 6              MR. DE LA GARZA:  Your Honor, at this time I will now
 7     defer Officer Barnes' testimony till tomorrow with the
 8     permission of the Court.
 9              THE COURT:  Wait, wait, wait.  Mr. Junker is reading
10     more in your mind.
11              MR. DE LA GARZA:  Oh.
12              (Pause)
13              MR. DE LA GARZA:  Your Honor, with the Court's
14     permission, Mr. Junker has informed me to ask a few more
15     questions.
16              THE COURT:  Of course he has.
17              MR. JUNKER:  Happy birthday, Judge.
18              THE COURT:  Mr. Junker.
19                  DIRECT EXAMINATION CONTINUED
20     BY MR. DE LA GARZA:
21     Q.   Officer Barnes, you've described how you went to the Tilak
22     Jewelry store, went back to the office, went back out to do --
23     to process the white Ford van.
24              Was there another vehicle that you ended up
25     processing that day that's connected to this investigation?
```

1    A.    Yes, sir.

2    Q.    And what vehicle was that?

3    A.    It was a silver Dodge Caravan.

4    Q.    And where was that vehicle when you processed it?

5    A.    It was located in Dallas.

6    Q.    Was that at 2775 North Haven in Dallas?

7    A.    Yes.

8    Q.    Was that the same location that it had been stolen from

9    earlier in the day?

10   A.    Yes, it was.

11   Q.    And how did it get to be in the same location that it had

12   been stolen from?

13   A.    I was notified that Farmers Branch PD had located the

14   vehicle and it had been reported stolen.  They in turn called

15   the owners of that vehicle, had them come pick it up, and took

16   it back to their home, which is that address, the North Haven

17   address.

18   Q.    How did you process that vehicle?

19   A.    I again photographed it, looked inside of it, photographed

20   the inside and outside, and located blood evidence inside of

21   it.

22   Q.    Where was the blood evidence located?

23   A.    The blood evidence was located on the third row back

24   driver's side seat and also on the sliding passenger side door

25   on the inside.

```
 1   Q.    And how did you collect those blood samples?
 2   A.    Again, with swabs, taking samples from each location
 3   independently and switching gloves in between each one.
 4   Q.    The blood evidence that you collected from the store, the
 5   blood evidence you collected from the white Ford van, and the
 6   blood evidence you collected from the Dodge minivan, was that
 7   put into evidence at the Irving Police Department?
 8   A.    Yes, it was.
 9   Q.    At a later date did you deliver that blood evidence to a
10   lab to be processed?
11   A.    Yes, sir.
12   Q.    Do you remember what date that was on?
13   A.    I believe that was on the 19th of November, two days after
14   the robbery.
15              MR. DE LA GARZA:  Your Honor, I think it best to talk
16   to Mr. Junker for a second, and then I'll pass the witness.
17              THE COURT:  Go ahead.
18              (Pause)
19              MR. DE LA GARZA:  Your Honor, at this time we'll
20   defer Officer Barnes' testimony till tomorrow --
21              THE COURT:  Okay.
22              MR. DE LA GARZA:  -- with the permission of the
23   Court.
24              THE COURT:  Y'all are going to wait and cross-examine
25   him after they completely finish, correct?
```

```
 1              MR. MARTIN:  Yes.

 2              MR. ROGERS:  That's fine, Your Honor.

 3              THE COURT:  Is that right, Ms. Hill?

 4              MS. HILL:  Yes, Your Honor.

 5              THE COURT:  You can step down.  We'll see you back

 6    tomorrow.

 7              THE WITNESS:  Yes, Your Honor.

 8              THE COURT:  Okay.  Thank you.

 9              (Pause)

10              MR. JUNKER:  Your Honor, at this time I'll step aside

11    and let Mr. Junker take over.

12              THE COURT:  Do you got another witness, Mr. Junker?

13              MR. JUNKER:  Yes, Your Honor.  At this time the

14    Government will call Special Agent Jason Ibrahim to the stand.

15              THE COURT:  Okay.  Good.

16              Raise your right hand and be sworn.

17              (The witness was sworn)

18              THE COURT:  And you heard me give all the instruction

19    about talking into the microphone?

