1                IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF TEXAS

3                         DALLAS DIVISION

4
     UNITED STATES OF AMERICA,      )        3:14-CR-340-K
5                   Government,     )
                                    )
6                                   )
     VS.                            )        DALLAS, TEXAS
7                                   )
                                    )
8    TREVEON DOMINIQUE ANDERSON     )
     and JIMMY HATCHETT,            )
9                   Defendants.     )        October 24, 2018

10

11              TRANSCRIPT OF JURY TRIAL VOLUME 3

12             BEFORE THE HONORABLE ED KINKEADE

13               UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16

17   FOR THE GOVERNMENT:          MR. JOHN J. DE LA GARZA
                                  UNITED STATES DEPARTMENT OF JUSTICE
18                                NORTHERN DISTRICT OF TEXAS
                                  U.S. Courthouse, Third Floor
19                                1100 Commerce Street
                                  Dallas, Texas  75242
20                                john.delagarza@usdoj.gov
                                  (214) 659-8682
21
                                  MR. WALT M. JUNKER
22                                UNITED STATES DEPARTMENT OF JUSTICE
                                  NORTHERN DISTRICT OF TEXAS
23                                U.S. Courthouse, Third Floor
                                  1100 Commerce Street
24                                Dallas, Texas  75242
                                  walt.junker@usdoj.gov
25                                (214) 659-8630

```
1    FOR THE DEFENDANT,          MR. E.X. MARTIN
     TREVEON DOMINIQUE ANDERSON: Law Offices of E.X. Martin
2                                8828 Greenville Avenue
                                 Dallas, Texas  75243
3                                exmartin@airmail.net
                                 (214) 343-7400
4

5                                MS. CAROLYN A. HILL
                                 Attorney at Law
6                                4144 N. Central Expressway
                                 Suite 1200
7                                Dallas, Texas  74204
                                 carolynhillatty@gmail
8                                (214) 418-3867

9
     FOR THE DEFENDANT,          MR. NATHAN ROGERS
10   JIMMY HATCHETT:             Burleson Pate & Gibson
                                 Founders Square
11                               900 Jackson Street
                                 Suite 330
12                               Dallas, Texas  75202
                                 nrogers@bp-g.com
13                               (214) 871-4900

14
                                 MR. PAUL TALIAFERRO LUND
15                               Burleson Pate & Gibson
                                 Founders Square
16                               900 Jackson Street
                                 Suite 330
17                               Dallas, Texas  75202
                                 plund@bp-g.com
18                               (214) 871-4900

19
     COURT REPORTER:             MR. TODD ANDERSON, RMR, CRR
20                               United States Court Reporter
                                 1100 Commerce St., Rm. 1625
21                               Dallas, Texas  75242
                                 (214) 753-2170
22

23

24        Proceedings reported by mechanical stenography and

25   transcript produced by computer.
```

```
 1              JURY TRIAL VOLUME 3 - OCTOBER 24, 2018
 2                       P R O C E E D I N G S
 3          THE COURT:  How are you this morning?
 4          THE WITNESS:  Good, Your Honor.  How about yourself?
 5          THE COURT:  Good.  Good.   Good.
 6          Have you got water down there?
 7          THE WITNESS:  I'm good.
 8          THE COURT:  Okay.  Good.  All right.
 9          MR. LUND:  Ready to proceed, Your Honor.
10          THE COURT:  I knew you were.
11          And -- off the record.
12          (Discussion off the record)
13          SECURITY OFFICER:  All rise for the jury.
14          (Jury in)
15          THE COURT:  Thank y'all.  Y'all be seated.
16   Appreciate it.
17          All right.  Mr. Lund.
18          MR. LUND:  Agent --
19          THE COURT:  The witness was passed, and now it's
20   cross-examination.
21                       CROSS-EXAMINATION
22   BY MR. LUND:
23   Q.   Agent, good morning.
24   A.   Good morning.
25   Q.   I'd like to show you Defendant's Exhibit 103, which was
```

1  previously admitted into evidence.

2  A.   Okay.

3          (Pause)

4          MR. LUND:  Ms. Lee, Defendant's --

5          MS. LEE:  Okay.

6  BY MR. LUND:

7  Q.   At the top here, can you read what this says at the very

8  top?

9  A.   "Facebook Business Record."

10  Q.   As an FBI agent, have you previously reviewed Facebook

11  business records?

12  A.   Not a lot, but I have a little.

13  Q.   Okay.

14          MR. LUND:  If I could have the whole image again,

15  Ms. Lee.

16          (Pause)

17  BY MR. LUND:

18  Q.   Will you generally agree with me that this is generally a

19  bag with some money in it?

20  A.   Yes, sir.

21  Q.   At the bottom here --

22          MR. LUND:  If I could have just this text at the

23  bottom, please, Ms. Lee.

24  BY MR. LUND:

25  Q.   There's a comment here where -- there's a name next to

```
 1    "user" where I'm highlighting.  What is that name?
 2    A.   Oh, where it says -- it says Cheryl Austin.
 3    Q.   Are you aware that Cheryl Austin was Mr. Hatchett's
 4    girlfriend in 2013?
 5    A.   No, sir.
 6    Q.   So you were not here in court when that testimony was
 7    heard previously?
 8    A.   No, sir.
 9    Q.   Can you please read the text?
10    A.   "I like.  Thank you baby."
11    Q.   And so that's a comment that was left by Ms. Austin
12    apparently in this Facebook photo?
13    A.   Okay.
14    Q.   Thank you.
15         MR. LUND:  May I please have Defense Exhibit 102,
16    which was previously admitted into evidence, and if you could
17    jump directly to page 19.
18         (Pause)
19    BY MR. LUND:
20    Q.   While that's coming up, you're familiar with the name
21    Hilton Aitch, are you not?
22    A.   Yes, sir.
23    Q.   That's one of the individuals whose cell phone records you
24    analyzed, correct?
25    A.   Yes, sir.
```

1   Q.   Do you see at the top --
2              MR. LUND:  I apologize.  Page 19.
3              MS. LEE:  Is this not the correct, page?
4              MR. LUND:  It's not.
5              MS. LEE:  Okay.
6              (Pause)
7              MR. LUND:  Scroll to the Hilton Aitch page, please.
8              MS. LEE:  Okay.
9              (Pause)
10   BY MR. LUND:
11   Q.   Okay.  Here we go.
12              Now, at the top here where it says "name," do you
13   recognize this name?
14   A.   It says Hilton -- well, Aitch, Hilton Murdock.
15   Q.   And you understand that's the same gentleman whose cell
16   phone records you reviewed, correct?
17   A.   Yes, sir.
18   Q.   I'm pointing here at the top where it says, "United States
19   Marshals Service."
20              If I told you these were admitted as certified United
21   States Marshals records, you wouldn't have any reason to doubt
22   me, would you?
23   A.   No, sir.
24              MR. LUND:  At the bottom of this page, if I can,
25   Ms. Lee.

```
 1              MS. LEE:  Yes, sir.
 2    BY MR. LUND:
 3    Q.   Where it says, "custody information" down here, do you see
 4    that?
 5    A.   The custody start date?
 6    Q.   Yes.
 7    A.   Yes, sir.
 8    Q.   You don't have to read the date.  I'm just looking for the
 9    custody information.
10              MR. LUND:  If I could go forward two pages, please.
11    BY MR. LUND:
12    Q.   Now, this is a little more difficult to see, so if we can
13    blow it up.  This lists --
14              MR. LUND:  Actually, a little higher.  Sorry.  Near
15    the top.  I apologize.  Right there.  Thank you.
16    BY MR. LUND:
17    Q.   Now, this lists a number of different facilities, correct?
18    A.   Cell block, Montgomery County, Kaufman County, Fannin
19    County, Johnson County, so, yes, sir.
20    Q.   Do you see then here where it says, "FCI Seagoville
21    Detention Center"?
22    A.   Yes, sir.
23              MR. LUND:  And if I could please go back out and see
24    the bottom part of this page.  I'll show you where.  It's this
25    second part right here.
```

1    BY MR. LUND:

2    Q.   And you see again here it says, "FCI Seagoville Detention

3    Center"?

4    A.   Yes, sir.

5    Q.   It says "admit."  Is that date 9-20-18?

6    A.   It's kind of blurry, and it's kind of broken up, but I

7    don't see any reason why it wouldn't be if that's the date

8    you're saying.

9    Q.   And then the release date is blank, correct?

10   A.   Yes, sir.

11   Q.   Thank you.

12            Now, I would like to move back on --

13            MR. LUND:  I appreciate that.  I'm finished with that

14   exhibit.

15   BY MR. LUND:

16   Q.   With regards to your analysis in this case, you went

17   through a number of call detail records for Mr. Hatchett,

18   correct?

19   A.   I only had toll records for the phone associated with

20   Mr. Hatchett.

21   Q.   That's correct.  And that's different than the cell site

22   data that you had for other individuals, correct?

23   A.   Yes, sir.

24   Q.   So because you only had the toll records, you cannot say

25   where Mr. Hatchett's phone was on November 17, 2013, correct?

```
 1   A.   No, sir.
 2   Q.   And you certainly couldn't say where Mr. Hatchett was on
 3   those dates, correct?
 4   A.   No, sir, I can't say anything about that.
 5   Q.   You had two different slides in your presentation
 6   yesterday.  I believe they were 36 and 37.  And they showed two
 7   different spreadsheets regarding the toll records you had for
 8   Mr. Hatchett.  Do you remember those?
 9   A.   Yes, sir.
10   Q.   You reviewed -- you reviewed the whole amount of records
11   from Mr. Hatchett, correct?
12   A.   I just looked mainly during the days, the couple of days
13   around the offense.  I didn't review the whole record.
14   Q.   But you had access to the whole record?
15   A.   Yes, sir.
16   Q.   And so you instead reviewed part of the record and put
17   that in your report, correct?
18   A.   Yes, sir.
19   Q.   And you were directed to do so?
20   A.   Yes, sir.
21   Q.   So you wouldn't be aware that there were calls between
22   Mr. Hatchett and Messrs. Aitch and Thompson from other days?
23   A.   I did see that there were other calls on those other days.
24   Q.   You did see them, so you're aware of some.  You're just
25   not sure how many?
```

```
 1   A.   Yes, sir.
 2   Q.   All right.
 3            MR. LUND:  May I please have the spreadsheet,
 4   Government's Exhibit 27?
 5            If I can scroll to the very top, line 1.
 6   BY MR. LUND:
 7   Q.   First of all, do you recognize this spreadsheet generally
 8   as the toll records that you're referring to for Mr. Hatchett's
 9   cell phone?
10   A.   Yes, sir.
11   Q.   If we go up to the very top, you can see that this is a
12   date of 11-10-2013?
13   A.   Yes, sir.
14   Q.   Is it fair to say that's where the records start?
15   A.   That's when they -- and if you'll see, it says, "date of
16   call."  That's in Pacific Time.
17   Q.   Yes.
18   A.   But yes.
19   Q.   So you're saying -- I understand your -- your point is
20   absolutely correct about Pacific Time versus Central Time, but
21   this day is when the records start, correct?
22   A.   Yes, sir.
23            MR. LUND:  At the very bottom line, 961.
24   BY MR. LUND:
25   Q.   And the records run all the way, it looks like, down to
```

```
 1   11-24; is that correct?
 2   A.   Yes, sir.
 3   Q.   It's about 15 days' worth of records?
 4   A.   Yes, sir.
 5   Q.   So this is obviously a broader range than the time period
 6   that you included in your chart, which was just a few hours,
 7   correct?
 8   A.   I -- I did about 12 hours or so, yes, sir.
 9   Q.   All right.  And you obviously haven't looked at all these
10   records, so I'm just going to point out a few to you briefly.
11            MR. LUND:  If I may please have line 154.
12            (Pause)
13            MR. LUND:  Thank you.
14   BY MR. LUND:
15   Q.   Line 154.  This number right here, you recognize this as
16   Mr. Hatchett's number, correct?
17   A.   That's the number I was provided for Mr. Hatchett.
18   Q.   Now, all of these -- this whole column, because it's the
19   records for Mr. Hatchett, C is always the same number, correct?
20   A.   Yes, sir.
21   Q.   Now, over here, this is the number that this particular
22   line, 154, is identifying, correct?
23   A.   That is the number -- it was an outgoing call.
24   Q.   Uh-huh.
25   A.   So that's the number that the phone associated with
```

```
 1   Mr. Hatchett dialed.
 2   Q.   And this is Hilton Aitch's phone call, correct -- phone
 3   number, correct?
 4   A.   832-887-2763.  Yes, sir.
 5   Q.   And the date is 11-12-13?
 6   A.   Yes, sir.
 7           MR. LUND:  If I could have line 170, please.
 8   BY MR. LUND:
 9   Q.   Line 170, right here.  I'm going to skip over some of
10   this, because we said this number is always the same, of
11   course.  This is column C on the left.
12           And then over here, we have the same number listed
13   twice.  That's Hilton Aitch's number, correct?
14   A.   Yes, sir.  There was an outgoing call, and then there was
15   an SMS pretty much almost at the same time.
16   Q.   SMS is a text message commonly referred to as, correct?
17   A.   Yes, sir.
18   Q.   And the date on this is 11-13?
19   A.   Yes, sir.
20           MR. LUND:  If I could have line 200, please.
21   BY MR. LUND:
22   Q.   I'm going to try to do this one in a little bit of a
23   bunch, but stay with me here.
24           We know that column C is always the same.
25           We know that over here this is Hilton Aitch's phone
```

```
 1   number again, correct?
 2   A.   Yes, sir.
 3   Q.   This is line 200.  And that's 11-13-13, the same day,
 4   correct?
 5   A.   Yes, sir.
 6   Q.   Now, if I show you line 207, same number?
 7   A.   Yes, sir.
 8   Q.   209, same number?
 9   A.   Yes, sir.
10   Q.   210, same number?
11   A.   Yes, sir.
12           MR. LUND:  May I please have line 249?
13   BY MR. LUND:
14   Q.   All right.  Line 249.  It was on 11-13 before.  Now I'm on
15   11-14, correct?
16   A.   Yes, sir.
17   Q.   And, again, column C is the same.  It's still
18   Mr. Hatchett's number?
19   A.   These are the records for Mr. -- the phone associated with
20   Mr. Hatchett.
21   Q.   All right.  And over here we see, once again, this is
22   another outgoing call to Hilton Aitch at line 249, correct?
23   A.   Yes, sir.
24           MR. LUND:  May I please have line 593?
25   BY MR. LUND:
```

```
1    Q.   Now, you can see here, agent, as we're scrolling through
2    to line 593, we're scrolling over the three days:  11-16,
3    11-17, 11-18.  And I'm doing that because those are some of the
4    days that were reflected in your already done work, correct?
5    A.   Yes, sir.  I started on the 16th and then rolled through
6    the 17th.
7    Q.   All right.  So I'm going to save the jury a little bit of
8    time here.  We're going to go to line 593.
9         And as you can see, we're now on 11-19, correct?
10   A.   Yes, sir.
11   Q.   This is, again, Hilton Aitch's number, correct?
12   A.   Yes, sir.
13   Q.   It's a terminating phone call?
14   A.   Yes, sir.  That means it was -- terminating means an
15   incoming call.
16   Q.   All right.
17        MR. LUND:  If I could have line 629.
18   BY MR. LUND:
19   Q.   Now, line 629 -- thank you.  We look at line 629 and 631
20   together.  Both 629 and 631 are 11-19, correct?
21   A.   Yes, sir.
22   Q.   The number is the same, Hilton Aitch's number for both,
23   correct?
24   A.   Yes, sir.
25        MR. LUND:  If I may have line 687, please.
```

```
 1   BY MR. LUND:
 2   Q.   687, we're now on 11-20, correct?
 3   A.   Yes, sir.
 4   Q.   So the next day.  This is now Hilton Aitch's phone number
 5   again, correct?
 6   A.   Yes, sir.
 7   Q.   If I may briefly show you 692.  I don't need to move it
 8   because we can see, once again, it's the same day, 11-20.  And,
 9   again, it's Hilton Aitch's phone number, correct?
10   A.   Yes, sir.
11   Q.   Once again, 694, Hilton Aitch's phone number once again.
12   The same day, correct?
13   A.   Line 694, sir?
14   Q.   694.  Yes.  I'm happy to highlight it if I did that too
15   quickly.
16   A.   No.  I just -- you -- I missed which line you were talking
17   about.
18            No, that is another call associated between
19   Mr. Hatchett's phone and phone associated with Mr. Aitch.
20   Q.   Thank you, agent.
21            MR. LUND:  I'd like to go to line 710, please.
22            (Pause)
23   BY MR. LUND:
24   Q.   Line 710, this is, again -- this is -- now the date is
25   11-21, correct?
```

```
 1   A.   Yes, sir.

 2   Q.   This is Hilton Aitch's number?

 3   A.   Yes, sir.

 4            MR. LUND:  Line 837, please.

 5   BY MR. LUND:

 6   Q.   837 and 838 you'll actually see are both the same Hilton

 7   Aitch number, correct?

 8   A.   Yes, sir.

 9   Q.   The date is now 11-22?

10   A.   Yes, sir.

11   Q.   So we're now five days after the Tilak robbery?

12   A.   Yes, sir.

13            MR. LUND:  Line 897.

14            (Pause)

15            MR. LUND:  897.  Thank you very much.

16   BY MR. LUND:

17   Q.   We're now at 11-23.  This is, again, a phone call with

18   Hilton Aitch's cell phone, correct?

19   A.   Yes, sir.

20            MR. LUND:  And line 948.

21   BY MR. LUND:

22   Q.   So on line 948, we have, once again, Hilton Aitch's cell

23   phone?

24   A.   Yes, sir.

25   Q.   A terminating voice call with that number?
```