20              THE WITNESS:  I did.

21              THE COURT:  Okay.  Great.

22              Do you want to keep all that evidence up here?

23              MR. JUNKER:  No.  May I approach?

24              THE COURT:  Sure.  You don't need to ask again on

25    him.
```

```
 1              MR. JUNKER:  I apologize, Judge.
 2              THE COURT:  No, that's okay.  It's okay.
 3              (Pause)
 4              MR. JUNKER:  May I inquire, Your Honor?
 5              THE COURT:  Yes, sir.
 6              MR. JUNKER:  Thank you.
 7           JASON IBRAHIM, GOVERNMENT'S WITNESS, SWORN
 8                     DIRECT EXAMINATION
 9    BY MR. JUNKER:
10    Q.   Would you please tell the jury what you do for a living?
11    A.   Sure.  I'm a special agent with the Federal Bureau of
12    Investigation.
13    Q.   You know what?  I don't remember.  Did you state your name
14    for the record?
15    A.   I have not.
16    Q.   Let's start with that.
17    A.   It's Jason Ibrahim.
18    Q.   Spell the last name, please.
19    A.   It's I-B-R-A-H-I-M.
20    Q.   All right.  And now the agency you work for.
21    A.   The FBI.
22    Q.   All right.  And how long have you worked for the FBI?
23    A.   About 16 years.
24    Q.   Let's talk about that a little bit more.
25              Before joining the FBI, what did you do?
```

1    A.   I was a briefing attorney for the federal appellate court

2    in New Orleans, Louisiana.

3    Q.   So you've been to law school?

4    A.   I have.

5    Q.   Which one?

6    A.   Texas Tech University.

7    Q.   Not Baylor?

8    A.   Not Baylor.

9    Q.   All right.  After you joined the FBI, where were you first

10   assigned?

11   A.   Our Chicago office.

12   Q.   And what were your primary duties there, or what section

13   were you assigned to?

14   A.   I worked narcotics case.

15   Q.   How long were you there?

16   A.   Seven years.

17   Q.   And after that where did you go?

18   A.   I went -- from there I went to D.C., and I was on a

19   counterterrorism team that deployed overseas.

20   Q.   I'm sorry, what?

21   A.   I was on a counterterrorism team that deployed overseas.

22   Q.   Okay.  I'm going to ask you to adjust that mic real quick

23   and keep your voice up, because as the Judge warned, the

24   acoustics in here are a little difficult.

25   A.   Okay.

```
1    Q.   All right.  So deployed overseas.  Deployed overseas to
2    where?
3    A.   The Horn of Africa, East Africa area.
4    Q.   Really?  To do what?
5    A.   We were -- myself and other agents were working
6    counterterrorism cases, FBI counterterrorism cases out of the
7    embassies in Uganda and Kenya.
8    Q.   What kinds of cases?
9    A.   Counterterrorism dealing with the Al-Shabab threats.
10   Al-Shabab is a terrorist group that is in Somalia.
11   Q.   All right.  How long did you do that kind of work?
12   A.   About three and a half years.
13   Q.   Was it all overseas in Africa?
14   A.   Yes.  We would be deployed three months at a time and
15   return stateside for three months and then back out the door
16   for another three months.
17   Q.   Okay.  And after that where did you go?
18   A.   From there I came to the Dallas office.
19   Q.   The FBI here in Dallas?
20   A.   Yes.
21   Q.   What year did you get here?
22   A.   2013.
23   Q.   Okay.  When in 2013?
24   A.   February 2013.
25   Q.   So shortly before this case arose?
```