1    A.    Yes, sir.

2    Q.    The date is 11-24?

3    A.    Yes, sir.

4    Q.    So that means that from what we just reviewed and from

5    what you reviewed previously that was shown to the jury

6    yesterday, there are 15 days of records for Mr. Hatchett's

7    phone and 12 of those 15 days he's contacting Mr. Aitch,

8    correct?

9    A.    I -- I wouldn't be able to say the total number of days of

10   contact, but there also was contact the day of -- the day

11   before the robbery and the day of the robbery later in that

12   day.  But there is contact throughout the records, obviously,

13   with that number, which obviously they know each other.

14   Q.    If I were to represent to you that I did the math before

15   coming to court and that was 12 out of 15 days, would you have

16   reason to doubt me?

17   A.    No, sir.

18   Q.    Thank you.

19         If I may now then talk about Terrence Thompson.

20   There were also phone records that you analyzed for Terrence

21   Thompson's phone, correct?

22   A.    713-924-8841?

23   Q.    Yes, sir.  That's a number that you believe was associated

24   with Terrence Thompson based on your work in this, correct?

25   A.    Yes, sir.

```
 1  Q.   All right.  And, again, you analyzed the same days and the
 2  same time period as we did previously with Mr. Aitch, correct?
 3  A.   Yes, sir.
 4          MR. LUND:  Now, if I may have line 121, please,
 5  Ms. Lee.
 6          MS. LEE:  Mr. Lund, which one of the Government's
 7  exhibits?
 8          MR. LUND:  Oh, I'm sorry.  This is the same
 9  Government's exhibit, line 121.
10          MS. LEE:  Oh, I'm sorry.
11          MR. LUND:  I appreciate that.
12  BY MR. LUND:
13  Q.   Just to be clear, agent, I have not changed Government's
14  exhibits, correct?
15  A.   No, sir.
16  Q.   These are still Mr. Hatchett's call detail -- toll logs
17  that you reviewed?
18  A.   Yes, sir.  They're still the toll logs, yes.
19  Q.   So line 121 here.  We can now see that, again, column C
20  has not changed, because these are still Mr. Hatchett's
21  records, correct?
22  A.   Yes, sir.
23  Q.   Back to 11-12, five days before the Tilak robbery,
24  correct?
25  A.   Yes, sir.
```

```
 1   Q.   What's the number this time?
 2   A.   713-924-8841.
 3   Q.   And that's the phone number that you've associated with
 4   Terrence Thompson previously, correct?
 5   A.   Yes, sir.
 6   Q.   Well, without moving this, I'm going to show you line 127.
 7   Is this another same phone -- same phone number, Terrence
 8   Thompson's phone number?
 9   A.   Yes, sir.
10   Q.   Is this another terminated phone call?
11   A.   Terminating, yes, sir.
12            MR. LUND:  Scroll up just a little bit to line 130.
13   BY MR. LUND:
14   Q.   130.  I'm going to show you, once again, the same date,
15   11-12-2013.  The same phone number, correct?
16   A.   Yes, sir.
17   Q.   So that's, again, Terrence Thompson's phone number?
18   A.   That's the phone associated -- that I was told associated
19   with Mr. Thompson.
20   Q.   That's a tongue tier.  I understand.
21            MR. LUND:  Line 153, please, Ms. Lee.
22   BY MR. LUND:
23   Q.   Line 153 and 155 I'm going to show you briefly together.
24            The phone number for 153 matches the phone number for
25   155, correct?
```

```
 1    A.   Yes, sir.
 2    Q.   That's, again, Terrence Thompson's phone number?
 3    A.   Yes, sir.
 4              MR. LUND:  Line 172, please.
 5    BY MR. LUND:
 6    Q.   Line 172, the date has changed.  We're now at 11-13,
 7    correct?
 8    A.   Yes, sir.
 9    Q.   The phone number is still the same, Terrence Thompson's
10    phone number, outgoing phone call?
11    A.   Yes, sir.
12    Q.   Line 173, directly below it, is the same number, correct?
13    A.   Yes, sir.
14    Q.   Separate outgoing phone call?
15    A.   Sorry, sir?
16    Q.   Separate outgoing phone call?
17    A.   Yes, sir.
18    Q.   Thank you.
19              MR. LUND:  Line 596, please.
20    BY MR. LUND:
21    Q.   And, agent, once again, I'm moving past.  As you can see
22    as we scroll through the dates of 11-16 and 11-17, that was
23    part of your analysis.  You understand that, correct?
24    A.   Yes, sir.
25    Q.   Line 596 will show --
```

```
 1              MR. LUND:  Thank you, Ms. Lee, for your assistance.
 2    BY MR. LUND:
 3    Q.   Line 596, we now have -- is this the same phone number we
 4    looked at before for Terrence Thompson?
 5    A.   Yes, sir, it is.
 6    Q.   The date is now 11-19?
 7    A.   Yes, sir.
 8    Q.   It's another outgoing call?
 9    A.   Yes, sir.
10    Q.   Line 598, two lines below it, is that another phone call
11    of Terrence Thompson?
12    A.   Yes, sir, it is.
13              MR. LUND:  If I may have line 611, please.
14    BY MR. LUND:
15    Q.   Line 611, once again, 11-19.  This is the same outgoing
16    number for Terrence Thompson, correct?
17    A.   Yes, sir.
18    Q.   It's an outgoing phone call?
19    A.   Yes, sir.
20    Q.   Go down here to line 614.  Do you recognize this same
21    number?
22    A.   Line 614, yes, sir.
23    Q.   Separate outgoing phone call?
24    A.   Yes, sir.
25              MR. LUND:  If I may have line 840, please.
```

```
 1   BY MR. LUND:
 2   Q.   840, we've now gone to a different date.
 3             If you can tell, the date is now 11-22; is that
 4   correct?
 5   A.   Yes, sir.
 6   Q.   This is, once again, a separate outgoing phone call to the
 7   same number?
 8   A.   Yes, sir.  It's another outgoing phone call from the --
 9   the phone associated with Mr. Hatchett to the phone associated
10   with Mr. Thompson.
11   Q.   So, once again, as before with Hilton Aitch's records, it
12   seems from these that they knew each other, correct?
13   A.   Yes, sir.
14   Q.   They were phone calls well beyond what you were told to
15   analyze, correct?
16   A.   Yes, sir.
17             MR. LUND:  Thank you.  No further questions, Your
18   Honor.
19             MR. DE LA GARZA:  Nothing more for Agent Sedwick,
20   Your Honor.
21             THE COURT:  Mr. Martin?
22             MR. MARTIN:  Nothing more, Your Honor.
23             THE COURT:  All right.  Can we let this gentleman be
24   excused?
25             MR. LUND:  Yes, Your Honor, absolutely.
```

```
 1            MR. DE LA GARZA:  No objection.

 2            MR. MARTIN:  Yes, Your Honor.

 3            THE COURT:  You're excused.  Thank you, sir.

 4            THE WITNESS:  Thank you, Your Honor.

 5            (Witness excused)

 6            THE COURT:  Okay.  Are you ready to call your next

 7   witness?

 8            MR. JUNKER:  Your Honor, at this time the Government

 9   rests.

10            (Government rests)

11            THE COURT:  All right.  Mr. Lund, Mr. Rogers, there

12   are some matters we need to take up outside.

13            MR. LUND:  There is, Your Honor.

14            THE COURT:  All right.  This shouldn't take too long,

15   and you've got doughnuts back there.  So -- no more doughnuts.

16   I'm sorry, I didn't send enough in.  They were big doughnuts,

17   though.  We'll bring you back out.  And I'll send word in if

18   it's going to take a long time.  I don't think that it will.

19            Thank y'all very much.  Don't talk about the case.

20            All right.

21            SECURITY OFFICER:  All rise.

22            (Jury out)

23            THE COURT:  Mr. Lund, do you want to go?

24            MR. LUND:  If I may, Your Honor.  Thank you.

25            Comes now the Defendant, Jimmy Hatchett, in
```

 1    accordance with Rule 29 of the Federal Rules of Criminal

 2    Procedure.  The Defendant asks for a finding of not guilty as

 3    to all counts of the Fifth Superseding Indictment.

 4          With regards to all counts, there is no reliable

 5    evidence that would prove that Mr. Hatchett was one of the

 6    robbers in question.  The Government's evidence on that point

 7    is limited to phone records which do not demonstrate

 8    participation in the robbery and a vague Facebook record which

 9    at best only indicates that Mr. Hatchett was leaving the

10    Houston area, not that he was going to rob a store in Dallas.

11          Beyond that, the Government's only evidence in this

12    matter against Mr. Hatchett consists of co-defendant witnesses

13    who were attempting to gain a benefit for their testimony.

14          THE COURT:  Slow down just a little bit.

15          MR. LUND:  Yes, Your Honor.

16          And are, therefore, not inherently reliable.

17          Unsubstantiated co-conspirator testimony cannot form

18    the basis of a conviction in this matter; and, therefore, the

19    Court should enter verdicts of not guilty on all counts.

20          Additionally, with regards to the two kidnapping

21    counts, the evidence as presented by the Government simply does

22    not constitute a kidnapping.  Even if the Court were to believe

23    that Mr. Hatchett was one of the robbers in question, the

24    evidence was that the store owners were tied up but not moved,

25    transported, or otherwise confined to any location.  Further,

1    they were not held in the manner contemplated by the kidnapping

2    statute.   Instead, they were zip tied in order to allow a

3    robbery to transpire.   This is a grossly overly broad use of

4    the kidnapping statute and is not supported by the evidence.

5    The Court should enter not guilty verdicts on Counts Four and

6    Five.

7              Thank you, Your Honor.

8              THE COURT:  All right.  Ms. Hill?

9              Mr. Martin?

10             MS. HILL:  Your Honor, without taking any further

11   time, we also are in agreement with what the defense just asked

12   for.  We are also asking --

13             THE COURT:  So you adopt everything he said, too?

14             MS. HILL:  Everything he said, Your Honor.

15             THE COURT:  All right.

16             MS. HILL:  And are asking for the same relief.

17             THE COURT:  All right.  Government?

18             MR. JUNKER:  Your Honor, addressing the -- everything

19   except for the kidnapping counts, first, Your Honor, overall

20   counsel has argued basically credibility issues that are for

21   the jury to decide.  The Court's own instruction instructs the

22   jury that if they believe the co-conspirators, that their

23   testimony alone is enough for a conviction, contrary to what

24   counsel argued.

25             It's a -- there's been sufficient facts, evidence,

1    and testimony to base a verdict of guilty on all the charges
2    before the jury should they decide the credibility issues in
3    favor of the Government.
4            As to the kidnapping charges, Your Honor, the
5    Government disagrees as to counsel's characterization of the
6    kidnapping charges.  I know that the Court has expressed some
7    concern about those charges.  Let me say this.  First of all,
8    the kidnapping statute was amended in 2006 by the Adam Walsh
9    Act.  It --
10           THE COURT:  By the -- say it again a little slower.
11           MR. JUNKER:  It was amended in 2006 by the Adam Walsh
12   Act.
13           THE COURT:  Yes, sir.
14           MR. JUNKER:  And that Act added the elements that the
15   Government is proceeding under, in other words, that you can
16   use an instrumentality of interstate commerce to infer that it
17   basically is part of the kidnapping scheme.
18           At that time Congress recognized that that was going
19   to enlarge, substantially enlarge the reach of the kidnapping
20   statute, and they passed it with that in mind.
21           Now, when they passed the Adam Walsh Act, some of the
22   things that they passed was sex offenses and were specifically
23   targeted towards sex offenses involving children.  But other
24   things that they expanded, they intended to expand in a general
25   sense, not just involving children but just in general.  And

1    that's what we're dealing with here.

2            Now, as far as counsel's argument that it is not the

3    kind of holding, seizure, or confinement contemplated by the

4    Act, I respectfully disagree with his characterization for the

5    following reasons:

6            First of all, the Defendants, when they entered that

7    store, they could have pointed the gun at the guy and said get

8    out.  They didn't, because they didn't want him running and

9    going to the police.  They planned in advance.  It was

10   premeditated, planned and purposeful planning to zip tie those

11   individuals, confine them, put them on the floor, and restrain

12   them.  That is exactly what is contemplated by this statue.

13           This is no different than the child predator going

14   into a bathroom.  We've had -- when I was a state prosecutor,

15   we had an event where a child goes into the bathroom and

16   somebody corners him in the bathroom stall.  They're still

17   confining, seizing, and not letting that person leave.  It is

18   exactly the kind of conduct that is contemplated by the statue.