```
 1   A.   That's correct.
 2   Q.   And eventually assigned to work this kind of robbery
 3   investigation?
 4   A.   Yes.
 5   Q.   Okay.  Let me do this.  I want to direct your attention
 6   now --
 7            THE COURT:  Let me interrupt.  I was trying to
 8   remember.  Did Al-Shabab do the Kenya --
 9            THE WITNESS:  The Westgate -- the Westgate mall.
10            THE COURT:  The mall?
11            THE WITNESS:  Yeah.  The Westgate mall, yes.
12            THE COURT:  Okay.
13            THE WITNESS:  Yes.
14            THE COURT:  Which part of that was videotaped?
15            THE WITNESS:  Right.
16            THE COURT:  Do you remember seeing all that?
17            THE WITNESS:  I did.  Yes, Your Honor.
18            THE COURT:  Okay.  Okay.  Go ahead.
19            MR. JUNKER:  Thank you, Your Honor.
20   BY MR. JUNKER:
21   Q.   I would now like to direct your attention to November the
22   17th, 2013, to the location of 8300 North MacArthur Boulevard
23   in Irving, Texas, at about 11:30 a.m.
24            Were you assigned eventually to investigate an
25   incident that occurred at that location around that time?
```

1   A.   I was.

2   Q.   And is that location in the Dallas Division of the

3   Northern District of Texas?

4   A.   It is.

5   Q.   Please tell the jury, how did you come to be involved in

6   that investigation?

7   A.   I first saw the robbery on the news, and a couple of days

8   after the robbery I reached out to the lead detective on the

9   case who I knew at Irving Police Department and offered my

10  assistance.

11  Q.   Okay.  And what was your general understanding as to what

12  had occurred?

13  A.   Seven individuals armed with handguns, not all of them,

14  but three of the individuals were armed with handguns, entered

15  the jewelry store.  They were all wearing concealing clothing,

16  and they robbed it in about one to two minutes.

17  Q.   Was anyone seized or confined during that robbery?

18  A.   Yes, the two owners of the store.

19  Q.   Okay.  So was this also a kidnapping investigation?

20  A.   Yes.

21  Q.   All right.  What did you do once you joined the

22  investigation to get up to speed, so to speak, with the

23  investigation?

24  A.   I met with the lead robbery detective.  I obtained the

25  video, the security video from the store of the robbery.  I

1    obtained their police reports, their photographs, and met with
2    the detective and talked about the case.
3    Q.   Okay.  Did you also examine or obtain copies of some of
4    the evidence?
5    A.   I did.
6    Q.   For example, the videotape that we saw played in the
7    courtroom, did you obtain the original version?
8    A.   I did.
9    Q.   And would you just please tell the jury, the original
10   version, how does it differ from the version that we've seen?
11   A.   It -- it has twenty -- approximately 27 different camera
12   angles.  You have to click on each camera to view the video
13   footage from that camera, whereas the video shown here in the
14   courtroom was looped together to show some of the pertinent
15   cameras, the video footage from those cameras.
16   Q.   All right.  Did you cause that to be created, the second
17   video?
18   A.   I did.
19   Q.   All right.  As you looked at the evidence, had any blood
20   evidence been recovered?
21   A.   It was.
22   Q.   Okay.  And did that eventually lead you to any of the
23   robbers in this case?
24   A.   Yes, it did.
25   Q.   And who did that lead you to?

```
1    A.   Three of the co-conspirators, Afraybeom Jackson, Joshua
2    Caldwell, and Dominique Pearson.
3    Q.   Did the investigation of those defendants then lead you to
4    other potential suspects?
5    A.   It did.
6    Q.   And how many suspects did you ultimately end up with?
7    A.   14.
8    Q.   Okay.
9              MR. JUNKER:  Your Honor, I have Exhibit --
10   Government's Exhibit 20, which has been pre-admitted.  And I
11   ask for permission to publish it.
12             THE COURT:  It's pre-admitted?
13             MR. JUNKER:  Yes.
14             THE COURT:  Okay.  You can show it.  That will be
15   fine.
16             MR. JUNKER:  All right.
17             THE COURT:  Do you have a thing to show it on, one of
18   these --
19             MR. JUNKER:  Yes.
20             THE COURT:  -- displays or something?
21             MR. JUNKER:  Do you want them left over there, or can
22   I drag them out more central to the courtroom?
23             THE COURT:  It kind of depends on where you want to
24   drag it to.  Where do you want to drag it to?
25             MR. JUNKER:  Like, I was thinking right there would
```