19           They did take it a step further.  This is not

20   somebody that's just told at gunpoint get on the ground.  They

21   zip tied them.

22           Now, you can tell from the video that they didn't zip

23   tie them very well because they were able to get up and get

24   loose fairly quickly, but the intent was they would not be able

25   to get out and that they would not be able to contact the

1    police quickly.  So this is exactly what is contemplated by the
2    statute.  And we respectfully submit that this should be
3    permitted to go to the jury.
4         The jury should be able to decide whether or not this
5    issue is a guilty or not guilty, and then counsel can address
6    that later.  But at this point in time, we have presented
7    sufficient facts and evidence and circumstances that justify
8    it.
9         THE COURT:  Okay.  I'm going to let it go to the
10   jury, but I still have the same concerns I have with regard to
11   that, and I'll -- and that way, either way, regardless of what
12   happens, it will give an opportunity for the Fifth Circuit to
13   address it and maybe the United States Supreme Court to address
14   it with regard to that.
15        I certainly would think that this is a really big
16   enlargement on what kidnapping is, and we'll just have to -- I
17   will just have to think about it and look at that statute.  And
18   I have heard your argument and your comparison to a bathroom
19   and that sort of thing and what that -- what that entails.
20        So, anyway, I'm going to submit it, and then we will
21   see where we are after that.  And I may do something at that
22   point, and we'll have a chance to -- if there happens to be
23   convictions on those, we can address it again at that point.
24        Okay.  So I'm denying your motions on all counts at
25   this point.

```
 1                    All right.  How long?  15 minutes?
 2               MR. ROGERS:  I think 15 minutes should be sufficient,
 3    Your Honor.
 4               MR. LUND:  Yes, sir.  Mr. Rogers is doing it, Your
 5    Honor.
 6               THE COURT:  Oh, is he?  Are you, Mr. Rogers?  Okay.
 7               MR. ROGERS:  Yes, Your Honor.
 8               THE COURT:  Mr. Martin, is that enough for you?
 9               MR. MARTIN:  Yes, Your Honor.
10               THE COURT:  Who's doing it?  Who's doing it?  Both of
11    y'all or --
12               MR. DE LA GARZA:  Yes, you Honor.
13               Your Honor, I will open, and Mr. Junker will do
14    rebuttal.
15               THE COURT:  Okay.  And you think that's enough for
16    y'all?
17               MR. JUNKER:  Yes, absolutely.
18               THE COURT:  Okay.  All right.  Now, charge.  Y'all
19    can sit down.
20               Have y'all had enough chance to look at the charge
21    and everything and what you've got and where we are?
22               I know y'all wanted me to do something the way it had
23    been done in another court on that brandishing or using.  I'm
24    going to leave it the way that it is.  I get your point.
25               And I did one change in how I submit the using part.
```

1    Instead of saying "yes or no," I put "guilty or not guilty,"

2    which I think is a better way to put it.  But I don't -- was

3    there anything else that y'all had?

4            MR. JUNKER:  Minor stuff that's already been

5    corrected, Your Honor.  The Government is satisfied with the

6    present -- we'll have to read through it, obviously, to see if

7    there's been any --

8            THE COURT:  I didn't make any other changes, I don't

9    think.

10           Have y'all looked at it from last night?

11           MR. JUNKER:  I looked at it last night, but since

12   then, no, I have not had a chance to look at it.

13           THE COURT:  Oh, I haven't made any -- we haven't

14   made -- other than what I -- I don't think there's any other

15   changes other than that that we made.

16           How about you, Mr. Lund?

17           MR. LUND:  Your Honor, I have an objection for record

18   purposes related to our own requested jury instructions;

19   however, I'm not sure if the Court wants to take that up at

20   this time or the Court would rather wait till the evidence is

21   closed in this matter.

22           THE COURT:  Oh, I'm assuming the evidence is closed,

23   but you're right, it isn't.

24           So y'all -- let's go through that right now, and then

25   you can make that, all right?

```
 1            MR. LUND:  Your Honor, may I approach?
 2            THE COURT:  Yes.
 3            (Pause)
 4            THE COURT:  All right.  Call your -- are you going to
 5     have any witnesses that we need to call or not?  I don't want
 6     to go over the charge yet.
 7            MR. LUND:  Then I apologize, Your Honor.  I
 8     misunderstood your comment.  I thought you wanted me to go over
 9     the charge.
10            THE COURT:  My fault.  My fault.  No, that was my
11     fault.
12            All right.  Y'all want me to bring the jury out and
13     then call witnesses, or where are we at this point?
14            MR. LUND:  Your Honor, I'm under the impression that
15     Mr. Martin is actually going first with his case-in-chief.
16            THE COURT:  Okay.
17            MR. LUND:  I'm not sure if that's correct or not.
18            THE COURT:  Mr. Martin, is that right?
19            MR. MARTIN:  No, Your Honor.  We're going to close.
20            THE COURT:  Okay.
21            MR. LUND:  Oh, we're going to close as well.
22            THE COURT:  Okay.
23            MR. MARTIN:  And that was a change in position.
24            THE COURT:  Okay.  So both sides close.
25            Do you have any admonitions for the Defendants that
```

1    y'all would like to put on the record or anything about if they
2    want to testify or not testify?  That's up to y'all.  I'm not
3    demanding anything.
4              MR. MARTIN:  Yes, Your Honor.
5              THE COURT:  Okay.
6              MR. MARTIN:  My admonition would be in the presence
7    of my client, Treveon Anderson, that we have discussed in great
8    detail his right, of course, to testify in his own behalf or
9    his right not to testify in his own behalf.  And he has
10   informed me that he feels that he does not want to testify, and
11   that is what he has told me.
12             THE COURT:  Is that right, Mr. Anderson?
13             DEFENDANT ANDERSON:  Yes, sir.
14             THE COURT:  Okay.  Mr. Lund?
15             MR. LUND:  Your Honor, I won't take up too much of
16   the Court's time.  Our admissions to Mr. Hatchett have been
17   very similar.  We've had numerous conversations with him,
18   including one over lunch yesterday.  And Mr. Hatchett has
19   consistently indicated to us that he does not want to testify
20   for various reasons.  I say that in the presence of my client.
21             THE COURT:  Is that true, Mr. Hatchett?
22             DEFENDANT HATCHETT:  Yes, sir, it is.
23             THE COURT:  Okay.
24             MR. LUND:  Thank you, Your Honor.
25             THE COURT:  All right.  Anything else?

 1              And I just want to put this on the record.

 2              Mr. Anderson, do you have any complaints about the

 3      quality of the representation since you've got a

 4      court-appointed lawyer?

 5              DEFENDANT ANDERSON:  No, sir.

 6              THE COURT:  Okay.  How about you, Mr. Hatchett?

 7              DEFENDANT HATCHETT:  No, sir, I have no complaints.

 8              THE COURT:  You what?

 9              DEFENDANT HATCHETT:  I said no, sir, I have no

10      complaints.

11              THE COURT:  Okay.  All right.

12              Okay.  Y'all need a little break before we bring them

13      in and get your act together on making a final argument?

14              MR. JUNKER:  That would be nice, if the Court please.

15              MS. HILL:  Yes, sir.

16              MR. MARTIN:  It would be very nice.

17              THE COURT:  Okay.  Off the record.

18              (Discussion off the record)

19              THE COURT:  Here we go.

20              MR. LUND:  Your Honor, first, with regards to the

21      change in -- Your Honor, first, with regards to the change in

22      the verdict form, I would request that the original verdict in

23      the verdict form be used as to Count Three as opposed to the

24      modified version that was just handed to me moments ago.

25              The original version stated, "Count Three:

1    Brandishing a firearm during and in relation to a crime of

2    violence, 18 U.S.C. 924(c)(1)(A)(ii) and 2."  There is a

3    selection of "guilty" or "not guilty" of the offense charge.

4    "If your answer to Count Three is 'not guilty,' do you find

5    that the Defendant used or carried or aided and abetted another

6    person in using or carrying a firearm during the commission of

7    the offense?  Yes or no?"

8              That's my first objection.

9              THE COURT:  And I changed "yes or no" to "guilty or

10   not guilty."  And "guilty" goes to where "yes" is, and "not

11   guilty" goes to where "no" is.

12             And you object to that, correct?

13             MR. LUND:  Yes, Your Honor.

14             THE COURT:  Okay.  I overrule that.  Okay.

15             MR. LUND:  In addition to that, Judge, previously

16   filed were Defendant Hatchett's requested jury instructions.

17   That's Document 513 filed on October 9, 2018.

18             There are a number of instructions within that that

19   the Court has refused to adopt in its jury charge, so I would

20   generally object to the failure to adopt those jury

21   instructions.

22             THE COURT:  Yes.  And I reviewed all of those and

23   chose not to adopt, so I overrule those, and I overrule your

24   objection.  Okay.

25             MR. LUND:  I understand, Your Honor.

```
 1                    THE COURT:  And deny those requests.
 2                    MR. LUND:  I understand.
 3                    THE COURT:  Anything else?
 4                    MR. LUND:  No, Your Honor.
 5                    THE COURT:  Okay.  But does that satisfy -- I think
 6      that gets your record cleared up?
 7                    MR. LUND:  I believe so, Judge.  Thank you.
 8                    THE COURT:  I think so, too.
 9                    Anything you want to make on the record?
10                    MR. JUNKER:  No, Your Honor.
11                    THE COURT:  All right.  Okay.  Y'all go take a break.
12                    (Recess from 9:51 to 10:22)
13                    THE COURT:  Okay.  Are we ready to bring them in?
14                    MS. HILL:  Yes, Your Honor.
15                    MR. JUNKER:  The Government is ready, Your Honor.
16                    MS. HILL:  We're ready, Your Honor.
17                    THE COURT:  Okay.  Anybody need warnings, or are
18      y'all going to keep up with your own time?
19                    MR. ROGERS:  Your Honor, I would ask the Court for a
20      two-minute warning.
21                    THE COURT:  Okay.
22                    MR. DE LA GARZA:  Your Honor, could I have a warning
23      at 9 minutes of the 15 minutes, please?
24                    THE COURT:  Okay.
25                    MR. JUNKER:  And may I have a one-minute warning,
```

```
 1    Your Honor?
 2              THE COURT:  You want a one --
 3              MR. JUNKER:  One minute, Your Honor.  Thank you very
 4    much.
 5              THE COURT:  You bet.
 6              Yes?
 7              MR. MARTIN:  Judge, one minute.
 8              THE COURT:  Okay.
 9              MR. MARTIN:  Judge, one minute warning for me.
10              THE COURT:  Okay.  I think I've got all that
11    straight.
12              All right.  I don't think there's anything else we
13    need to do.
14              You did your Rule 29 outside the presence of the
15    jury, and I don't think you need to repeat it for purposes of
16    the record unless you just want to say that.
17              MR. LUND:  Your Honor -- Your Honor, I would agree
18    with the Court; however, simply for record purposes, to protect
19    everything --
20              THE COURT:  At the end, since both sides rest and
21    close, you just want to say, "I repeat my motion" or something
22    like that?
23              MR. LUND:  Yes, Your Honor.
24              THE COURT:  And I will interpret that as being a
25    Rule 29.  You can say the word "Rule 29."  Whatever record you
```

```
 1    need to make.  I'm not trying to prevent you from doing that.
 2    I just want to make sure y'all are clear about that, okay?
 3             MR. LUND:  I appreciate that.  Thank you, Judge.
 4             THE COURT:  You bet.
 5             And you, too, Mr. Martin.
 6             MR. MARTIN:  Thank you, Your Honor.
 7             THE COURT:  Okay.  All right.
 8             SECURITY OFFICER:  All rise for the jury.
 9             (Jury in)
10             THE COURT:  Y'all be seated.
11             All right.  Okay.  Mr. Martin?
12             MR. MARTIN:  No evidence.
13             THE COURT:  Witnesses?  We haven't closed or anything
14    in front of the jury.  Do you have any witnesses?
15             MR. MARTIN:  I'm sorry, Judge.  I understand.  We
16    close.
17             (Defendant Anderson rests and closes)
18             MR. ROGERS:  Your Honor, Mr. Hatchett rests and
19    close.
20             (Defendant Hatchett rests and closes)
21             THE COURT:  And close.
22             The Government?
23             MR. JUNKER:  The Government rests and close.
24             (Government rests and closes)
25             THE COURT:  Okay.  And so, ladies and gentlemen,
```

```
 1    you've heard all the testimony you're going to hear.
 2              MR. LUND:  Your Honor?
 3              THE COURT:  Just a moment.  There's -- I need to let
 4    them put something in the record.  Just a second.
 5              Go ahead, Mr. Lund.
 6              MR. LUND:  Your Honor, I renew my Rule 29 motion.
 7              THE COURT:  All right.  The same ruling as before.
 8              Mr. Martin?
 9              MR. MARTIN:  We renew ours also, Your Honor.
10              THE COURT:  All right.  The same ruling as before.
11              Okay.  You've heard all the evidence you're going to
12    hear.  I think it's already turned to the page that you need to
13    be on.  That means we've got a second Number 1, but that's
14    okay.
15              If you'll see where it says "Post-Evidence
16    Instructions," that's where we're going to start reading.
17              Let me explain something to you.  I'm going to read
18    this really fast, not because it's not important.  It is
19    important.  I am required to read it.  It's as if the powers
20    that be, the judges above me that sit in the Fifth Circuit and
21    sit in the United States Supreme Court, think that y'all can't
22    read or some judges don't give this to you to read.  And that's
23    true.  But -- so don't think just because I'm reading it
24    quickly doesn't mean that it's not important.  It is important.
25    You can read it faster than I can.  I don't care how fast I
```

 1    read.

 2              So don't be alarmed when you hear me read.  It's not

 3    that I don't think it's important, it's that I think you can

 4    read for yourself.  And I've been a judge long enough that if

 5    that irks judges above me, so be it.  Okay?

 6              So here we go.

 7              "Members of the jury, in any jury trial there are in

 8    effect two judges.  I am one of the judges; the other is you,

 9    the jury.  It is my duty to preside over the trial and to

10    decide what evidence is proper for your consideration.  It is

11    also my duty at the end of the trial to explain to you the

12    rules of law that you must follow and apply in arriving at your

13    verdict.

14              "First, I will give you some general instructions

15    which apply in every case, for example, instructions about

16    burden of proof and how to judge the believability of

17    witnesses.  Then I will give you some specific rules of law

18    about this particular case, and finally I will explain to you

19    the procedures you should follow in your deliberations.

20              "Number 1.  Jury's Role.

21              "You, as jurors, are the judges of the facts, but in

22    determining what actually happened -- that is, in reaching your

23    decision as to the facts -- it is your sworn duty to follow all

24    the rules of law as I explain them to you.

25              "You have no right to disregard or give special

1    attention to any one instruction, or to question the wisdom or

2    correctness of any rule I may sate to you.  You must not

3    substitute or follow your own notion or opinion as to what the

4    law is or ought to be.  It is your duty to apply the law as I

5    explain it to you, regardless of the consequences.