```
 1   be good.
 2            THE COURT:  Yeah.  If the jury can still see it from
 3   that far away.  I can't tell how big it is or isn't.
 4            MR. JUNKER:  I think it will work.
 5            THE COURT:  They probably can.  Sure, that will be
 6   fine.  Ronnie will help you.
 7            MR. JUNKER:  Thank you very much.
 8            Sorry, Ronnie.
 9            THE COURT:  Ronnie does everything except be the
10   Judge, and he would do a great job at that.
11            (Pause)
12   BY MR. JUNKER:
13   Q.  Agent Ibrahim, prior to coming to court today, did -- was
14   this chart created based on your investigation?
15   A.  It was.
16   Q.  Okay.  And if I put this up here, can you see that all
17   right?
18   A.  Yeah.  The last couple of names are kind of concealed,
19   but --
20   Q.  You have a book in front of you.  If you turn to
21   Exhibit 20, let's see if you can maybe see it that way.  Maybe
22   I need to move it forward.
23            THE COURT:  Why don't you pull it over a little bit?
24            Help him, Ronnie.
25            (Pause)
```

 1              MR. JUNKER:  Over here, is that going to be okay?

 2              THE COURT:  That's okay.

 3              Y'all -- the Defendants' lawyers can get up and walk

 4      around if you need to see it.

 5              Y'all have already seen it?  Okay.

 6              MR. ROGERS:  We've got copies.

 7              THE COURT:  Y'all have got copies.  Okay.

 8              MR. JUNKER:  Great.  Thank you, guys.

 9              THE COURT:  But if you feel like you need to,

10      Mr. Lund, Mr. Rogers, y'all can get up, too.

11      BY MR. JUNKER:

12      Q.   All right.  So you stated earlier you started off with

13      three suspects, and eventually the list grew; is that correct?

14      A.   That's correct.

15      Q.   All right.  And the list that we have here, Exhibit 20, is

16      that a list of the eventual names that you focused on as

17      suspects?

18      A.   Yes.

19      Q.   Did you also along the way obtain nicknames or things like

20      that for the same people?

21      A.   I did.

22      Q.   And are those listed next to the name of the person who

23      they applied to?

24      A.   They are.

25      Q.   Now, what I would like to focus on is, during the course

1    of your investigation, did you also seek to obtain documentary

2    evidence as part of your investigation?

3    A.    I did.

4    Q.    And what kind of documentary evidence did you seek out?

5    A.    I subpoenaed telephone records for the individuals that I

6    knew about, and I would analyze those and review the calls

7    around the time of the robbery and determine other numbers

8    which seemed to be pertinent, and I would subpoena those

9    telephone records as well.

10   Q.    All right.  So to be clear, these phone numbers that we

11   have on Exhibit 20, not all -- those records weren't subpoenaed

12   all at once?

13   A.    No.

14   Q.    This was a process?

15   A.    Yes.

16   Q.    An ongoing process?

17   A.    It was.

18   Q.    All right.  And eventually you were able --

19             THE COURT:  Wait, wait, wait.

20             Objection?

21             MR. MARTIN:  I would like to ask if the agent, the

22   documents he obtained, that was pursuant to a subpoena or to an

23   application predicated on the Stored Communications Act.

24             MR. JUNKER:  Ask to approach, Your Honor, regarding

25   that objection.