6           "It is also your duty to base your verdict solely

7    upon the testimony and the evidence, without prejudice or

8    sympathy.  That was the promise you made and the oath you took

9    before being accepted by the parties as jurors, and they have

10   the right to expect nothing less.

11          "Number 2.  Burden of Proof.

12          "The indictment or formal charge against the

13   Defendants is not evidence of guilt.  Indeed, the Defendants

14   are presumed by law to be innocent.  The Defendants begin with

15   a clean slate.  The law does not require the Defendants to

16   prove their innocence or produce any evidence at all.

17          "The Government has the burden of proving the

18   Defendants guilty beyond a reasonable doubt, and if it fails to

19   do so, you must acquit the Defendants.  While the Government's

20   burden of proof is a strict or heavy burden, it is not

21   necessary that the Defendants' guilt be proved beyond all

22   possible doubt.  It is only required that the Government's

23   proof exclude any 'reasonable doubt' concerning the Defendants'

24   guilt.

25          "A 'reasonable doubt' is a doubt based upon reason

1   and common sense after careful and impartial consideration of

2   all the evidence in the case.  Proof beyond a reasonable doubt,

3   therefore, is proof of such a convincing character that you

4   would be willing to rely and act upon it without hesitation in

5   making the most important decisions of your own affairs.

6                "Number 3.  The Evidence.

7                "As I told you earlier, it is your duty to determine

8   the facts.  In doing so, you must consider only the evidence

9   presented during the trial.  Evidence is the sworn testimony of

10  the witnesses, including stipulations, and the exhibits.  The

11  questions, statements, objections, and arguments made by the

12  lawyers are not evidence.

13               "The function of the lawyers is to point out those

14  things that are most significant or most helpful to their side

15  of the case, and in doing so to draw your attention to certain

16  facts or inferences that might otherwise escape your notice.

17  In the final analysis, however, it is your own recollection and

18  interpretation of the evidence that controls in the case.  What

19  the lawyers say is not binding upon you.

20               "During the trial I sustained objections to certain

21  questions.  You must disregard those questions entirely.  Do

22  not speculate as to what the witness would have said if

23  permitted to answer the question.  Your verdict must be based

24  solely on the legally admissible evidence and testimony.

25               "Also, do not assume from anything I may have done or

1    said during the trial that I have any opinion concerning any of

2    the issues in this case.  Except for the instructions to you on

3    the law, you should disregard anything I may have said during

4    the trial in arriving at your own verdict.

5            "In considering the evidence, you are permitted to

6    draw such reasonable inferences from the testimony and exhibits

7    as you feel are justified in light of your common experience.

8    In other words, you may make deductions and reach conclusions

9    that reason and common sense lead you to draw from the facts

10   which have been established by the evidence.

11           "Do not be concerned about whether evidence is

12   'direct evidence' or 'circumstantial evidence.'  You should

13   consider and weigh all the evidence that was presented to you.

14           "'Direct evidence' is the testimony of one who

15   asserts actual knowledge of a fact, such as an eyewitness.

16   'Circumstantial evidence' is proof of a chain of events and

17   circumstances indicating that something is or is not a fact.

18           "The law makes no distinction between the weight you

19   may give to either direct or circumstantial evidence.  But the

20   law requires that you, after weighing all of the evidence,

21   whether direct or circumstantial, be convinced of the guilt of

22   the Defendant beyond a reasonable doubt before you can find him

23   guilty.

24           "4.  Credibility, Impeachment, Weight of the

25   Evidence.

1             "I remind you that it is your job to decide whether

2    the Government has proved the guilt of the Defendants beyond a

3    reasonable doubt.  In doing so, you must consider all of the

4    evidence.  This does not mean, however, that you must accept

5    all of the evidence as true or accurate.

6             "You are the sole judges of the credibility or

7    'believability' of each witness and the weight to be given to

8    the witness's testimony.  An important part of your job will be

9    making judgments about the testimony of the witnesses who

10   testified in this case.  You should decide whether you believe

11   all, some part, or none of what each person had to say, and how

12   important that testimony was.  In making that decision I

13   suggest that you ask yourself a few questions:  Did the witness

14   impress you as honest?  Did the witness have any particular

15   reason not to tell truth?  Did the witness have a personal

16   interest in the outcome of the case?  Did the witness have any

17   relationship with either the Government or the defense?  Did

18   the witness seem to have a good memory?  Did the witness

19   clearly see or hear the things about which he or she testified?

20   Did the witness have the opportunity and ability to understand

21   the questions clearly and answer them directly?  Did the

22   witness's testimony differ from the testimony of other

23   witnesses?  These are a few of the considerations that will

24   help you determine the accuracy of what each witness said.

25             "Your job is to think about the testimony of each

1    witness you have heard and decide how much you believe of what

2    each witness had to say.  In making up your mind and reaching a

3    verdict, do not make any decisions simply because there were

4    more witnesses on one side than on the other.  Do not reach a

5    conclusion on a particular point just because there were more

6    witnesses testifying for one side on that point.  You will

7    always bear in mind that the law never imposes upon a defendant

8    in a criminal case the burden or duty of calling any witnesses

9    or producing any evidence.

10           "In this case the Government called as one of its

11   witnesses an alleged accomplice, named as a co-defendant in the

12   indictment, with whom the Government has entered into a plea

13   agreement."  It actually had two.  "The agreement provides for

14   dismissal of certain counts as to the co-defendants and the

15   nonbinding recommendation for a reduced maximum punishment.

16   Such plea bargaining, as it is called, has been approved as

17   lawful and proper, and is expressly provided for in the rules

18   of this Court.

19           "An alleged accomplice, including one who has entered

20   into a plea agreement with the Government, is not prohibited

21   from testifying.  On the contrary, the testimony of such a

22   witness may alone be of sufficient weight to sustain a verdict

23   of guilty.  You should keep in mind that such testimony is

24   always to be received with caution and weighed with great care.

25   You should never convict a defendant upon the unsupported

1    testimony of an alleged accomplice unless you believe that

2    testimony beyond a reasonable doubt.

3              "The fact that an accomplice has entered a plea of

4    guilty to the offense charged is not evidence of the guilt of

5    any other person.

6              "The testimony of a witness may be discredited by

7    showing that the witness testified falsely, or by evidence that

8    at some other time the witness said or did something, or failed

9    to say or do something, which is inconsistent with the

10   testimony the witness gave at this trial.

11             "Earlier statements of a witness were not admitted in

12   evidence to prove that the contents of those statements are

13   true.  You may not consider the earlier statements to prove

14   that the content of an earlier statement is true; you may only

15   use earlier statements to determine whether you think the

16   earlier statements are consistent or inconsistent with the

17   trial testimony of the witness and therefore whether they

18   affect the credibility of that witness.

19             "If you believe that a witness has been discredited

20   in this manner, it is your exclusive right to give the

21   testimony of that witness whatever weight you think it

22   deserves.

23             "Certain charts and summaries have been shown to you

24   solely as an aid to help explain the facts disclosed by

25   evidence (testimony, books, records, and other documents) in

 1    the case.  These charts and summaries are not admitted into
 2    evidence or proof of any facts.  You should determine the facts
 3    from the evidence that is admitted.
 4              "Other charts and summaries have been received into
 5    evidence.  You should give them only such weight as you think
 6    they deserve.
 7              "5.  The Fifth Superseding Indictment.
 8              "You will note that the Fifth Superseding Indictment
 9    charges that the alleged offenses were committed on or about a
10    specific date -- specified date.  The Government does not have
11    to prove that the crime was committed on that exact date, so
12    long as the Government proves beyond a reasonable doubt that
13    the Defendants committed the crime on a date reasonably near
14    November 17, 2013, the date stated in the Fifth Superseding
15    Indictment.
16              "A separate crime is charged against one or more of
17    the Defendants in each count of the Fifth Superseding
18    Indictment.  Each count, and the evidence pertaining to it,
19    should be considered separately.  The case of each defendant
20    should be considered separately and individually.  The fact
21    that you may find one or more of the accused guilty or not
22    guilty of any of the crimes charged should not control your
23    verdict as to any other crime or any other defendant.  You must
24    give separate consideration to the evidence as to each count
25    and as to each defendant.

```
 1                    "6.   Consider Only Crimes Charged.

 2              "You are here to decide whether the Government has

 3    proved beyond a reasonable doubt that the Defendants are guilty

 4    of the crimes charged.  The Defendants are not on trial for any

 5    act, conduct, or offense not alleged in the Fifth Superseding

 6    Indictment.  Neither are you called upon to return a verdict as

 7    to the guilt of any other person or persons not on trial as a

 8    defendant in this case, except as you are otherwise instructed.

 9                    "8.   Expert Opinion Testimony.

10              "During the trial, you heard the testimony of

11    individuals who purport to be experts in their fields --

12    respective fields.  This includes the testimony of the

13    following witnesses -- witness:  Mark Sedwick, who expressed

14    opinions on cell tower information for cellular telephones.  If

15    scientific, technical, or other specialized knowledge might

16    assist the jury in understanding the evidence or in determining

17    a fact in issue, a witness qualified by knowledge, skill,

18    experience, training, or education may testify and state an

19    opinion concerning such matters.

20              "Merely because such a witness has expressed an

21    opinion does not mean, however, that you must accept this

22    opinion.  You should judge such testimony like any other

23    testimony.  You may accept it or reject it and give it as much

24    weight as you think it deserves, considering the witness's

25    education and experience, the soundness of the reasons given
```

1    for the opinion, and all other evidence in the case.

2              "9.   Punishment Not Your Concern.

3              "If the Defendants -- either Defendant is found

4    guilty, it will be my duty to decide what the punishment will

5    be.  You should not be concerned with the punishment in any

6    way.  It should not enter your consideration or discussion.

7              "10.  General Definitions.

8              "The word 'knowingly,' as that term has been used

9    from time to time in these instructions, means that the act was

10   done voluntarily and intentionally, not because of mistake or

11   accident.

12             "Interstate commerce means commerce or travel between

13   one state, territory or possession of the United States and

14   another state, territory or possession of the United States,

15   including the District of Columbia.

16             "Foreign commerce means commerce or travel between

17   any part of the United States, including its territorial

18   waters, and any other country, including its territorial

19   waters.

20             "The term 'commerce' means all commerce between any

21   point in a state and any point outside thereof, all commerce

22   between points within the same state through any place outside

23   such state, and all other commerce over which the United States

24   has jurisdiction.

25             "Commerce includes travel, trade, transportation and

1    communication.

2            "Count One -- Conspiracy to Interfere with Commerce

3    by Robbery.

4            "18 United States Code, Section 1951(a).

5            "Count One of the Fifth Superseding Indictment

6    charges the Defendants Treveon Dominique Anderson and Jimmy

7    Hatchett with conspiracy to interfere with commerce by robbery

8    in violation of Title 18, United States Code, Section 1951(a).

9    The object or purpose of the conspiracy charged in Count One is

10   robbery, as charged in Count Two.

11           "A 'conspiracy' is an agreement between two or more

12   persons to join together to accomplish some unlawful purpose.

13   It is a kind of 'partnership in crime' in which each member

14   becomes the agent of every other member.

15           "For you to find the Defendant guilty of this crime,

16   you must be convinced that the Government has proved each of

17   the following beyond a reasonable doubt:

18           "First:  That the Defendant had at least one other

19   person -- and at least one other person made an agreement to

20   commit the crime of interference with commerce by robbery, as

21   charged in the indictment;

22           "Second:  That the Defendant knew the unlawful

23   purpose of the agreement and joined in it willfully, that is,

24   with the intent to further the unlawful purpose; and

25           "Third:  That one of the conspirators during the

1    existence of the conspiracy knowingly committed at least one of

2    the overt acts described in the indictment, in order to

3    accomplish some object or purpose of the conspiracy.

4              "One may become a member of a conspiracy without

5    knowing all the details of the unlawful scheme or the

6    identities of all the other alleged conspirators.  If a

7    defendant understands the unlawful nature of a plan or scheme

8    and knowingly and intentionally joins in that plan or scheme on

9    one occasion, that is sufficient to convict him for conspiracy

10   even though the Defendant had not participated before and even

11   though the Defendant played only a minor role [sic].

12             "The Government need not prove that the alleged

13   conspirators entered into any formal agreement, nor that they

14   directly stated between themselves all the details of the

15   scheme.  Similarly, the Government need not prove that all of

16   the details of the scheme alleged in the indictment were

17   actually agreed upon or carried out.  Nor must it prove that

18   all of the persons alleged to have been members of the

19   conspiracy were such, or that the alleged conspirators actually

20   succeeded in accomplishing their unlawful objectives.

21             "Mere presence at the scene of an event, even with

22   knowledge that a crime is being committed, or the mere fact

23   that certain persons may have associated with each other, and

24   may have assembled together and discussed common aims and

25   interests, does not necessarily establish proof of the

1    existence of a conspiracy.  Also, a person who has no knowledge

2    of a conspiracy, but who happens to act in a way which advances

3    some purpose of a conspiracy, does not thereby become a

4    conspirator.

5              "Count Two -- Interference with Commerce by Robbery.

6              "18 United States Code, Section 1951(a).

7              "Count Two of the Fifth Superseding Indictment

8    charges the Defendants Treveon Dominique Anderson and Jimmy

9    Hatchett with violating Title 18, United States Code, Section

10   1951(a), which makes it a crime for anyone to obstruct, delay,

11   or affect commerce by robbery.  The term 'robbery' means the

12   unlawful taking or obtaining of personal property from the

13   person or in the presence of another, against that person's

14   will, by means of actual or threatened force, or violence, or

15   fear of injury, immediate or future, to that person or

16   property.

17             "If -- for you to find Mr. Anderson and Mr. Hatchett

18   guilty of this crime, you must be convinced that the Government

19   has proved each of the following beyond a reasonable doubt:

20             "First:  That the Defendant unlawfully took or

21   obtained personal property from the person or in the presence

22   of another, against that person's will;

23             "Second:  That the Defendant did so by means of

24   actual or threatened force, or violence, or fear of injury to

25   that person or their property; and

1          "Third:  That the Defendant's conduct in any way or

2    degree obstructed, delayed, or affected commerce or the

3    movement of any article or commodity in commerce.

4          "The Government is not required to prove that the

5    Defendant knew that his conduct would obstruct, delay, or

6    affect commerce or the movement of any article or commodity in

7    commerce.  It is not necessary for the Government to show that

8    the Defendant actually intended or anticipated an effect on

9    commerce by his actions.  All that is necessary is that the

10   neutral -- natural, excuse me, and probable consequences of the

11   acts the Defendant took would be to affect commerce.  If you

12   decide that there would be any effect at all on commerce, then

13   that is enough to satisfy this element.

14         "The term 'property' includes money and other

15   tangible and intangible things of value.

16         "The term 'fear' includes fear of economic loss or

17   damage, as well as fear of physical harm.

18         "It is not necessary that the Government prove that

19   the fear was a consequence of a direct threat; it is sufficient

20   for the Government to show that the victim's fear was

21   reasonable under the circumstances.

22         "Count Three -- Using, Carrying, or Brandishing a

23   Firearm During and in Relation to a Crime of Violence.

24         "18 U.S.C., Section 924(c)(1)(A)(ii).