```
 1                THE COURT:  Well, just ask that question, and then
 2      we'll know whether we need to approach or not.
 3                          VOIR DIRE EXAMINATION
 4      BY MR. MARTIN:
 5      Q.   Did you just say something about subpoena some phone
 6      records?
 7      A.   I did.
 8      Q.   Are you talking about the records that were obtained
 9      pursuant to an order signed by Judge Stickney based on the
10      Stored Communications Act provision?
11      A.   Not at that point in my investigation.  Initially it was
12      via subpoenas.
13      Q.   And was it for -- were the subpoenas for cell phone data
14      or cell phone records like name and phone number?
15      A.   It was for subscriber information, name and phone number,
16      as well as tolls.
17      Q.   Okay.  Not the data?
18      A.   Not the cell site data.  That's correct.
19                MR. MARTIN:  All right.  Thank you.
20                THE COURT:  All right.  So I think that covered it.
21      Okay.
22                       DIRECT EXAMINATION CONTINUED
23      BY MR. JUNKER:
24      Q.   Okay.  To go further with Mr. Martin's questions, so the
25      information you obtained is what we commonly refer to as call
```

1    detail records?

2    A.    Yes.

3    Q.    All right.  Please tell the jury, what are call detail

4    records?

5    A.    Call detail records are a list of calls coming to or from

6    a cell phone, and it can include text messages as well.

7    Q.    And information such as the time of the call?

8    A.    The time of the call.

9    Q.    How long it was?

10   A.    The duration of the call.

11   Q.    All right.  However, eventually you did obtain additional

12   phone records regarding the phone -- some of the phone numbers

13   on this list?

14   A.    That's correct.

15   Q.    And you referred to something earlier that you called cell

16   site information?

17   A.    Cell tower information, yes.

18   Q.    Cell tower information.

19         Please explain to the jury what cell tower

20   information is.

21   A.    Cell site information or cell tower information is when a

22   person makes or receives a call or sends a text or receives a

23   text, it will record which cell tower that person's phone is

24   hitting off of.

25   Q.    Okay.  And why is that important?

```
1    A.    You can determine the location of the phone.
2    Q.    Whereas with call detail records you cannot?
3    A.    You just see a number and contact with that phone.
4    Q.    Okay.  Now, we've had a number of exhibits that have been
5    pre-admitted, and I would like to just talk about those
6    briefly.
7            So if you could turn in your book to -- we have --
8    well, let me do this.  I'm going to tell you an exhibit number
9    and the phone number, the last four digits of the phone numbers
10   it pertains to.  And if you would just tell me which defendant
11   or which -- not defendant, excuse me -- which suspect that
12   would apply to.
13   A.    Okay.
14   Q.    All right.  So the first one is Exhibit 21, T-Mobile
15   telephone records.
16            Let's begin with the number ending in 2763.
17   A.    That's going to be the telephone number for Hilton Aitch.
18   Q.    Okay.  And the number ending in 7577?
19   A.    That's going to be the telephone number for Xavier Ross.
20   Q.    And the number ending in 7772?
21   A.    That's going to be the telephone number for Joshua
22   Caldwell.
23   Q.    And the number ending in 8841?
24   A.    That's going to be the telephone number for Terrence
25   Thompson.
```

1   Q.   All right.  Going on to Exhibit 23, T-Mobile records for a
2   number ending in 8209?
3   A.   That's going to be the telephone number for Anthony
4   Turner.
5   Q.   I'm sorry, I may have --
6   A.   I'm sorry.  No, I was mistaken.  It's Michael Cornelious.
7   Q.   Okay.  And then Exhibit 25, T-Mobile records for a number
8   ending in 4458?
9   A.   That's the telephone number for Afraybeom Jackson.
10  Q.   Exhibit 27, first we have a T-Mobile number ending in
11  3621.
12  A.   That's going to be the telephone number for Dominique
13  Pearson.
14  Q.   And the number ending in 6775?
15  A.   That's going to be the telephone number for Mr. Hatchett.
16  Q.   Jimmy Hatchett?
17  A.   Yes.
18  Q.   Exhibit 29 are going to be Sprint telephone numbers, first
19  one ending in 7004.
20  A.   That is the telephone number for Anthony Turner.
21  Q.   And ending in 1503?
22  A.   That is the telephone number for Ricky Polk.
23  Q.   Okay.  By the way, was Mr. Polk ever arrested?
24  A.   He was not.
25  Q.   Why was that?

1   A.   He -- he died prior to being charged in the case.

2   Q.   Okay.  And Sprint telephone number ending in 0885?

3   A.   That's the telephone number for Irving Flanagan.

4   Q.   All right.  Two more.  Exhibit 31, a Sprint number ending

5   in 7013?

6   A.   That's the telephone number for Treveon Anderson.

7   Q.   And Exhibit 33, AT&T records for first number ending in

8   6768?

9   A.   That's the number for Vanlisa Scott.

10  Q.   And 7692?

11  A.   That is the telephone number for Larry Solomon.

12  Q.   Okay.  And then in a moment -- Okay.  So regarding

13  Exhibit 27, you stated that some of those records involved

14  Jimmy Hatchett?

15  A.   That's correct.

16        MR. JUNKER:  And, Your Honor, at this time we ask

17  permission to publish a page from those records.

18        THE COURT:  And these are pre-admitted?

19        MR. JUNKER:  Yes.

20        THE COURT:  All right.

21        MR. JUNKER:  Okay.  If we can go to page 2, please,

22  and -- right there.

23  BY MR. JUNKER:

24  Q.   Is this cellular telephone registered in the name of

25  anybody?

 1 | A.   Yes, Jimmy Hatchett.
 2 | Q.   Okay.  And does it also have background information on
 3 | him?  For example, date of birth?
 4 | A.   It does have the date of birth.
 5 | Q.   And what is the date of birth?
 6 | A.   September 2, 1964.
 7 | Q.   Okay.  And then -- now if we could go to Exhibit 31.
 8 |         MR. JUNKER:  Again, permission to publish, Your
 9 | Honor?
10 |         THE COURT:  Yes.
11 |         MR. JUNKER:  Page 2 of Exhibit 31, please.
12 | BY MR. JUNKER:
13 | Q.   And you mentioned another phone associated with Treveon
14 | Anderson?
15 | A.   That's correct.
16 | Q.   And in just a moment -- Okay.  And is that phone actually
17 | listed in his name?
18 | A.   It is.
19 | Q.   And is there an address associated with this from the
20 | telephone company?
21 | A.   There is.
22 | Q.   And what is that?
23 | A.   That's 1212 Grand Plaza Drive, Apartment 1803, Houston,
24 | Texas.
25 | Q.   And a zip code?