25         "Count Three of the Fifth Superseding Indictment

1    charges the Defendants Treveon Dominique Anderson and Jimmy

2    Hatchett with violating Title 18, United States Code, Section

3    924(c)(1)(A)(ii), which makes it a crime for anyone to

4    knowingly use, carry, or brandish a firearm during and in

5    relation to a crime of violence.

6            "For you to find Mr. Anderson and/or Mr. Hatchett

7    guilty of this crime you must be convinced that the Government

8    has proven each of the following beyond a reasonable doubt:

9            First:  That the Defendant committed the crime

10   alleged in Count Two of the indictment.  I instruct you that

11   Interference with Commerce by Robbery is a crime of violence;

12   and

13           "Second:  That the Defendant knowingly used, carried,

14   or brandished a firearm during and in relation to the

15   Defendant's commission of the crime charged in Count Two of the

16   indictment.

17           "To prove the Defendant 'used' a firearm during and

18   in relation to a crime of violence, the Government must prove

19   the Defendant actively employed the firearm in the commission

20   of Count Two, such as a use that is intended to or brings about

21   a change in the circumstances of the commission of Count Two.

22   'Active employment' may include brandishing, displaying,

23   referring to, battering -- bartering, excuse me -- bartering,

24   striking with, firing, or attempting to fire the firearm.

25   'Use' is more than mere possession of a firearm or having it

1    available during the crime of violence.

2           "To prove the Defendant 'carried' a firearm during

3    and in relation to a crime of violence, the Government must

4    prove that the Defendant carried the firearm in the ordinary

5    meaning of the word 'carry,' such as by transporting a firearm

6    on the person or in a vehicle.  The Defendant's carrying of the

7    firearm cannot be merely coincidental or unrelated to the crime

8    of violence.

9           "To prove the Defendant 'brandished' a firearm, the

10   Government must prove that the Defendant displayed all or part

11   of the firearm, or otherwise made the presence of the firearm

12   known to another person, in order to intimidate that person,

13   regardless of whether the firearm was directly visible to that

14   person.

15          "'In relation to' means that the firearm must have

16   some purpose, role, or effect with respect to the crime of

17   violence.

18          "Count Four -- Kidnapping.

19          "18 United States Code, Section 1201(a)(1).

20          "Count Four of the Fifth Superseding Indictment

21   charges the Defendants Treveon Dominique Anderson and Jimmy

22   Hatchett with violating Title 18, United States Code, Section

23   1201(a)(1), which makes it a crime for anyone to unlawfully

24   kidnap another person in or affecting interstate or foreign

25   commerce for some purpose or benefit.

1          "For you to find Mr. Anderson and/or Mr. Hatchett

2     guilty of this crime, you must be convinced that the Government

3     has proved each of the following beyond a reasonable doubt:

4          First:  That the Defendant, knowingly acting contrary

5     to law, kidnapped, seized, or confined A.S., the initials of

6     the person, A.S. as charged;

7          "Second:  That the Defendant held the person for some

8     purpose or benefit; and

9          "Third:  That the Defendant used a facility or

10    instrumentality of interstate commerce in furtherance of the

11    commission of the kidnapping.  I instruct you that cellular

12    telephones and motor vehicles are facilities and/or

13    instrumentalities of interstate commerce.

14         "To 'kidnap' a person means to unlawfully hold, keep,

15    detain, or confine the person against that person's will.

16    Involuntariness or coercion in connection with the victim's

17    detention is an essential part of the offense.

18         "You need not unanimously agree on why the Defendant

19    kidnapped the person in question, so long as you each find that

20    he had some purpose or derived some benefit from the

21    kidnapping.

22         "The Government need not prove the Defendant knew he

23    was using a facility or instrumentality of interstate commerce

24    in furtherance of the commission of the kidnapping, only that

25    he did.

1          "Count Five -- Kidnapping.

2          18 United States Code, Section 1201(a)(1).

3          "Count Five of the Fifth Superseding Indictment

4    charges the Defendants Treveon Dominique Anderson and Jimmy

5    Hatchett with violating Title 18, United States Code, Section

6    1201(a)(1), which makes it a crime for anyone to unlawfully

7    kidnap another person in or affecting interstate or foreign

8    commerce for some purpose or benefit.

9          "For you to find Mr. Anderson and/or Mr. Hatchett

10   guilty of this crime, you must be convinced that the Government

11   has proved each of the following beyond a reasonable doubt:

12         "First:  That the Defendant, knowingly acting

13   contrary to law, kidnapped, seized, or confined a person, the

14   initials V.P. as charged;

15         "Second:  That the Defendant held the person for some

16   purpose or benefit; and

17         "Third:  That the Defendant used a facility or

18   instrumentality of interstate commerce in furtherance of the

19   commission of the kidnapping.  I instruct you that cellular

20   telephones and motor vehicles are facilities and/or

21   instrumentalities of interstate commerce.

22         "To 'kidnap' a person means to unlawfully hold, keep,

23   detain, or confine the person against that person's will.

24   Involuntariness or coercion in connection with the victim's

25   detention is an essential part of the offense.

1    "You need not unanimously agree on why the Defendant

2    kidnapped the person in question, so long as you each find that

3    he had some purpose or derived some benefit from the

4    kidnapping.

5         "The Government need not prove that the Defendant

6    knew he was using a facility or instrumentality of interstate

7    commerce in furtherance of the commission of the kidnapping,

8    only that he did.

9         "Unanimity of Theory.

10        "You have been instructed that your verdict, whether

11   it is guilty or not guilty, must be unanimous.  The following

12   instruction applies to the unanimity requirement as to Counts

13   Four and Five.

14        "Counts Four and Five of the Fifth Superseding

15   Indictment accuse the Defendants of committing the crime of

16   kidnapping in three different ways.  The first is that the

17   Defendant kidnapped A.S. and/or V.P.  The second is that the

18   Defendant seized A.S. and/or V.P.  The third is that the

19   Defendant confined A.S. and/or V.P.

20        "The Government does not have to prove all of these

21   for you to return a guilty verdict on this charge.  Proof

22   beyond a reasonable doubt on one is enough.  But in order to

23   return a guilty verdict, all of you must agree that the same

24   one has been proved.  All of you must agree that the Government

25   proved beyond a reasonable doubt that the Defendant kidnapped

1    A.S. and/or V.P.; or, all of you must agree that the Government

2    proved beyond a reasonable doubt that the Defendant seized A.S.

3    and/or V.P.; or, all of you must agree that the Government

4    proved beyond a reasonable doubt that the Defendant confined

5    A.S. and/or V.P.

6              "Aiding and Abetting Instruction.

7              "With respect to Counts Two through Five of the Fifth

8    Superseding Indictment, the guilt of the Defendants may be

9    established without proof the Defendants personally -- that the

10   Defendants personally did every act constituting the offense

11   alleged.  The law recognizes that, ordinarily, anything a

12   person can do for himself may also be accomplished by him

13   through the direction of another person as his or her agent, or

14   by acting in concert with, or under the direction of, another

15   person or persons in a joint effort or enterprise.

16             "If another person is acting under the direction of

17   the Defendants or if the Defendants join another person and

18   perform acts with the intent to commit a crime, then the law

19   holds that the Defendants -- holds the Defendants responsible

20   for the acts and conduct of such other persons just as though

21   the Defendants had committed the acts or engaged in such

22   conduct.

23             "Before any defendant may be held criminally

24   responsible for the acts of others, it is necessary that the

25   accused deliberately associate himself in some way with the

1   crime and participate in it with the intent to bring about the

2   crime.

3          "Of course, mere presence at the scene of a crime and

4   knowledge that a crime is being committed are not sufficient to

5   establish that a defendant either directed or aided and abetted

6   the crime unless you find beyond a reasonable doubt that the

7   Defendant was a participant and not merely a knowing spectator.

8          "In other words, you may not find any defendant

9   guilty unless you find beyond a reasonable doubt that every

10  element of the offense as defined in these instructions was

11  committed by some person or persons, and that the Defendant

12  voluntarily participated in its commission with the intent to

13  violate the law.

14         "For you to find either defendant guilty of aiding

15  and abetting an offense, you must be convinced that the

16  Government has proved each of the following beyond a reasonable

17  doubt:

18         "First:  That the offense of Interference with

19  Commerce by Robbery (for Count Two), Using, Carrying, or

20  Brandishing a Firearm During and in Relation to a Crime of

21  Violence (for Count Three), or Kidnapping (for Counts Four and

22  Five) was committed by some person;

23         "Second:  That the Defendant associated with the

24  criminal venture;

25         "Third:  That the Defendant purposefully participated

1  in the criminal venture of Interference with Commerce by

2  Robbery (for Count Two); or that the Defendant actively

3  participated in the offense of Using, Carrying, or Brandishing

4  a Firearm During and in Relation to a Crime of Violence (for

5  Count Three) with advance knowledge that a confederate would

6  use or carry a gun during the crime's commission; or that the

7  Defendant purposefully participated in the criminal venture of

8  Kidnapping (for Counts Four and Five); and

9       "Fourth:  That the Defendant sought by action to make

10  that venture successful.

11       "'To associate with the criminal venture' means that

12  the Defendant shared the criminal intent of the principal.

13  This element cannot be established if the Defendant had no

14  knowledge of the principal's criminal venture.

15       "'To participate in the criminal venture' means that

16  the Defendant engaged in some affirmative conduct designed to

17  aid the venture or assist the principal of the crime.

18       "'Actively participated' means that the Defendant

19  provided aid relating to some of a crime's phases or elements.

20       "'Advance knowledge' means that the Defendant knew

21  ahead of time -- at a time when he could have walked away --

22  that his accomplice was going to use, carry, or brandish guns

23  during the commission of the crime."

24       The rest of the instructions I will read after you

25  hear the lawyers' final arguments.

```
 1              All right.  Mr. De La Garza.
 2              MR. DE LA GARZA:  Thank you.
 3              (Pause)
 4              MR. DE LA GARZA:  May I proceed, Your Honor?
 5              THE COURT:  Yes.
 6              MR. DE LA GARZA:  Counsel, counsel.
 7                         CLOSING STATEMENT
 8   BY MR. DE LA GARZA:
 9              We've had four gunmen in this court.  We've had four
10   kidnappers in this court.  We've had four conspirators in this
11   court.  And you're looking at two of those four.
12              I think the evidence after the two days of trial has
13   convinced you that Mr. Anderson and Mr. Hatchett are guilty of
14   the five crimes they've been accused of.
15              I want to thank you in advance for all the work
16   you're going to put in in your deliberations.  Please take all
17   the time that you need to go through this evidence.  Go through
18   all the exhibits.  Go through the phone records.  Watch the
19   videos.  Look at the still shots.  Take your time.  Don't rush
20   this.  It's an important decision both for the Defendants and
21   for the Government.
22              You've heard the facts.  You've heard the testimony.
23   You've heard testimony of the people that are involved on
24   Government's Exhibit 20:  Mr. Jackson, Mr. Caldwell,
25   Mr. Pearson, Mr. Flanagan, Mr. Solomon, Mr. Aitch,
```

1   Mr. Thompson, Mr. Turner, Mr. Anderson, Mr. Cornelious,

2   Mr. Rashad, Ms. Scott, Mr. Hatchett, and Mr. Polk.

3            Some of these people were the gunmen in this robbery.

4   Some of these people were lookouts.  Ms. Scott drove up to pick

5   up the jewelry.  Some of these people are older men.  Some of

6   these people are younger men.

7            You heard testimony about the youngsters and older

8   men.  Most of the older men were the lookouts.  Most of the

9   younger men were the inside men with one exception, Jimmy

10  Hatchett.  He was one of the older men.

11           When you watch that video that's Government's

12  Exhibit 2, look at the difference in how the six younger men

13  move versus Mr. Hatchett.  That's an older man on that video.

14  And I don't say that with any offense to any older people on

15  the jury, but that's an older man.  He moves very differently

16  than the six younger men do.

17           You also see in that video glasses.  There's a glint

18  of a silver piece on those glasses.  And you've heard evidence

19  and seen evidence that Mr. Hatchett was wearing glasses that

20  day and wears glasses.

21           You also heard from Mr. Soni, the victim of this

22  robbery.

23           And this robbery is not in dispute.  How do we know

24  it's not in dispute?  Because it was captured on video,

25  Government's Exhibit Number 2.  Please take that back with you

1    and watch it.  Watch all the angles.

2          Mr. Soni told you that he was, on November 17th, in

3    his store; the men burst in there; they stole over $500,000.00

4    in gold from him.  He did not consent to this.  This is not

5    something he wished upon himself.  This is not something anyone

6    will wish upon themselves.

7          He told you his business dealt in foreign-bought

8    gold, interstate commerce.  He told you that he was forced on

9    the ground and bound with zip ties, that he was confined, he

10   was kidnapped.

11         Now, the Defendant who bound him, Treveon Anderson,

12   didn't do a very good job of binding Mr. Soni.  Mr. Soni got

13   out of the zip ties.  Mr. Patel took a little time.  But that

14   doesn't mean they weren't confined.  They were confined at

15   gunpoint, guns pointed inches from them.  And watch that video.

16   Those guns are inches from their backs when they're being

17   forced on the ground and being zip tied.

18         Why did they zip tie?  They zip tied because Mr. Soni

19   and Mr. Patel wouldn't put up a struggle, wouldn't run out of

20   the store and wave down police.

21         Now, fortunately for Mr. Soni and Mr. Patel and all

22   the employees in that store, the panic button had already been

23   pushed, but that doesn't change the fact they still were

24   kidnapped, Mr. Soni and Mr. Patel.

25         You also heard from Special Agent Jason Ibrahim about

1    the thorough investigation that he did, a four-year

2    investigation that ultimately located Mr. Anderson and

3    Mr. Hatchett.

4         You heard from Officer Barnes who brought you some of

5    the nuts and bolts of what the local agency working eventually

6    with the FBI did.  You saw some of the evidence.  He showed you

7    the vans.  He showed you the blood evidence that was used in

8    the investigation.  He showed you the bag.  There's a bag

9    that's been put into evidence you can see that matches the bags

10   that were used in the video.

11        Then we heard from two gunmen, two kidnappers, two

12   conspirators, the men that Mr. Anderson and Mr. Hatchett threw

13   in with.  Remember, they drove for over 12 hours.  The whole

14   robbery spanned more than 12 hours, but they drove up and back

15   from Houston to Dallas with these men, all 13 of them.  This is

16   the guys they threw in with, okay?  This is the guys that they

17   agreed to do this robbery with.

18        These men are criminals.  And when I say criminals, I

19   don't think you can use another word to better describe

20   Mr. Turner and Mr. Aitch.  Those men are criminals, undisputed.

21   But those are the men that Mr. Hatchett and Mr. Anderson

22   associated with.