```
 1    A.    77067.
 2    Q.    All right.  Agent Ibrahim, do you see the person that
 3    you've referred to as Treveon Dominique Anderson in the
 4    courtroom today?
 5    A.    I do.
 6    Q.    Would you please point him out and identify an article of
 7    clothing that he's wearing for the record?
 8    A.    Sure.  He's the African-American male in the gray suit, in
 9    the burgundy tie, it appears to be.
10            MR. JUNKER:  May the record reflect that the witness
11    has identified the Defendant Treveon Anderson?
12            THE COURT:  The record will so reflect.
13    BY MR. JUNKER:
14    Q.    At some point in your investigation did you arrest
15    Mr. Anderson, or was -- or cause him to be arrested?
16    A.    Yes.
17    Q.    And what date was that?
18    A.    That was February 18th of 2016.
19    Q.    And when a defendant is arrested, are they processed or
20    what's commonly known as booked?
21    A.    Yes, they are.
22    Q.    And as part of that booking process, do you obtain certain
23    biographical information about them, such as name, address,
24    et cetera?
25    A.    Yes.
```

1  Q.   And when Mr. Treveon Anderson was booked, did he give his

2  name?

3  A.   He did.

4  Q.   Did he also give a home address?

5  A.   He did.

6  Q.   And what home address did he give?

7  A.   1212 Grand Plaza Drive, Apartment 1803, Houston, Texas.

8  Q.   Matching the phone records we've just seen?

9  A.   That's correct.

10 Q.   Did he also give you his Social Security number at that

11 time?

12 A.   He did.

13 Q.   Do you recall now what the Social Security number was?

14 A.   It ended in 7228.  I believe it may have been 635 -- I

15 don't recall the middle two numbers.  Possibly 15-7228.

16 Q.   Is there anything that would refresh your recollection?

17 A.   Yes.

18 Q.   And what would that be?

19 A.   A copy of my arrest report.

20 Q.   Okay.

21 A.   Booking report.

22 Q.   And we'll try and get that for you in a moment.  Let's

23 move on, though, for now.

24        So as par of your investigation, did you analyze the

25 call detail records that were obtained for Mr. Anderson's

1  phone?

2  A.   Yes.

3           MR. MARTIN:  Judge, if I may, we object to this in

4  that it's my understanding they were not obtained pursuant to a

5  Fourth Amendment search warrant but, rather, an order under the

6  Stored Communications Act.  And, hence, it does not comply with

7  the ruling in Carpenter versus United States that I think the

8  Court is familiar with.

9           THE COURT:  I am familiar with that.

10           You want to ask him that question to determine

11  whether it was or wasn't?

12           MR. MARTIN:  Yes.

13           THE COURT:  Okay.

14           MR. JUNKER:  Your Honor, I'd ask to approach about

15  that before we go into questioning, Your Honor.

16           THE COURT:  Well, he's going to ask that question.

17           MR. JUNKER:  Okay.

18                     VOIR DIRE EXAMINATION

19  BY MR. MARTIN:

20  Q.   Would the call detail records that you obtained, was that

21  pursuant to an order signed by Judge Stickney?

22  A.   Yes.  Later in my investigation, it was.

23  Q.   Okay.  Predicated upon the Stored Communications Act, and

24  an order was obtained from Judge Stickney?

25  A.   That's correct.

1   Q.   For the call data records; is that correct?

2   A.   That's correct.

3   Q.   This was not obtained pursuant to a Fourth Amendment

4   search warrant?

5   A.   It was not.

6   Q.   Okay.

7           THE COURT:  Now you still have your objection?

8           MR. MARTIN:  Yes.

9           THE COURT:  Okay.  All right.  I'm going to rule on

10   that outside y'all's presence.

11           I'm going to let you off a little bit early today.

12   We're moving just fine.  We're getting things done.

13           Be back here at 9:00.

14           Y'all are not used to sitting, listening to humans

15   all day long.  So tonight and tomorrow at lunch, try not to

16   load up on too much chicken fried steak.  I mean, it's just

17   hard.  This is so different than what you do in your real

18   lives.  But you're doing great, and y'all are listening real

19   well.  I'm just suggesting that.  Go to bed early.

20           We can't start till everybody is here.  So make sure

21   you're here before 9:00, and then we'll start right at 9:00.