23        And who better?  Are you going to pick choirboys,

24   priests, ministers to do a robbery with?  No.  You're going to

25   pick men like Mr. Aitch and Mr. Turner to do that robbery.  And

```
 1    you've heard of their criminal experience in doing it.  You
 2    heard all their prior -- prior convictions.
 3            You get to weigh their testimony.  Did it check in
 4    with the facts?  Did it jibe with what happened on the video?
 5    Did it jibe with the phone records?  Evaluate that.
 6            And you get to see all the documents they signed,
 7    their plea agreements, their proffer letters, their plea
 8    agreement supplements.  Look at those.  You can see all the
 9    agreements they have with the Government to testify.
10            And you heard frankly from them they want to get a
11    reduction in their sentences for coming here, okay?  So
12    evaluate that.  But think what they said.  Did it jibe with all
13    the facts you heard from Special Agent Ibrahim, from the video,
14    from Officer Barnes?  And I think it does.
15            You also heard from Special Agent Sedwick.  Special
16    Agent Sedwick told you about his cell phone analysis.
17            And Treveon Anderson's cell phone spoke for him,
18    didn't it?  It did.  It told us where he was.  He was in
19    Houston early morning 17th with Mr. Turner.  That's exactly
20    what Mr. Turner said.  They drove up all the way to Dallas.
21    Exactly what Mr. Turner said.
22            They did some preparation, stuff they talked about in
23    Houston, okay, buying supplies, stealing cars, you know, making
24    sure people were in the right place at the right time, getting
25    towards the store, looking for police, all the things they
```

1   discussed at the Gambling Shack.  That's the conspiracy.  They
2   planned, they plotted, they prepared for this.  The robbery is
3   the execution of that conspiracy.
4           Mr. Hatchett, his cell phone records, they show he's
5   talking to Mr. Aitch and Mr. Thompson.
6           Now, if you're friends with somebody before you do a
7   robbery with them, are you going to stop calling them
8   afterwards?  No.  Completely consistent.  You call them before;
9   you call them afterwards.  They're your friends.  They are the
10  guys you associate with.  They're the ones you hang out with.
11  They're the ones you do a robbery with.
12          Mr. Hatchett's Facebook also speaks for himself.
13  What does he say on his posting the night before?  He tells his
14  girlfriend, "I'm leaving out of town."  He doesn't say, "I'm
15  leaving out of town to go to a business convention, go to a
16  family reunion, go to a Cowboy's game."  He says, "I'm leaving
17  somewhere.  I'll be out of my misery if I don't come back."
18          Think about what he knew he was going to be doing in
19  that robbery.  He knew guns were going to be involved.  He knew
20  there was danger.
21          Mr. Turner told you in his testimony, he said, "when
22  the women were around the corner, I didn't go over there,
23  because I didn't know if they had a gun."
24          There was danger involved in this robbery, horribly
25  and terribly for the victims of it, but also for the men who

1  were involved in it.  They knew what they were doing.  They

2  knew the risks.  And Mr. Hatchett says that in the Facebook

3  posting.  "I'll be out of my misery."

4          Later that evening his Facebook posting shows some

5  money.  It's not, you know, $50,000.00, $100,000.00, but it's

6  money.  Where did he get that money from?

7          THE COURT:  Nine minutes.

8          MR. DE LA GARZA:  I think reasonable inferences tell

9  you that money was from the robbery.

10         I want to talk about a few things in the charge here.

11 On the kidnapping, you have to be unanimous in how the

12 kidnapping -- how you find a verdict on the kidnapping.

13         The Court's instruction says -- the first allegation

14 is the Defendants kidnapped A.S. or V.P.  The second is that

15 they seized them.  The third is that they confined them.

16         I think the evidence shows here they definitely

17 confined them.  They put zip ties on their wrists.  But you

18 have to be unanimous on that when you return your verdict.

19         Regarding the carrying, using, or brandishing a

20 firearm, the definition of brandishing is the Government must

21 prove the Defendant displayed all or part of the firearm, or

22 otherwise made the presence of the firearm known to another

23 person, in order to intimidate that person, regardless of

24 whether the firearm was directly visible to that person.

25         The video shows directly they brandished those

```
 1    firearms.
 2              Ladies and gentlemen, I think after you deliberate,
 3    take your time, look at the exhibits, you'll be confident in
 4    returning a verdict of guilty against Mr. Anderson and
 5    Mr. Hatchett.
 6              Thank you.
 7              THE COURT:  Mr. Martin?
 8              MR. MARTIN:  Yes, Your Honor.  May it please the
 9    Court.
10              THE COURT:  Yes, sir.
11              MR. MARTIN:  Able counsel for the Government, most
12    able Ms. Cindy Lee, helping us with all the documents -- just
13    leave it.  It's fine -- Ms. Lee, who helped us with the graphic
14    evidence and the various documents and other evidence that has
15    been crucial to this case.
16                         CLOSING STATEMENT
17    BY MR. MARTIN:
18              I want y'all to know that I recognize that y'all came
19    into this courtroom three days ago as strangers to one another
20    to sit in judgment on two other strangers.  I want you to know
21    that we appreciate you honoring your summons coming down here
22    to sit in essentially a form of involuntary servitude in
23    judgment of these two men.  The system does not work without
24    you.  Very important.  And we appreciate your service.
25              I'm going to ask you to base your verdict on three
```

1    things, that is, particularly, and maybe first and foremost,

2    the law that Judge Kinkeade gives you in these jury

3    instructions or what we commonly call the Court's charge.

4         Base your verdict on the law the Judge gives you, the

5    evidence that has been brought to you by either side, through

6    direct examination or cross-examination of any of the

7    witnesses, and, thirdly, the logical inferences and reasonable

8    deductions that can be made from that evidence.  If you do

9    that, you will have served well and no one can ask any more of

10   you.

11        It is my obligation at this time to submit to you

12   some of my thoughts and ideas pertaining to the evidence in

13   this case.

14        Crucially, in my view of the case, it's based on two

15   forms of evidence:  cell phone data and accomplice testimony.

16        I'm not going to beat this to death.  Y'all have

17   seen -- you've heard from good experts.  You've heard

18   pertaining to the cell phones, you've seen the video, and

19   you've heard from the accomplice witnesses.

20        With respect to the cell phone data, the computer

21   evidence, both of the experts to my recollection said we can

22   place the phone at the scene, but we don't know who's using it,

23   or words essentially to that effect.  And I want -- please

24   consider that when you're deliberating with respect to what

25   verdict you want to return in this case based on the evidence.

 1              The other thing I found more troubling is that it's

 2    based on accomplice witness testimony.  And I cannot think of a

 3    more powerful motive to be less than honest with the jury if

 4    you're trying to get a sentence reduction to spend less time in

 5    prison.  I don't care whether it's a month or six years or

 6    more.  It is the most powerful motive I can think of to be less

 7    than honest with the jury.

 8              And what is interesting -- these are my words, but it

 9    is also embodied in the jury instruction that Judge Kinkeade

10    has given you.  This is His Honor Judge Kinkeade, and this is

11    his document.

12              You will see on page 6 it says you should keep in

13    mind that such testimony, accomplice testimony, is always to be

14    received with caution and great care.

15              It's very suspect evidence.  Please analyze that,

16    talk about it among one another, but scrutinize their evidence

17    just like the Court is asking you or instructing you in these

18    jury instructions.

19              Simply put, the accomplices are just trying to sway

20    your -- sway your verdict at the cost of these two gentlemen,

21    particularly my client, Mr. Anderson.

22              The prosecution asks you to brand these men or

23    Mr. Anderson a criminal.  But first they owe an obligation to

24    you, and, that is, to prove their guilt to you beyond a

25    reasonable doubt to your satisfaction, because this is not a

 1    country in which you come into the courtroom, point the finger
 2    of accusation, and the axe falls.  To the contrary, you come
 3    into this Court and get due process.
 4            Judge Kinkeade has allowed due process, which just
 5    means fundamental fairness.  And I'm asking you to be fair to
 6    this man, be fair to the law, read the law, follow the Court's
 7    jury instructions.  No one can ask any more of you.
 8            With respect to the jury charge, the jury
 9    instructions, it is more than just a bunch of words.  Really
10    and truly, it's a precious document that has been based on an
11    accumulation of legal thinking, judges so forth and so on, for
12    over -- way over a hundred years.  It is a document that must
13    be scrutinely -- must be followed carefully, because if not, it
14    is trouble for all of us.
15            And once again, there is a common thread that runs
16    throughout the jury instruction:  presumption of innocence and
17    proof beyond a reasonable doubt.
18            When you go back to your verdict, you can say to
19    yourself, "I started this lawsuit with the understanding that
20    the Defendant is presumed to be innocent."  And I can read it
21    in the Court's charge.  Like I said, it's a common thread that
22    runs throughout the charge, throughout the jury instruction.
23    That -- you can also read that the burden of proof is on the
24    Government, and that never shifts throughout -- and it's
25    throughout the jury trial.

1           Really, this jury is a citizen of -- this is a group

2    of citizens from this community, and you are free and

3    authorized by charge of this Court, these jury instructions, to

4    return a verdict without fear or favor and to say to the

5    Government you owe us what the law says you owe us, and that's

6    proof beyond a reasonable doubt, because I will not act

7    without -- unless I can without hesitation.

8           All I'm asking is that you be reasonable with me.

9    That's all I've asked of any jury at any time.  And being

10   reasonable with me in this case, my opinion is find this young

11   man not guilty, because the law does not establish his guilt,

12   his presence at the jewelry store, beyond a reasonable doubt.

13          Thank you very much for your attention.

14          Thank you, Judge.

15          THE COURT:  Thank you, Mr. Martin.

16          Mr. Rogers?

17          MR. ROGERS:  Yes, Your Honor.

18          (Pause)

19          MR. ROGERS:  May it please the Court?

20          THE COURT:  Yes, sir.

21          MR. ROGERS:  Counsel for the Government, Mr. Martin.

22          MR. MARTIN:  Thank you.

23                       CLOSING STATEMENT

24   BY MR. ROGERS:

25          Ladies and gentlemen of the jury, early on the

1   morning of November 17, 2013, a group of people drove up from

2   Houston to the Metroplex in order to rob a jewelry store in

3   Irving.  I told you that on Monday that it wasn't in dispute.

4   What was in dispute is that Mr. Hatchett was there.  And at

5   this point the Government has not proved to you beyond a

6   reasonable doubt that Mr. Hatchett was there.

7            Three people left blood at the scene of that crime.

8   FBI agent sees this is on TV, calls the local police

9   department, says, "Hey, guys, you want some help?  I work

10  robberies for the FBI."

11           And a couple months later, they get a break in the

12  case.  There is a hit on the DNA from one of the blood samples.

13  That's in early 2014.  And that's when Afraybeom "Ray Ray"

14  Jackson was arrested, the first arrest made in this case.

15           Mr. Jackson comes in, talks to the Government.  The

16  investigation continues.  More arrests are made.

17           At first the other two people left blood at the scene

18  of the crime.  They are arrested.  They come in, investigation

19  continues, and eventually more people are arrested.

20           Eventually, we have 12 people arrested and indicted.

21           And then three and a half years after the first

22  arrest in this case, almost four years since the robbery

23  itself, Mr. Hatchett is arrested.  He's not found in hiding.

24  He's not on the run, things you might expect from someone who

25  has allegedly committed a robbery with 12 other people, all of

1    whom have been arrested at this point.  No.  He's just living

2    his life in Houston day-to-day, out in the open.

3           You heard Agent Ibrahim testify about the scope of

4    the investigation in this case and the length of the

5    investigation in this case, the number of agencies that were

6    involved:  the Irving Police Department, the Farmers Branch

7    Police Department, the Houston Police Department, task force

8    officers, at least three FBI agents, who knows how many FBI

9    analysts.  We're talking about mustering the resources of the

10   federal government and a lot of resources of the state

11   government as well, and they end up arresting Mr. Hatchett.

12          What do they have to show for it?  They have some

13   posts from Facebook.  They have a grainy photo from the video

14   of someone who is allegedly wearing metal-frame glasses.  They

15   have some cell phone records but not any location data.  And

16   they have the testimony of some snitches.

17          I talked to you on Monday about the types of evidence

18   that the Government was going to produce.  We talked about

19   reliable evidence.  And I told you it's reliable because

20   usually it's some sort of computer-generated report or record

21   of an event that occurred, whether that is Facebook or whether

22   that's a cell phone record.

23          But I also told you that that reliable data is

24   reliable only insofar as it tells us something actually

25   happened, but five years after the fact we can take that out of

1    context and sort of make it fit what story we want.  And that's
2    what happens in this case with both the Facebook records and
3    the cell phone records.

4         Agent Ibrahim showed you in his direct testimony that
5    around the three day -- the three days around the date of the
6    robbery that there were eight cell phone calls made between
7    Mr. Hatchett and two of the co-defendants.  And that sounds a
8    little bit suspicious, but when you stop and back up and look
9    at a little bit of a broader picture, over the 15 days for
10   which cell phone records were subpoenaed, there were 25 calls
11   between Mr. Hatchett and Hilton Aitch, and there were even more
12   calls -- there were 31 or 32 calls between Terrence Thompson
13   and Mr. Hatchett.  And now it seems a little bit less
14   suspicious that there were eight calls in three days.

15        And if you look at the even bigger raw data that
16   Agent Sedwick relied on in compiling his reports in
17   Government's Exhibit 21, which you'll get to look at, you'll
18   see that over a two-month span, in November and December of
19   2013, Mr. Thompson and Mr. Hatchett talked.  Probably there are
20   more than a hundred calls between them.  And there are almost
21   that many between Mr. Hatchett and Mr. Aitch.  And now it
22   really doesn't seem suspicious at all, because now you're
23   talking about guys from the same neighborhood who have known
24   each other for decades.  Taken out of context, it seems
25   suspicious.

1          Mr. de la Garza said you're going to keep calling
2    people that you know before and after a robbery.  Of course
3    you're going to do that.  Well, I hope nobody ever gets my cell
4    phone records after somebody that I know commits a crime
5    because they've been calling me before and after the crime.
6    That's just weak.  That's not proof of anything.
7          And that, ladies and gentlemen, is really ignoring
8    the elephant in the room.
9          Ms. Lee, could I get Government's Exhibit 40, page
10   Number 4?
11         We have location data for most of the guys in the
12   indictment.  We don't have it for Mr. Hatchett.  And the only
13   answer we got in that regard was, well, it was just too long
14   ago, T-Mobile doesn't keep their records for that long, or they
15   didn't back then.  T-Mobile didn't keep their records for that
16   long back then.
17         Well, look up here and you see that Xavier Ross,
18   provider T-Mobile; Hilton Aitch, provider T-Mobile; Ray Ray
19   Jackson, provider T-Mobile; Slim, Terrence Thompson, provider
20   T-Mobile.  We've got location data for those guys.
21         And speaking of taken out of context, you heard Agent
22   Sedwick say this morning in his cross-examination that he
23   wasn't asked to get anything other than those three days
24   surrounding the robbery as far as cell phone data.  And there
25   is no allegation of Mr. Hatchett being in contact with any of

1    the other co-defendants.  But we've got four guys with location

2    data here who have T-Mobile.  Mr. Hatchett has T-Mobile, no

3    location data.

4           Ms. Lee, could I get Government's Exhibit 27, please?

5           I'm sorry.  27.

6           MS. LEE:  Yes, sir.  Would you like to have that

7    spreadsheet we looked at this morning?