22   And we'll clear up some of these other issues before then.

23           But I appreciate it.  Don't talk about the case.

24   Don't do any research yourselves.  Be back here in that jury

25   room at 9:00 -- before 9:00.

1                    Thank y'all.

2                    SECURITY OFFICER:  All rise.

3                    (Jury out)

4                    THE COURT:  Okay.  Outside the presence of the jury.

5                    We've already had a motion to suppress in this,

6      correct?

7                    MR. MARTIN:  That is correct, Your Honor.

8                    THE COURT:  And I ruled against you on this.  And

9      you're preserving that objection at this time, correct?

10                   MR. MARTIN:  I'm sorry, just the very last again?

11                   THE COURT:  Just a second.

12                   (Pause)

13                   THE COURT:  Okay.  We've already had a motion to

14     suppress on this.

15                   MR. MARTIN:  Yes, Your Honor.

16                   THE COURT:  And I ruled against you at that time,

17     both of the Defendants, correct?

18                   MR. MARTIN:  That's correct.

19                   THE COURT:  But you're still making the objection on

20     the same basis to preserve your objection, correct?

21                   MR. MARTIN:  That's correct.

22                   THE COURT:  Is there anything new?

23                   MR. MARTIN:  No.

24                   THE COURT:  Okay.  I still overrule your objection at

25     this time.  Okay.

1          So I will let you go into that matter, all right,

2    Mr. Junker?

3          MR. JUNKER:  Yes, Your Honor.

4          Are you going to rule on that in front of the jury as

5    well?  Because they're now left with the impression that he may

6    have done something outside the law.

7          THE COURT:  No.

8          MR. JUNKER:  Okay.

9          THE COURT:  When you get to be a judge, you can do it

10   your way.

11         MR. JUNKER:  I was not trying to step on the Court's

12   toes.  I apologize, Your Honor.

13         THE COURT:  No, I know.  I'm not going to let you do

14   that.  Don't worry about it.  You're a big boy and I'm a big

15   boy.  We don't get our feelings hurt over it.  I just tell you

16   no.

17         MR. JUNKER:  Thank you.

18         THE COURT:  But you can one of these days.  You're a

19   young guy.  Maybe you'll be one of these, and you'll have to

20   make those decisions.  And, you know, the jury -- whatever the

21   jury thinks, you know, I don't know.  There's no -- we'll just

22   see.  But I don't think that's necessary, no.

23         You can just go into what you need to go into, and

24   they'll -- that's what they need to do.  They don't need to

25   know why I'm doing what I'm doing in that instance, I don't

1    think.

2            Okay.  Off the record.

3            (Discussion off the record)

4            (Recessed for the day at 4:43)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            INDEX

 2   Jury sworn............................................. 6

 3   Preliminary jury instructions.......................... 6

 4   Pleas received........................................ 18

 5   OPENING STATEMENT:  Mr. de la Garza..................... 19

 6   OPENING STATEMENT:  Mr. Rogers......................... 27

 7                                                  Voir
                      Direct  Cross  Redirect  Recross  Dire
 8
     WITNESSES FOR THE
 9   GOVERNMENT

10   AJAY SONI              31

11   VANCE BARNES           59

12   JASON IBRAHIM          83,93                  93,101

13
     GOVERNMENT'S EXHIBITS                          Received
14
         1    Digital recording                        4
15
         2    Digital recording                        4
16
         3    Zip ties                                69
17
         4    Zip ties                                69
18
        5A    Zip ties                                79
19
        5B    Zip ties                                79
20
         6    Spreadsheet                             51
21
         7    Photograph                               4
22
         8    Photograph                               4
23
         9    Photograph                              63
24
        11    Ford Motor Company records               4
25
```