8           MR. ROGERS:  It's not the spreadsheet.  It's actually

9    just the letter.

10          I think this is 28.  This is 28.

11          (Pause)

12          MR. ROGERS:  It's going to be that third document,

13   Hatchett subscriber info.

14          If you can zoom in right here.

15          Here we have -- it says date, May 30, 2015.

16          "In response to your subpoena dated March 31, 2015."

17   And these records are returned May 30, 2015.  That seems pretty

18   early on in this investigation, but still we don't have cell

19   phone records -- we don't have any cell phone location data for

20   Mr. Hatchett.  That's a long time.

21          And then we have taken out of context the Facebook

22   records.

23          Ms. Lee, could I get Defense Exhibit 103, please?

24          (Pause)

25          MR. ROGERS:  We have a bag of money with a hundred

1      dollar bill on top.  So we're talking about a robbery that you

2      heard yesterday resulted in more than half a million dollars in

3      stolen jewelry that was fenced for $240,000.00 in cash.  And

4      these are the proceeds in a perfume bag from Victoria's Secret?

5              The Government says, well, this was posted the night

6      of the robbery.  This must be Mr. Hatchett's proceeds.

7              Okay.  And then they ask you to consider that in

8      connection with the Facebook conversation that's been

9      referenced.

10             Could I get Government's Exhibit 47, please?

11             Actually, could I go up -- I want to go up just a

12     little bit, not focus on that part right there.  It's going to

13     be on the second page.

14             (Pause)

15             MR. ROGERS:  Can we focus in on that top paragraph,

16     please?

17             Okay.  So this is still universal time, which is six

18     hours past where we're at, so this is still at 7:00 the day

19     before the robbery.

20             "I asked you before to let me go in peace, why you

21     chose to drag me I don't know.  You know what I'm going through

22     yet you hurt me still.  I waited all day for you to go to this

23     room I rented and to give you your gift," the same gift that

24     the Government says he didn't give until after the robbery.

25             So they want you to look at part of this

1    conversation, saying, "I'm leaving town."  And even there, you

2    have to assume a lot of things to think that means he did this

3    robbery.  You have to infer that he actually left town, that he

4    actually left Houston, that he actually went to Dallas, that he

5    went to Dallas in order to commit this robbery.  But they're

6    going to ignore the part where the gift [sic] says, "I had this

7    gift the day before."  That's the bag of money.

8                And then there's no forensic evidence that puts

9    Mr. Hatchett there.  So, instead, we have a grainy still photo

10   of somebody from the video that looks like they're wearing

11   glasses with a metal frame.  And they put that up next to a

12   photo of Mr. Hatchett, another Facebook photo with no date, we

13   don't know where it was taken or by whom, but it's a photo of

14   Mr. Hatchett with glasses with metal frames.

15               Because apparently if you have glasses with metal

16   frames at some point in your life, that's the only glasses you

17   have ever had, because nobody would ever have more than one

18   pair of glasses because they don't want to wear black glasses

19   with a blue suit or they don't want to wear brown glasses with

20   a charcoal suit or maybe some days they wear their contacts

21   because their allergies aren't bothering them.

22               They've got a photo of two people wearing glasses,

23   and that's what they say puts Mr. Hatchett at the scene of the

24   crime.

25               So when I talk about reliable evidence, it's reliable

```
 1    only insofar as that we know these things may have actually
 2    happened.  But taken out of context, it can sort of fit
 3    whatever story you want it to fit.
 4              And talking about stories, that's the other type of
 5    evidence they brought, suspect evidence.  And in this case,
 6    boy, was it ever suspect.
 7              You heard a couple of guys get up on the stand,
 8    co-defendants who are here to help themselves.  They say
 9    they're here to tell the truth, but we know they're here to
10    help themselves.  Because what do these guys know about the
11    truth?
12              You heard about their criminal convictions.  You
13    heard about their tendencies over a period of multiple years
14    really, because you've got one guy with juvenile crimes, so his
15    entire life.  You've got Mr. Aitch, who was convicted and
16    sentenced to 45 years in 1991.  So that's going on for almost
17    30 years.
18              They have tendencies throughout their lives to put
19    themselves in front of others and try and take advantage of
20    others.  But here all of a sudden they're here to tell the
21    truth.
22              They have shown repeatedly that they can't follow the
23    Government's instructions because they can't follow the law.
24    But now they've had a change of heart.  "Now I can follow the
25    Government's instructions and just tell the truth.  I'm just
```

1    hear to tell the truth.  I only want to tell the truth."  Come

2    on, you want your sentence reduced.  You want to continue your

3    pattern of what you've always done, which is put yourself above

4    others, whatever it takes, in order to get a benefit for

5    yourself.

6             And then they say, "Well, I just -- I hope maybe the

7    Judge will consider that."  Come on, that's not a fringe

8    benefit; that's the reason you're here.

9             Hilton Aitch lied to you on the stand.  You heard

10   Agent Ibrahim say his investigation showed that Hilton Aitch

11   was one of the ringleaders of this.  And then Hilton Aitch gets

12   up and says, "Oh, Ricky Polk called me to talk about this.  He

13   told me about the jewelry store, and this was his idea, and

14   he's the one who took care of the guns."  Come on, Mr. Aitch.

15            And then -- that's because Ricky Polk is deceased and

16   Ricky Polk can't tell a different story.

17            And then Hilton, that's the same guy who said, "I

18   don't know if I've ever been arrested for a crime involving

19   dishonesty."  And that's just minutes after he sat there and

20   told us that he had already pled guilty to this charge of

21   robbery.  Robbing somebody is dishonest.  You're taking

22   something that doesn't belong to you, and in this case you're

23   taking it by yourself.

24            Hilton hasn't been charged with kidnapping.  He

25   hasn't been charged with lying to a federal agent.  He hasn't

1    been charged with being a felon in possession of a firearm, all

2    charges, by the way, on which the statute of limitations has

3    not run.  So for Hilton to come in say, "I've already been

4    sentenced.  I'm not really going to get much benefit from this,

5    because I've already gotten my sentence reduction" -- come on.

6    He's got all sorts of exposure.  Hilton Aitch was here to help

7    himself.

8            And then they've got Anthony Turner who told you he

9    smoked marijuana on a daily basis.

10           THE COURT:  You've got a couple of minutes.

11           MR. ROGERS:  How long, Judge?

12           THE COURT:  A couple of minutes.

13           MR. ROGERS:  Thank you, Judge.

14           Anthony Turner smoked marijuana on a daily basis.

15   That's in addition to his other drug habits, abusing

16   prescription drugs.  He told you but it didn't have any

17   effect -- it didn't affect his memory and he wasn't under the

18   influence of those drugs on that night.  Even though he woke up

19   that morning and smoked marijuana from the time he woke up

20   until 8:00 p.m., didn't have any effect.

21           It had an effect on his memory, because I had to

22   remind him that when he talked to the probation officer in this

23   case, he said, "Yeah, I was under the influence."  But now he

24   gets on the stand and says, "Oh, no, I wasn't under the

25   influence," because he wants you to think his memory is

1    working.

2              He also gets up and says, "Yeah, I said I about 80

3    percent recognized Jimmy."  And it wasn't until today that it

4    was 100 percent sure for the first time that this was actually

5    Jimmy.  Of course, now that he's in court and he knows what the

6    stakes are, that's the day he's going to say it's 100 percent

7    sure he's Jimmy.

8              And then he tells you that he cuffed 14 pieces of

9    jewelry.  Everybody was cuffing jewelry.  Cuffed 14 pieces.

10   That's 14 times he lied and stole and cheated from guys that he

11   threw in to lie and cheat and steal with.

12             Everybody is looking out for themselves, he says.

13   Well, of course, just like him and Hilton Aitch.

14             These guys met with the Government multiple times

15   during the course of this investigation, and still they

16   couldn't get their story straight.

17             You have Mr. Turner saying, "I rode up from Houston

18   with Jimmy."

19             You have Mr. Aitch saying, "I rode up with

20   Mr. Turner, but Jimmy wasn't there."

21             You have Mr. Turner saying, "Afterwards we stopped to

22   put jewelry in Ms. Polk's car" -- I'm sorry, "in Vanlisa's car.

23   We stopped to put jewelry in there.  We stopped at a gas

24   station."

25             Hilton Aitch says, "No, we stopped at a Whataburger."

1          You heard Mr. Turner say these guys were housed

2     together in Seagoville.  It's a lot of time they've been

3     sitting there while this case is being investigated to talk

4     about their case and get their story straight.

5          After the Judge has read you -- the Judge has already

6     read us the jury charge.  You're going to go back and

7     deliberate.  I want you to think about those things.  Think

8     about the lack of location data for the cell phone for

9     Mr. Hatchett.  Think about how there's no forensic evidence.

10    Think about how that Facebook message, that photo, were taken

11    out of context and seem to contradict one another.  And I want

12    you to think about the inconsistencies and the testimony from

13    two convicted felons who are here to help themselves out.

14         And then I want you to remember what I told you on

15    Monday, that the Government was going to have to change your

16    mind on this case, that Mr. Hatchett is innocent unless the

17    Government proves to you, and that proof must be beyond a

18    reasonable doubt.  And the Government just didn't get there,

19    because it turns out reliable evidence is not always so

20    reliable, and the suspect evidence in this case was just as

21    suspect as I told you it would be.

22         We heard from one victim in this case, Mr. Soni.  And

23    he said this was a terrorizing event.  And then we've got two

24    more guys in here, two co-defendants in here who robbed

25    Mr. Soni, and they're in here to rob again.  They're trying to

 1    rob society of the sentences that they got when they were

 2    convicted by getting credit for time that they don't deserve,

 3    credit that they don't deserve.  They're trying to rob

 4    Mr. Hatchett of his freedom by putting him behind bars, by

 5    trying to put him at the scene of that crime.

 6            Don't let these men rob us.  Don't let these men

 7    continue to terrorize our justice system.  Find Mr. Hatchett

 8    not guilty.

 9            THE COURT:  Mr. Junker?

10            MR. JUNKER:  Yes, Your Honor.

11            (Pause)

12            MR. JUNKER:  May it please the Court.

13            THE COURT:  Yes, sir.

14            MR. JUNKER:  Respected defense counsel.

15                        CLOSING STATEMENT

16    BY MR. JUNKER:

17            Members of the jury, one of the reasons I like my job

18    is because all we have to deal with is the truth, and the truth

19    is simple.  The truth fits the facts.  You don't have to make

20    it and squish it in there to get it to go right.  You just --

21    it just works because it's exactly what happened, whereas lies

22    are the things that have to be fit together with everything to

23    make it work.

24            And the simple truth here is that those two men were

25    gunmen in this takeover-style jewelry store robbery.  They

1    conspired with the other men to come up from Houston to go into
2    that store, to zip tie the owners, and take as many jewelry --
3    as much jewelry as they possibly could.

4           And they didn't just take the guns in there and carry
5    them.  They stuck them in their face and threatened them with
6    the guns to get them to get down on the floor and to zip tie
7    them.  And that's important when you go back there to make your
8    decision.  This is not a case where they're simply carrying
9    guns, using guns; they're actually sticking them in their face.
10   And you'll see that on the verdict form.

11          Let's talk about Treveon Anderson.  Treveon Anderson,
12   you heard, was recruited by Anthony Turner to join this
13   conspiracy to participate in this robbery.

14          Now, you're going to hear -- you heard arguments
15   that, well, you know, both these men that came in and
16   testified, Mr. Turner and Mr. Aitch, have a powerful motive to
17   lie.  Granted.  And we've also told you, and everyone agrees,
18   that they're definitely criminals.

19          But the problem here is the phone companies don't
20   care.  The phone companies don't care what the defense says.
21   They don't care what the Government says.  That is the most
22   objective evidence you have in this case.  And it's not mere
23   accident that those phone records confirm everything that
24   Mr. Aitch and Mr. Turner told you about their participation in
25   this robbery and kidnapping.  That's not accident.  That is

1    confirmation of everything that they told you from the stand as

2    far as the important points of who was involved in the robbery,

3    when they came up.

4              This isn't something where people are coming up

5    coincidentally at the same time from Houston to Dallas at 3:00

6    a.m. in the morning.  All these guys rode into town together.

7    They all came up together.

8              And it's not a coincidence that Mr. Anderson's phone

9    was turned off from 9:00 a.m. to 12:00 p.m. at the time that

10   all the vans were being stolen and the robbery is taking place,

11   and then suddenly it gets flipped back on at mid -- at noon,

12   excuse me.

13             But, instead, what are you brought?  You're brought

14   basically an equivalent of "where's Waldo?" for cell phones.

15             Does it really sound credible that the phone went up

16   to Dallas but the person didn't?  Is that what we're supposed

17   to believe?  It makes no sense.

18             Let's talk about Mr. Hatchett and things being taken

19   out of context.  First of all, there is nothing wrong that

20   Agent Ibrahim didn't arrest Mr. Hatchett until three-and-a-half

21   years later.  It was a careful investigation.  It was

22   painstakingly put together.

23             That's the kind of agent that you want out there

24   working.  You don't want somebody that jumps the gun.  You want

25   somebody that puts everything together until there's enough to

1    make an arrest, to bring it into court and to prove it beyond a

2    reasonable doubt.  And I submit to you that's what's happened

3    in this case.  And the fact that the phone records don't have

4    location data for Mr. Hatchett doesn't mean that he gets a

5    bonus.

6            And talking about taking things out of context, sure,

7    there were other phones from T-Mobile that we had location data

8    for, but as you heard from that stand repeatedly, different

9    people were arrested at different times.

10           There were people who were known very early on, as

11   defense counsel told you, because of DNA testing.  Sure, we got

12   those phone records earlier than we got the other ones.  And by

13   the time Mr. Hatchett was identified, there wasn't a way to get

14   the cell tower records, because T-Mobile didn't keep them for

15   more than a year at that time.

16           And if you want to look at the date on that return

17   for the subpoena for Mr. Hatchett's records, you'll see it's

18   well past a year from the date of the robbery.

19           You had Mr. Hilton Murdock Aitch, a man who's known

20   Mr. Hatchett for 20 years, come into court and say, "That's the

21   man that did this robbery with me.  That is one of the people

22   that was recruited to come in and conspire to do the robbery

23   and the kidnapping."

24           And what are we supposed to assume?  Okay.  So we

25   gave you three days' worth of phone records, highlighted with

1    the relevant portion of time around the robbery.  And now you

2    know that they also had contact earlier.  What does that prove,

3    except that they actually had contact during the planning

4    stages of the robbery and the fact that they had contact

5    afterwards when the material was being fenced and the

6    distributions were being made.

7            And is it surprising really that they're friends?  I

8    mean, who are you going to conspire with, perfect strangers or

9    somebody you're comfortable with?

10           And do you think it's mere happenstance or

11   coincidence that he happens to be on the phone with Terrence

12   Thompson, who you heard from the stand was one of the other

13   main planners of this robbery, and Hilton Aitch, again, who is

14   also a planner of the robbery or a main participant?

15           I talk to you about taking things out of context.

16   Just because Hilton Aitch testified from that stand that Ricky

17   Polk also had a role and went and got guns and was the person

18   that brought this -- this location to him as a possible robbery

19   target, is that in any way Hilton Aitch saying, "No, I wasn't a

20   leader or organizer in this robbery"?