| | | | |
|---|---|---|---|
| 12 | Ford Motor Company business records affidavit (Record only) | 4 |
| 14 | Firearm slide springs | 70 |
| 15 | Jewelry display stand | 75 |
| 16 | Black plastic trash bags | 78 |
| 20 | Summary chart | 4 |
| 21 | T-Mobile records | 4 |
| 22 | T-Mobile business records affidavit (Record only) | 4 |
| 23 | T-Mobile records | 4 |
| 24 | T-Mobile business records affidavit (Record only) | 4 |
| 25 | T-Mobile records | 4 |
| 26 | T-Mobile business records affidavit (Record only) | 4 |
| 27 | T-Mobile records | 4 |
| 28 | T-Mobile business records affidavit (Record only) | 4 |
| 29 | Sprint records | 4 |
| 30 | Sprint business records affidavit (Record only) | 4 |
| 31 | Sprint records | 4 |
| 32 | Sprint business records affidavit (Record only) | 4 |
| 33 | AT&T records | 4 |
| 41 | Sprint records | 4 |
| 42 | Sprint business records affidavit (Record only) | 4 |
| 45 | Photograph | 4 |

1    47   Facebook message                                    4

2    48   Photograph                                          4

3    49   Photograph                                          4

4    50   Facebook business records affidavit                 4
          (Record only)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I, TODD ANDERSON, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Dallas Division, hereby certify that the above and

4    foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6        WITNESS MY HAND on this 10th day of July, 2019.

7

8

9
                                    /s/Todd Anderson
10                                  TODD ANDERSON, RMR, CRR
                                    United States Court Reporter
11                                  1100 Commerce St., Rm. 1625
                                    Dallas, Texas  75242
12                                  (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25