21           Is that the best they've got?  This is a very simple

22   case.  It requires important decisions to be made by you, but

23   it is still a very simple, straightforward case.

24           This is not a case of guilt by association.  This

25   isn't an association of guilt.  The sole purpose for these

1    people to be contacting each other and working together on this

2    is to complete this robbery and this kidnapping.

3              Let's also talk about things taken out of context

4    when it comes to the Facebook records.

5              Even if you put aside the phone records for

6    Mr. Hatchett, you still have him saying, "I'm going out of

7    town.  And if things don't work out, I may not be coming back

8    but at least I'll be out of my misery."

9              But if you look at those phone records -- excuse me,

10   the Facebook records, you will also see that when he says that

11   he waited around in some hotel room for Cheryl Austin, she

12   accused him of lying.  There's no confirmation in those that he

13   was in Houston that day or thereafter.

14             And, again, talking about things --

15             MR. LUND:  Objection.  Shifting the burden of proof,

16   Your Honor.

17             THE COURT:  Overruled.

18             MR. JUNKER:  As to the evidence, let's also talk

19   about things taken out of context.

20             I apologize to the Court, to you folks, and to

21   defense counsel regarding the technical difficulties we've had

22   with photos in this courtroom.  That's on me.  That's my fault.

23   But you've got the originals.  You'll be able to look at them

24   when you go back to the courtroom [sic].  You look at the

25   photos of the bag of money.  That's not just a one hundred

 1    dollar bill laying on top.  If you look at that carefully,
 2    that's not a one hundred dollar bill snugly fit in a small bag.
 3    You can see other money underneath it.
 4             And coincidentally, apparently, the stars align, the
 5    moons came together, and all of a sudden Mr. Hatchett has all
 6    that money not just after the robbery but also after the time
 7    period where they would have made the first contact with a
 8    fence to get money for the robbery.
 9             And he doesn't say, "What do you get your girlfriend
10    for her birthday?  A hundred dollar bill."  He says, "A bag of
11    money."
12             So even he acknowledges when he posted it on Facebook
13    it is a bag of money.
14             Then you have the matter with the eyeglasses.  You've
15    go an agent that focused on the video, watched it very
16    carefully, and also noticed that there were Facebook photos
17    showing that man wearing glasses that had a metal piece at the
18    same location as one of the robbers, that is also identified by
19    his co-conspirators as having been at the robbery scene.  And
20    yet now it's again supposed to be coincidence?  That's not
21    coincidence.  That's confirmation of his presence at the
22    robbery scene.
23             This case was carefully put together to prove it
24    beyond a reasonable doubt, and what we ask you folks to do is
25    to take your time, be comfortable with your decision.  But

```
 1    we're asking you to render the only decision that is consistent
 2    with the facts, the only one consistent with the law, and the
 3    only one that's consistent really with what's right to do in
 4    this case, and, that is, a verdict of guilty for both
 5    defendants on all counts.
 6              Thank you.
 7              THE COURT:  All right.  Ladies and gentlemen, I left
 8    a phrase out, and it was an important phrase.
 9              Go back on page 2 of what you've got in the first
10    paragraph under "Burden of Proof," first paragraph, where it
11    says, "The law does not require the Defendants to prove their
12    innocence or produce any evidence at all."  I left a phrase
13    out, and it's a critical phrase.  "And no inference whatever
14    may be drawn from the decision of a defendant not to testify."
15    So I'm adding that in.
16              You will actually get -- this is the document.  I'm
17    not going to change all 13 pages that came to you.  But this
18    will be in the actual document you will get, which will be the
19    charge that you will work from.  So I want to make sure you
20    look at that page and see that with regard to that.
21              Now, back -- turn back to the "Post Argument
22    Instructions," which are on page 25.
23              "To reach a verdict, whether it is guilty or not
24    guilty, all of you must agree.  Your verdict must be unanimous
25    on each count of the Fifth Superseding Indictment.  Your
```

1    deliberations will be secret.  You will never have to explain

2    your verdict to anyone.

3            "It is your duty to consult with one another and to

4    deliberate in an effort to reach an agreement if you can do so.

5    Each of you must decide the case for yourself, but only after

6    an impartial consideration of the evidence with your fellow

7    jurors.  During your deliberations, do not hesitate to

8    reexamine your own opinions and change your mind if convinced

9    that you were wrong.  But do not give up your honest beliefs as

10   to the weight or effect of the evidence solely because of the

11   opinion of your fellow jurors, or for the mere purpose of

12   returning a verdict.

13           "Remember at all times, you are the judges -- judges

14   of the facts.  Your duty is to decide whether the Government

15   has proved that the Defendant is guilty beyond a reasonable

16   doubt.

17           "In a few minutes, I will send you to the jury

18   deliberation room with this charge and the exhibits the Court

19   has admitted into evidence.  When you go to the jury room, the

20   first thing that you should do is select one of your number as

21   your foreperson, who will guide your deliberations and will

22   speak for you here in the courtroom.  Do not deliberate unless

23   all of you are present in the jury room.  In other words, if

24   two or more of you go to lunch together or are together outside

25   the jury room, do not discuss the case.

1          "A verdict form has been prepared for your

2    convenience.  The foreperson will write the unanimous answer of

3    the jury in the space provided for in each count of the Fifth

4    Superseding Indictment, either guilty or not guilty.  At the

5    conclusion of your deliberations, the foreperson should sign

6    and date -- date and sign the verdict.

7          "If you need to communicate with me during your

8    deliberations, the foreperson should write the message and give

9    it to the Court Security Officer.  I will either reply in

10   writing or bring you back into the court to answer your

11   message.

12         "Bear in mind that you are never to reveal to any

13   person, not even to the Court, how the jury stands, numerically

14   or otherwise, on any count of the Fifth Superseding Indictment,

15   until after you have reached a unanimous verdict.

16         "So ordered.

17         "Signed," today, "October 24, 2018."

18         And then the verdict forms are attached behind that.

19   You will see that.

20         And it reads first with regard to Mr. Anderson in

21   Count One, conspiracy to interfere with robbery, either guilty

22   or not guilty.

23         Count Two.  Interference with commerce by robbery,

24   either guilty or not guilty.

25         Count Three.  Using, carrying, or brandishing a

1    firearm during and in relation to a crime of violence.

2             And then it's broken down.

3             "Do you find the Defendant brandished, or aided and

4    abetted another person in brandishing, a firearm during the

5    commission of the offense?"  Guilty or not guilty of the

6    offense charged.

7             "And if you answered 'not guilty' in the previous

8    brandishing question, do you find that the Defendant used or

9    carried, or aided and abetted another person in using or

10   carrying, a firearm during the commission of the offense?"

11            And you will either put guilty or not guilty of the

12   offense charged.

13            And then kidnapping, guilty or not guilty.

14            And Five, kidnapping, guilty or not guilty.

15            And it will be signed by the Presiding Juror.

16            And Jimmy Hatchett, it's exactly the same form, just

17   with regard to Mr. Hatchett.

18            So go back now in the jury room and begin your

19   deliberation.  I'll send the charge back in a brief moment.

20            And, Mr. Anderson, if you -- Mr. Anderson, if you'll

21   remain here in the courtroom.

22            You haven't done anything wrong.  You're the

23   alternate juror, and you won't be able to deliberate, but I

24   never tell jurors that until the very last minute.  It's just

25   what the law is.

1           So I didn't want y'all to think there was anything

2    wrong with Mr. Anderson.  He'll just get to go -- to leave at

3    this time.

4           So I'll talk to you just a minute by yourself, and

5    then everybody else go back in the jury room.

6           Mr. Anderson, if you'll come right up here.

7           Thank y'all very much.

8           SECURITY OFFICER:  All rise.

9           (Jury out at 11:43)

10          THE COURT:  Okay.  All right.  Let's bring the jury

11   in.  We've got a verdict -- verdicts.

12          (Pause)

13          SECURITY OFFICER:  All rise for the jury.

14          (Jury in)

15          THE COURT:  All right.  Y'all be seated.

16          Mr. Neber, did the jury reach a verdict?

17          PRESIDING JUROR:  Yes, Your Honor.

18          THE COURT:  Mr. Neber, you're the foreman, right?

19          PRESIDING JUROR:  Yes, sir.

20          THE COURT:  Okay.  I'm reading the verdict of the

21   jury.

22          "We, the Jury, find the Defendant Treveon Dominique

23   Anderson:

24          "Count One:  Conspiracy to Interfere with Commerce by

25   Robbery, guilty of the offense charged.

Todd Anderson, RMR, CRR     (214) 753-2170

1           "Count Two:  Interference with Commerce by Robbery,

2     guilty of the offense charged.

3           "Count Three:  Using, Carrying, or Brandishing a

4     Firearm During and in Relation to a Crime of Violence."  And

5     they did find him guilty of brandishing, aiding, and abetting

6     another person in brandishing, a firearm during the commission

7     of the offense, guilty of that.  So the second part didn't need

8     to be answered.

9           Count Four:  Kidnapping, found him guilty of that in

10    Count Four.

11          And in Count Five, guilty of kidnapping.

12          And signed today, 24th of October, 2018, by Mr. Peter

13    Neber, foreperson of the jury.

14          If that's the unanimous verdict on each count, each

15    and every one of the jurors raise your right hand.

16          Let the record reflect each and every one of the

17    jurors raised their right hand, reflecting that is their

18    unanimous verdict.

19          With regard to the United States of America versus

20    Jimmy Hatchett, "We, the Jury, find the Defendant Jimmy

21    Hatchett, in Count One, Conspiracy to Interfere with Commerce

22    by Robbery, guilty."

23          "Count two:  Interference with Commerce by Robbery,

24    guilty."

25          "Count Three:  Using, Carrying, or Brandishing a

1     Firearm During and in Relation to a Crime of Violence."  And

2     they found him -- it said, "Do you find the Defendant

3     brandished, or aided and abetted another person in brandishing,

4     a firearm during the commission of the offense?"  Found him

5     guilty of that.

6          Didn't have to answer the second half.  That was all

7     under Count Three.

8          Under Count Four, kidnapping, found him guilty of

9     that.

10          And in Count Five, guilty of kidnapping.

11          Signed the 24th day of October, 2018, that's today,

12     here in Dallas, signed by Peter Neber, Presiding Juror.

13          If that's the unanimous verdict of each and every one

14     of the jurors, raise your right hand.

15          I do receive and accept your verdicts.

16          Thank you.  Put your hands down.

17          Let the record reflect each and every one of the

18     jurors raised their right hand with regard to both of those,

19     that there being unanimous verdicts as to each count in finding

20     each of the Defendants guilty on each count.

21          I do receive and accept your verdict, and you are

22     discharged.

23          Thank you very much for being here.

24          You don't have to come back until you get another one

25     of those little notices in the mail.

1              I can't thank you enough.  It didn't take a long
2   time, but it's critical and it's important to our system that
3   folks like you take out of your normal lives and, you know, set
4   aside everything going on and being -- come down here and be
5   willing to be part of that.  And you would want that if you
6   were involved in a case, and so it's important to do it.
7              I hope we didn't abuse your time too much.  You have
8   been very good listeners, and I appreciate your time here.
9              I hope that you have a wonderful Thanksgiving coming
10  up and other holidays coming up, Christmas and Hanukkah and
11  Kwanza and the other holidays that are all coming up and --
12  that's right.  I think that's all that I know about.
13             But y'all really have done a great service.  And
14  isn't it unique to see folks from all different walks of life
15  become a part of that.  That's a great thing to see in our
16  system.
17             I will come back there in a minute if y'all have
18  questions.  You don't -- it will just be a minute before I come
19  back there.
20             And then if you want to ask me questions, those that
21  I can answer, I will; and if I can't, I will not do that.
22             But I don't -- you won't hear from anybody else
23  unless I give them permission.  And nobody has requested that
24  yet.
25             So thank y'all very much, and I appreciate it.  And

1    if you'll wait back there, I'll be back there in about two

2    seconds.

3              Thank you very much.

4              SECURITY OFFICER:  All rise.

5              (Jury out)

6              THE COURT:  Okay.  The presentence report on each of

7    your cases will be due January 9, 2019.

8              Written objections will be due January 23, 2019.

9              And after those, if there are objections made, the

10   Probation Office must disclose any addendum by January the

11   30th, 2019.

12             And any written objections to the addendum must be

13   filed by February 6, 2019.

14             Your sentencing, each of you, is scheduled for

15   9:30 a.m. on Wednesday, February 13, 2019.

16             And you have rights to appeal.  Your lawyers will go

17   over that with you.  And if, I'm assuming, you still need me to

18   appoint appellate lawyers, then I will do that at that time.

19             Is there anything else you need to put in the record,

20   Mr. Lund?

21             MR. LUND:  I would ask if the Court is willing for us

22   to speak to the jurors.

23             THE COURT:  Let me ask them if they want to, okay?

24             MR. LUND:  I understand, Your Honor.  Thank you.

25             THE COURT:  All right.  Anything else?

1          MR. MARTIN:  No.  No, Your Honor.

2          THE COURT:  Anything else from the Government?

3          MR. JUNKER:  No, Your Honor.

4          THE COURT:  Okay.  All right.  Well, I'll ask them

5    right now.

6          Thank y'all.

7          Stay on top of the appellate timelines, okay?

8          Thank y'all.

9          (Jury trial adjourned at 12:58)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                                  INDEX

 2                                                           Voir
                        Direct   Cross   Redirect   Recross   Dire
 3
      WITNESS FOR THE
 4    GOVERNMENT

 5    MARK SEDWICK                    3

 6
      Government rests........................................ 23
 7
      MOTION:  Mr. Lund....................................... 23
 8
      MOTION:  Ms. Hill....................................... 25
 9
      Admonitions............................................. 32
10
      Objections to the Court's Verdict Form.................. 33
11
      Defendant Anderson rests and closes..................... 37
12
      Defendant Hatchett rests and closes..................... 37
13
      Government closes....................................... 37
14
      MOTION:  Mr. Lund....................................... 38
15
      MOTION:  Mr. Martin..................................... 38
16
      Court's Charge read.................................. 39,92
17
      CLOSING STATEMENT:  Mr. De la Garza..................... 61
18
      CLOSING STATEMENT:  Mr. Martin.......................... 68
19
      CLOSING STATEMENT:  Mr. Rogers.......................... 72
20
      CLOSING STATEMENT:  Mr. Junker.......................... 85
21
      Verdicts................................................ 96
22

23

24

25
```

1          I, TODD ANDERSON, United States Court Reporter for the

2     United States District Court in and for the Northern District

3     of Texas, Dallas Division, hereby certify that the above and

4     foregoing contains a true and correct transcription of the

5     proceedings in the above entitled and numbered cause.

6          WITNESS MY HAND on this 10th day of July, 2019.

7

8

9
                                    /s/Todd Anderson
10                                  TODD ANDERSON, RMR, CRR
                                    United States Court Reporter
11                                  1100 Commerce St., Rm. 1625
                                    Dallas, Texas  75242
12                                  (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25